## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL W. HILL,

|  |  |
|---|---|
| Plaintiff, | Civil Action No. 03-323E |
| v. | Judge McLaughlin<br>Magistrate Judge Baxter |
| JOHN J. LAMANNA, et al., | *(Electronic Filing)* |
| Defendants. | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S FIFTH AMENDED COMPLAINT, OR IN THE ALTERNATIVE, <u>FOR SUMMARY JUDGMENT</u>

AND NOW, come the Defendants, John J. LaManna, William Collins, Marty Sapko, Deborah Forsyth, Stephen Housler, Robert Klark, Robert Reome, and Beth Fantaskey (hereinafter collectively referred to as "Defendants"), and the United States of America ("United States") by and through their attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, Christy Criswell Wiegand, Assistant United States Attorney for said district, and Douglas S. Goldring, Assistant General Counsel for Federal Prison Industries, Inc., and respectfully request that the Court dismiss Plaintiff's Fifth Amended Complaint pursuant to Fed. Rule Civ. Pro. 12(b)(6). In the alternative, Defendants request that the Court grant summary judgment in favor of Defendants pursuant to Federal Rule of Civil Procedure 56.

## I.    INTRODUCTION

Plaintiff Hill, a federal inmate, has brought a <u>pro se</u> action styled after the type recognized by the Supreme Court in <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971). Plaintiff's claims generally relate to dental care he received

while incarcerated at the Federal Correctional Institution in McKean, Pennsylvania, ("FCI McKean") and alleged hazardous work conditions at his UNICOR assignment.  Plaintiff also asserts a negligence claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680.

As relief, Plaintiff seeks: (1) unspecified compensatory damages from each individual Defendant and the United States; (2) unspecified punitive damages from each individual Defendant (2) reasonable attorney's fees, costs, and interest; and (3) such other relief as the Court deems proper and just.  For the reasons that follow, the Court should dismiss Plaintiff's Fifth Amended Complaint or, in the alternative, grant summary judgment in favor of the Defendants.

## II.    PROCEDURAL BACKGROUND

Plaintiff filed his original Complaint in this action on or around December 3, 2003.  See Docket Number 5.  On February 13, 2004, the United States Attorney for the Western District of Pennsylvania was served with Plaintiff's original Complaint.  See Docket No. 17.  On April 29, 2004, Plaintiff filed a Notice to Amend Complaint, together with an Amended Complaint.  See Docket No. 24.  On June 7, 2004, Defendants filed a Motion to Dismiss Plaintiff's Amended Complaint, together with Exhibits and a Brief in Support thereof.  See Docket Nos. 29-30.

On August 2, 2004, Defendants received from Plaintiff the following documents: (1) A Brief in Opposition to Defendants' Motion to Dismiss Plaintiff's Amended Complaint, together with a "Statement of Disputed Factual Issues" and voluminous exhibits; (2) a Second Amended Complaint.  See Docket Nos. 35-41.

Defendants filed a Motion to Dismiss Plaintiff's Second Amended Complaint, or in the Alternative, for Summary Judgment on September 30, 2004.  See Docket Nos. 43-44.  Plaintiff filed an opposition to that motion on November 22, 2004.  See Docket No. 47.

2

On February 15, 2005, the Court issued a Report and Recommendation ("R&R") relating to Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint.  See Docket No. 50. The Court recommended that: 1) portions of the First and Fourth Claim be dismissed for failure to exhaust administrative remedies; 2) Plaintiff's Fifth Claim – Negligence – be dismissed as to all named Defendants; 3) all named Defendants be dismissed, to the extent they were named in their official capacities; and 4) Plaintiff's claim for injunctive relief be dismissed as moot. Simultaneously, the Court issued an order allowing Plaintiff to file a Third Amended Complaint naming the United States as a party and more fully alleging the equal protection claim in the Second Claim.  See Docket No. 49.

On February 28, 2005, Plaintiff filed a Third Amended Complaint.  See Docket No. 53. Defendants then filed a Motion to Stay their response to the Third Amended Complaint until all objections to the R&R could be resolved.  See Docket No. 54.  This motion was granted on March 15, 2005.  See Docket No. 54.

On March 17, 2005, Defendants submitted objections to the R&R.  See Docket No. 55. On March 31, 2005, the District Court adopted the R&R, and invited Defendants to file an additional Motion for Summary Judgment, based upon arguments and evidence which were presented to the Court as part of Defendants' Objections to the R&R.  See Docket No. 57.

Pursuant to the April 14, 2005, Case Management Conference, Defendants' dispositive motion was scheduled to be due on or before May 27, 2005.  See Docket Nos. 60-62.

Meanwhile, on April 22, 2005, Plaintiff again sought leave to amend his Complaint.  See Docket No. 63.  The court granted the motion on April 26, 2005, and Plaintiff filed his Fourth Amended Complaint on May 5, 2005.  See Docket No. 66.  Defendants submitted a Motion to Dismiss or for Summary Judgment, along with an extensive brief and supporting documentation

on May 26, 2005.  See Docket Nos. 67-69 .   Before the Court could rule on that motion, however, it granted Plaintiff's renewed Motion for Appointment of Counsel.  See Docket Nos. 74, 76-80.   On December 2, 2005, the Court appointed counsel to represent Plaintiff; dismissed without prejudice Defendants' Motion to Dismiss Plaintiff's Fourth Amended Complaint; and afforded Plaintiff an opportunity to file a Fifth Amended Complaint.  See Docket No. 80.

Plaintiff filed a Fifth Amended Complaint on January 20, 2006.  See Docket No. 81. Plaintiff's Fifth Amended Complaint asserts the following claims: 1) that he was exposed to environmental hazards inside the UNICOR factory at FCI McKean, in violation of the Eighth Amendment (Count I); 2) that he was exposed to environmental hazards inside the UNICOR factory at FCI McKean, in violation of the Fifth Amendment Due Process Clause (Count I); 3) that he was negligently exposed to environmental hazards inside the UNICOR factory (Count II); 4) that he received inadequate dental care, which rose to the level of a Constitutional violation (Count III); 5) that he was provided with negligently inadequate dental care (Count IV).[1]

## III.    FACTUAL BACKGROUND

### A.    Background

Plaintiff Hill is a Federal inmate currently incarcerated in the Federal Correctional Institution ("FCI") in Gilmer, West Virginia.  He was convicted in the District of Columbia Superior Court of Manslaughter While Armed, and sentenced to 21 years in prison on May 1, 1994.  His projected release date is January 16, 2014, via Mandatory Parole.  See Exhibit 1, Declaration of Douglas S. Goldring ¶ 3, and Attachment A.

---

[1] Although Plaintiff had previously alleged violations of the Fifth Amendment Equal Protection Clause, and the First Amendment, based upon a theory of retaliation, those claims have not been included in Plaintiff's Fifth Amended Complaint.

Plaintiff arrived at FCI McKean on October 18, 2001, and was first assigned to the Federal Prison Industries, Inc. (FPI or trade name UNICOR) factory on August 1, 2002.  See Exhibit 1 ¶ 4, and Attachment B; Exhibit 2, Declaration of Martin Sapko ¶ 6, and Attachment B.

FPI is a wholly-owned government corporation, created by Congress in 1934 with the mission of providing work simulation programs and training opportunities for inmates confined in federal correctional facilities.  FPI operates factories in over 100 locations across the country. It manufactures products and services in seven different business groups: Electronics, Clothing & Textiles, Fleet Management & Vehicular Components, Services, Office Furniture, Recycling, and  Industrial Products.  See Exhibit 2 ¶ 3.

Typically, each prison (with the exception of minimum security and administrative/ pretrial facilities) in the Federal system contains one UNICOR factory.  At all times relevant to this case, the FCI McKean UNICOR factory was part of the Office Furniture Business Group. See Exhibit 2 ¶ 4.

**B.**      **Plaintiff's Dental Treatment at FCI McKean**

When inmate Hill arrived at FCI McKean on October 18, 2001, he had a medicated (temporary) filing in tooth # 13, which had been applied in January 2001 at the United States Penitentiary in Lompoc, California ("USP Lompoc").  See Exhibit 3, Declaration of William Collins, D.D.S. ¶ 5.

Upon arrival at FCI McKean, all inmates – including Plaintiff –  are required to participate in an Admission and Orientation Seminar regarding the policies and practices of the institution.  Part of this orientation is conducted by representatives of the Health Services Department, and includes procedures for obtaining dental care.  As part of the presentation, inmates are informed about the difference between routine and emergency medical treatment, and

the procedures for obtaining each type of care.  Additionally, each inmate receives an Inmate

Information Handbook, which  further explains the procedures for seeking medical care.

Specifically, the Handbook explains that if an inmate has an immediate medical problem that

requires urgent care, he <u>must</u> report to the Health Services Unit and indicate that he requires

urgent care.  <u>See</u> Exhibit 3 ¶¶ 6-9, and Attachments A and B.

Plaintiff did not report any dental concerns to staff upon his arrival at FCI McKean.

Nothing in his dental chart, and nothing communicated by inmate Hill orally, indicated that the

tooth was causing any discomfort, or otherwise required immediate attention.  <u>See</u> Exhibit 3 ¶ 10.

The first indication that he required dental care at all was on December 3, 2001.  At that

time, Plaintiff submitted a request to staff, noting that he had two cavities which would need to be

filled, one of which already had a medicated filling which he wished to have replaced.  He also

requested a prophylactic cleaning at that time.  Plaintiff was placed on the waiting list for routine

dental care on December 4, 2001.  <u>See</u> Exhibit 3 ¶¶ 11-13, and Attachments B-E.

Plaintiff did not mention any concerns relating to his cavities again for four months.  Not

until April 8, 2002 did Plaintiff submit a second request for treatment.  At that time, he noted that

he had two cavities which would need to be filled, one of which already had a medicated filling

which he wished to have replaced.  He also noted his belief that the cavities were getting worse.

Notably, he did not indicate that the cavities were causing him any pain or discomfort, or that he

otherwise required an immediate evaluation.  <u>See</u> Exhibit 3 ¶¶ 14-15, and Attachment F.

In response to his April 8 request, Plaintiff was told that he was number 184 on the dental

care waiting list. However, he was also instructed to "come right to sick call" if he developed "any

pain problems."  <u>See</u> Exhibit 3 ¶ 16, and Attachment F.

Plaintiff did not come to dental sick call.  If he had done so, and complained of increased

pain associated with his cavities, then his tooth pain would have been treated as urgent, and appropriate treatment would have been provided.  See Exhibit 3 ¶ 17, and Attachments D and E.

Plaintiff next raised his dental concerns to staff in connection with the administrative remedy process.  At that time, he was again told that if the medicated filling came out, or if he was in pain, to "please complete a sick call request."  See Exhibit 3 ¶¶ 18-19, and Attachments G and H.

Plaintiff did not contact anyone in Health Services to complain about any pain in his tooth, or otherwise seek to be seen at dental sick call.  The first time Plaintiff attempted to be seen as a result of any pain in his tooth was on November 27, 2002, when Dr. Collins examined his tooth at dental sick call.  Based upon that examination, Dr. Collins assessed Plaintiff with irreversible pulpitis of tooth #13, secondary to former deep caries. See Exhibit 3 ¶¶ 20-21, and Attachment E. Dr. Collins advised Plaintiff that because the condition was painful and irreversible (the tooth could not be salvaged), the tooth should be extracted.  See Exhibit 3 ¶¶ 22-25, and Attachments D and I.

Upon Plaintiff's consent, Dr. Collins immediately conducted a successful extraction tooth #13.  Although he may have asked questions about the extraction, Plaintiff did not voice any objections to the procedure.  See Exhibit 3 ¶¶ 26-31, and Attachments I and J.

### C.    OSHA Inspection

On July 3, 2001, the Area Director of the Occupational Safety and Health Administration ("OSHA") sent a letter to Stephen Housler, FCI McKean Safety Manager.  The letter advised Housler that OSHA had received a notice of safety hazards regarding the ventilation system in FCI McKean's UNICOR factory.  The notice of safety hazards alleged that ventilation was inadequate, employees were being exposed to excessive wood dust, and that dust masks were not

7

readily available.  OSHA's letter to Housler indicated that OSHA had not made any determination

that the alleged hazards existed, and that OSHA did not intend to conduct an inspection at that

time.  Nevertheless, since allegations of violations and/or hazards had been made, OSHA

requested that FCI McKean investigate the alleged conditions and make any necessary corrections

or modifications.  See Exhibit 4, Declaration of Steven Housler ¶¶ 8-10, and Attachment A.

The Warden responded to OSHA's concerns on July 27, 2001.  In that letter, he described

the dust collection system in the UNICOR factory and indicated that dust masks are available in

the UNICOR tool room, and are issued upon request.[2]  See Exhibit 4 ¶ 11, and Attachment B.  On

July 31, 2001, in response to the letter from OSHA, FCI McKean had Microbac Laboratories, Inc.

conduct an indoor air quality survey of the UNICOR factory at FCI McKean.  Microbac tested six

different sites in the factory, and all of the sites complied with the OSHA standard for total

Particulates/Nuisance Dust.  See Exhibit 4 ¶ 12, and Attachment C.[3]

---

[2]  The UNICOR factory at FCI McKean is equipped with two dust collection systems,
each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal.
Each dust collector has the capacity to move 34,000 cubic feet of air per minute from the
UNICOR factory. See Exhibit 2, ¶ 7, and Attachment C.  The dust collection system is connected
to the furniture-manufacturing machinery in the UNICOR building.  According to operational
procedures in the UNICOR factory at FCI McKean, the manufacturing machinery is not to be
operated unless the dust collection system is turned on first.  See Exhibit 2 ¶¶ 8-9.

Dust and air entering the dust collection system are moved by fans within the dust
collection system from the machinery process through smooth round ducts, to a large vacuum
located on the outside of the building.  The vacuum pulls dust and air from the factory to one of
two large cone-shaped filter houses, where air is filtered and dust is evacuated into to a hopper,
which is also located outside of the UNICOR building.  The filtered air is then returned to the
factory though square ducts.  The dust that is filtered from the factory air is collected in a hopper
and disposed at a site away from FCI McKean and the UNICOR factory.  See Exhibit 2 ¶ 10, and
Attachments D and E.

[3]Indeed, the survey results showed that the air quality was well within OSHA standards.
According to the Microbac Laboratories Summary, the OSHA standard for Total Particulates/
Nuisance Dust is 15 mg/cubic meter and 5.0 mg/cubic meter for Respirable Particulates/
Respirable Nuisance Dust.  According the Microbac survey, the highest measurement for total

On April 14, 2003, OSHA issued a Notice of Alleged Safety or Health Hazards to FCI McKean.   The OSHA notice alleged that the ventilation in the UNICOR factory was inadequate to control the hazards associated with dusts generated during the production processes.   The dusts included wood dust, particle board dust and Micoreboard dust.   The Notice also alleged that the ventilation was inadequate to control the hazards associated with vapors that were produced by glues utilized in the laminating processes.   See Exhibit 4 ¶¶ 14-15, and Attachment D.

On Wednesday, April 16, 2003, an OSHA compliance officer visited the UNICOR factory at FCI McKean and conducted a walk-through inspection.   At the conclusion of the walk-through, the OSHA inspector gave a verbal indication to Defendant Housler that he found no evidence of concern related to the air quality in the factory, and that all appropriate and necessary practices were being followed in accordance with OSHA regulations.   The inspector indicated that OSHA inspectors would return to the factory to conduct a formal inspection.   See Exhibit 4 ¶ 16.

On May 14, 2003, the OSHA Compliance Officer conducted an inspection of the UNICOR factory.   On June 17 and 18, 2003, representatives from OSHA returned to FCI McKean to conduct air monitoring of the UNICOR factory.   On June 18, 2003, after the air monitoring inspection, the OSHA Industrial Hygienist told Defendant Housler that the air monitoring had gone well, and he did not foresee any violations with respect to the air quality in the UNICOR factory.   See Exhibit 4 ¶ 17.

In a letter dated August 20, 2003, OSHA informed FCI McKean that no OSHA standard applied to the alleged hazards, and no OSHA citation would be issued for the alleged hazards. The letter included results of the OSHA air monitoring, which had evaluated worker exposures to

---

particulates was 0.3 mg/cubic meter, and the highest measurement for respirable particulates was 0.4 mg/cubic meter.  See Exhibit 4 ¶ 13, and Attachment C.

airborne dust concentrations of vitreous fiber and perlite.  The results showed that no worker's exposure exceeded 10% of the relevant exposure limit.  See Exhibit 4 ¶ 18, and Attachment E.

Also, between April 16, 2003, and August 1, 2003, OSHA inspectors evaluated the entire UNICOR factory and the FCI McKean prison compound, and on August 20, 2003, a Notice of Unsafe or Unhealthful Working Conditions was issued.   The only cited OSHA violation which is relevant to Plaintiff's complaints regarding hazardous substances in the UNICOR factory air was described as, "[a]dequate precautions against the ignition of flammable vapors were not taken." 29 C.F.R. § 1910.106(e)(6)(I).  See Exhibit 4 ¶¶ 19-20, and Attachments E-G.  The citation indicated the following:

> LokWeld 860/861 had a flash-point of approximately 15 degrees Fahrenheit and was applied to project items from a 5-gallon container with a roller.  Mechanical exhaust ventilation in combination with the enclosures were not utilized to control the LokWeld's flammable vapors.  Potential ignition sources in the area included but were not limited to the designated smoking area, woodworking machinery, and normal electrical systems.  The smoking area was located within approximately 16 feet to 30-feet from the areas where the LokWeld was applied to the items.

Id.

Lokweld 860/861 ("Lokweld") is a spray grade adhesive used in the UNICOR factory at FCI McKean.  Lokweld is applied to materials in the UNICOR factory using a sprayer, which is located in an enclosed spraying booth with an independent exhaust system. See Exhibit 4 ¶ 21. The booth in which Lokweld is used is a completely enclosed unit.  No leaks or other hazards have been identified.  Furthermore, if a leak were to form, the vapors emanating from the booth would have a noxious and easily identifiable odor.  There have been no reports or complaints of any unusual odors or vapors in or around the Lokweld spray station.  See Exhibit 4 ¶ 22.

During the OSHA inspection, which occurred from April 16, 2003 through August 1, 2003, OSHA personnel conducted a full inspection of the Lokweld spray booth.  During its

inspection, OSHA did not note any concerns relating to: Lokweld fumes emanating from the spray

booth; ventilation in the Lokweld area; or protecting inmates against Lokweld fumes.  See Exhibit

4 ¶¶ 23-26, and Attachments E-G.

By letter dated September 22, 2003, Defendant LaManna informed OSHA that FCI

McKean had taken corrective measures regarding all of the identified Unsafe Working

Conditions, with four exceptions, which were awaiting additional information from the Bureau of

Prisons Central Office.  Defendant LaManna's letter advised OSHA that by April 25, 2003,

LokWeld glue and the fire cabinet had been removed from the Special Projects Area.  The

Warden advised that LokWeld would no longer be used in making their products.  See Exhibit 4 ¶

29-30, and Attachment H.

## IV.    <u>LEGAL ARGUMENTS</u>

### A.    <u>Standard for Summary Judgment</u>

Federal Rule of Civil Procedure 56 provides that summary judgment shall be rendered

"forthwith" if there is no genuine issue as to any "material fact."  In recent years there has been a

dramatic change and much greater willingness of the courts to grant this remedy.  In 1986 the

Supreme Court decided three cases which greatly liberalized summary judgment practice and

encouraged a much greater use of summary judgment by trial courts.  See <u>Matsushita Electrical</u>

<u>Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986); <u>Anderson v. Liberty Lobby, Inc.</u> 477

U.S. 242 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).

> As stated by Chief Justice Rehnquist, summary judgment now:
> is properly regarded not as a disfavored procedural shortcut but rather as an
> integral part of the Federal Rules as a whole... Rule 56 must be construed with due
> regard not only for the rights of person asserting claims and defenses tried to a
> jury, but also for the rights of persons opposing such claims and defenses to
> demonstrate in the manner provided by the Rule, prior to trial, that the claims and
> defenses have no factual basis.

Celotex, 477 U.S. at 327.   "Modern, post-trilogy summary judgment doctrine is a stronger and more aggressive approach to summary judgment practice that places a reduced burden on the movant, greater burdens on the nonmovant, and makes summary judgment more likely to be granted than the pre-trilogy approach."  Moore's Fed. Prac., vol. 11, p. 56-312.1.

      One of the essential purposes of the motion is to "isolate and dispose of factually unsupported claims or defenses."  Celotex, 477 U.S. at 323-324.  The defendants have the initial burden of showing that there is an absence of evidence to support an essential element of the plaintiff's case; and then the plaintiff has the burden to come forward with "specific facts" showing that there is a genuine issue for trial.  LaBounty v. Coughlin, 137 F.3d 68, 73 (2nd Cir. 1998).  The failure to sufficiently support all elements necessary to support a case will render all other facts immaterial.  Celotex, 477 U.S. at 323; Moore's Fed. Prac., vol. 11, p. 56-143.

      The fact that a plaintiff has some facts on his side, or that there are some factual disputes, is not enough to deny the motion.  The "mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252;  Matsushita Elec. Indus. Co., 475 U.S. at 586 (The motion will not be denied merely because of  "some metaphysical doubt" about the material facts); Davidson v. Scully, 114 F.3d 12, 14 (2nd Cir. 1997)(Existence of  "some" alleged factual dispute is not enough to defeat summary judgment; opponent must show that there is no "genuine" issue of material fact"); Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2nd Cir. 1996) (Mere "conclusory allegations, speculation or conjecture" will not defeat the motion); Sunshine Books Ltd. v. Temple University, 697 F.2d 90 (3d Cir. 1982)(Responding party may not rest on the allegations of his/her pleading but must present by affidavit or otherwise specific facts

sufficient to create a genuine issue of material fact.  Fed.R.Civ.P. 56(e)).[4]

**BIVENS ACTION**

> ### B.   Plaintiff's Allegations of Inadequate Dental Care Do Not Rise to the Level of a Constitutional Violation

Plaintiff has not stated a claim of deliberate indifference under the Eighth Amendment

relating to the dental care he received at FCI McKean.  Plaintiff essentially has two concerns

regarding his dental treatment.  First, he alleges that the Defendants did not provide adequate

dental care during the time period leading up to his November 27, 2002 tooth extraction.  Second,

Plaintiff claims that Defendants were deliberately indifferent to his serious dental needs because

Dr. Collins extracted a severely decayed tooth instead of attempting to salvage it on November 27,

2002.  Because Plaintiff has failed to articulate a claim under the Eighth Amendment of the

United States Constitution for deliberate indifference to his serious medical needs, this cause of

action should be dismissed.

---

[4] In the alternative, Defendants seek dismissal of the Fifth Amended Complaint pursuant to Fed. R. Civ. Pro. 12(b)(6).  In a Rule 12(b)(6) motion to dismiss, the complaint is liberally construed, and all well-pleaded fact allegations, and any reasonable inferences, are viewed in the light most favorable to the non-moving party.  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F. 3d 1380, 1384 (3d Cir. 1994). This concession of truth, however, goes only to well-pleaded fact allegations, not legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.  See Mires v. Dekalb County, Ga., 433 U.S. 25, 27 n. 2 (1977); Washington Legal Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir. 1993); Davidson v. State of Ga., 622 F.2d 895 (5th Cir. 1980); Violenti v. Emery Worldwide A-CF Co., 847 F. Supp. 1251, 1255 (M.D. Pa. 1994).

Moreover, the claimant must set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.  See Fed. R. Civ. Pro. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 45-6 (1957).

In short, the court must dissect the complaint, eliminate mere rhetoric, legal conclusions and unsupported factual conclusions, and determine whether or not well-pleaded fact allegations, when construed in a light more favorable to the plaintiff, state a factual claim on some legal theory upon which relief can be granted, but not whether a plaintiff will ultimately prevail on that claim.  Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984).

1.    **Applicable Legal Standard**

In order to state a claim for violation of the Eighth Amendment based on inadequate

medical care, a plaintiff must demonstrate that the defendants exhibited "deliberate indifference to

[his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976); West v. Keve, 571 F.2d

158, 161 (3d Cir. 1978). A plaintiff cannot satisfy this standard unless he demonstrates both: (1)

that he had a serious medical need, and also that (2) the defendant was aware of this need and was

deliberately indifferent to it. See Farmer v. Brennan, 511 U.S. 825 (1994); Inmates of Allegheny

County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979); see also Wilson v. Seiter, 501 U.S. 294,

296-98 (1991).

2.    **Plaintiff Did Not Have a Serious Medical Need**

The Third Circuit has found that a medical need is "serious" if it is "one that has been

diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would

easily recognize the necessity for a doctor's attention." Monmouth County Correctional Institution

Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1989); Pace v.

Fauver, 479 F.Supp. 456, 458 (D.N.J.1979), aff'd, 649 F.2d 860 (3d Cir.1981). Plaintiff's

condition does not rise to this level of severity. Prior to arriving at FCI McKean, Plaintiff had

been informed that he had extensive decay in tooth #13, a premolar. Due to the severity of the

decay, it was not clear whether the damage to the tooth was reversible. As such, a medicated

(temporary) filling was utilized instead of a permanent filling in order to test whether the tooth

was salvageable. See Exhibit 3 ¶ 5.

Plaintiff did not report any dental concerns to staff upon his arrival at FCI McKean.

Specifically, nothing in inmate Hill's dental chart, and nothing communicated by him orally,

indicated that the medicated filling was causing any pain or discomfort, or otherwise required

immediate attention.  Typically, medicated fillings can remain in the tooth as long as additional

pain or discomfort does not occur.  See Exhibit 3 ¶ 10.

Plaintiff arrived at FCI McKean in October 2001.   See Exhibit 1 ¶ 4, and Attachment B.

Upon his arrival, Plaintiff was provided with a copy of the FCI McKean Inmate Information

Handbook ("Inmate Handbook"), which details the procedure inmates must follow to obtain

medical care.  See Exhibit 3 ¶¶ 8-9, and Attachment B.  Plaintiff also received information on sick

call procedures during his Admission & Orientation session at FCI McKean.  See Exhibit 3 ¶¶ 6-

7, and Attachment A.  The Inmate Handbook explains that if an inmate has an immediate medical

problem that requires urgent care, he must report to the Health Services Unit and indicate that he

requires urgent care.  See Exhibit 3 ¶¶ 8-9, and Attachment B.  The Admission and Orientation

Presentation explains that urgent or "emergency dental appointments will be given during the

regular morning sick call sign-up."  See Exhibit 3 ¶¶ 6-7, and Attachment A.  Additionally,

emergency dental care is available 24-hours a day through the Health Services Department.  See

Exhibit 3 ¶¶ 13 and 20.  Otherwise, for routine dental care, inmates may request to be scheduled

for an appointment by filling out an institutional "cop-out" form.  See Exhibit 3 ¶ 7, and

Attachment A.

Plaintiff did not report any dental concerns to staff upon his arrival at FCI McKean.  See

Exhibit 3 ¶ 10.  Plaintiff made several requests to have his fillings replaced, but he did not

indicate that he was in any pain or discomfort.  Plaintiff did not report for urgent care for any

dental concerns.  Accordingly, pursuant to BOP policy, FCI McKean staff treated Plaintiff's

requests to have cavities filled as requests for routine dental care.  See Exhibit 3 ¶¶ 11-19, and

Attachments C-H.

Plaintiff was repeatedly informed that if his teeth caused him any pain or discomfort, he

15

should report to dental sick call for urgent care.  See Exhibit 3 ¶¶ 11-19, and Attachments C-H.

From October 18, 2001 when he arrived at FCI McKean, until November 27, 2002, Plaintiff did

not report to dental sick call, or otherwise seek emergency dental treatment.  See Exhibit 3 ¶¶ 11-

19, and Attachments C-H.  Had he reported to dental sick call and notified FCI McKean staff that

he was experiencing pain or difficulty with his medicated filling, his teeth would have been

examined and he would have received urgent care.  See Exhibit 3 ¶ 11. Plaintiff's failure to report

for sick call indicates that he was not experiencing pain or difficulty with his medicated filling,

and that he did not have a medical need which was sufficiently serious to subject Defendants to

personal liability.[5]

> ### 3.    Defendants Were Not Deliberately Indifferent to Plaintiff's Dental Needs in the Time Period Leading up to his November 27, 2002 Tooth Extraction

Assuming, arguendo, that Plaintiff's desire to have his cavities filled did amount to a

serious medical need, Plaintiff still cannot show that either Defendant Collins or Defendant

LaManna was deliberately indifferent to Plaintiff's condition.[6]  In order to satisfy his steep burden

---

[5]  Even assuming, arguendo, that Dr. Collins failed to adequately assess the severity of Plaintiff's need for a filling, such a mistake would amount to no more than medical malpractice or negligence.  Neither of which subject a doctor to individual personal liability.  Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1999); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)(negligent medical treatment is not actionable under the Eighth Amendment); Unterberg v. Correctional Medical Systems, Inc., 799 F.Supp. 490, 497 (E.D.Pa.1992)(medical malpractice is not deliberate indifference).

[6]  There is clearly no basis for holding Defendant LaManna personally liable.  He is a prison administrator, not a health care provider, and was named in this lawsuit based solely upon his role as the Warden of FCI McKean.  See section E, infra.  Furthermore, the only allegation against Defendant LaManna is that Plaintiff complained to him through the Administrative Remedy process.  At that time, Defendant LaManna provided a response which outlined the procedures through which Plaintiff could seek immediate dental care.  See Exhibit 3 ¶ 19, and Attachment H. It is well settled, however, that, when an inmate is being treated by the prison doctor, a Warden may not be considered deliberately indifferent for failing to respond directly to

under the Eighth Amendment, Plaintiff cannot merely assert that Defendants were negligent or

that they engaged in medical malpractice.  Estelle, 429 U.S. at 106.  See also Durmer v. O'Carroll,

991 F.2d 64, 67 (3d Cir. 1993); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d

Cir. 1979)(negligent medical treatment is not actionable under the Eighth Amendment); Unterberg

v. Correctional Medical Systems, Inc., 799 F.Supp. 490, 497 (E.D.Pa. 1992)(medical malpractice

is not deliberate indifference).  Instead, to state a claim for deliberate indifference under the

Eighth Amendment, Plaintiff must show "such indifference that can offend 'evolving standards of

decency' in violation of the Eighth Amendment."  Estelle, 429 U.S. at 106.  "While the distinction

between deliberate indifference and malpractice can be subtle, it is well established that as long as

a physician exercises professional judgment, his behavior will not violate a prisoner's

constitutional rights."  Estelle, 429 U.S. at 107; Brown v. Borough of Chambersburg, 903 F.2d

274, 278 (3d Cir. 1990).

        Plaintiff cannot show that Defendants were deliberately indifferent to his dental needs in

the time period leading up to Plaintiff's November 27, 2002 tooth extraction.  To the contrary, for

thirteen months, Plaintiff himself failed to notify Defendants that he was having any pain or

difficulty with his temporary filling.  Plaintiff did not report any dental concerns to staff upon his

arrival at FCI McKean.  See Exhibit 3 ¶ 10. Plaintiff's dental records did not note that the

medicated filling he had received while at FCI Lompoc needed to be replaced within a specific

time frame. See Exhibit 3 ¶ 10.   Typically, medicated fillings can remain in the tooth indefinitely

as long as they do not cause additional pain or discomfort.  See Exhibit 3 ¶ 10.  Plaintiff arrived at

FCI McKean on October 18, 2001, yet he did not notify medical staff that his filling was causing

---

that inmate's medical complaints. Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).  As such,
Defendant LaManna cannot be held liable for the medical care provided by Dr. Collins.

him discomfort until November 27, 2002, well over a year after his arrival.  See Exhibit 3 ¶¶ 10-19, and Attachments C-H.

The first indication that Plaintiff required dental care at all was on December 3, 2001.  At that time, he submitted a request to staff in which he noted that he had two cavities which would need to be filled, one of which already had a medicated filling which he would like to have replaced.  He also requested a prophylactic cleaning at that time.  Notably, Plaintiff indicated his need for a dental care by submitting a "cop-out," otherwise known as an "inmate request to staff." In other words, he followed the procedures for seeking routine dental care.  He did not report to the health services unit during sick call, or otherwise indicate that he required urgent care or an immediate evaluation of his dental problems.  Had he done so, he would have been immediately evaluated and either treated, or scheduled within 14 days.  See Exhibit 3 ¶ 11, and Attachment C.

Typically, requests to have cavities filled are considered to be requests for routine dental treatment.  Pursuant to Program Statement 6000.05, Health Services Manual, access to routine dental care is equitably controlled through a treatment list.  Inmates on the routine dental care list are typically treated according to their chronological entry date.  See Exhibit 3 ¶ 12, and Attachment D, p. 27.

As a result, Plaintiff was placed on the waiting list for routine dental care on December 4, 2001.  If, at any time, Plaintiff had experienced significant pain, discomfort or trauma associated with his cavities or the medicated filling in tooth # 13, he could have come to dental sick call or sought emergency treatment 24-hours a day, in order to relieve his pain.  There is no indication in his record that he sought any type of urgent care.  See Exhibit 3 ¶ 13, and Attachments D and E.

Plaintiff did not mention any concerns relating to his cavities again for four months.  It was not until April 8, 2002, that he submitted a second request for treatment.  At that time, he

again noted that he had two cavities which would need to be filled, one of which already had a medicated filling which he would like to have replaced. Additionally, he noted his belief that the cavities were getting worse. Notably, he did not indicate that the cavities were causing him any pain or discomfort at that time, or that he otherwise required an immediate evaluation. See Exhibit 3 ¶¶ 14-15, and Attachment F.

In response to this request, Plaintiff was told that he was number 184 on the dental care waiting list. However, he was also instructed to "come right to sick call" if he experienced "any pain problems." See Exhibit 3 ¶ 16, and Attachment F.

Plaintiff did not go to dental sick call. If he had done so, and complained of increased pain associated with his cavities, then his tooth pain would have been treated as urgent, and appropriate treatment would have been provided. See Exhibit 3 ¶ 17, and Attachments D and E.

The next mention of Plaintiff's tooth came in the form of an informal resolution with his counselor, in which he complained about tooth pain associated with his cavities. At that time, he was instructed to contact the dentist. There is no indication he ever attempted to contact any health services staff members about the pain in his tooth. See Exhibit 3 ¶ 18, and Attachment G.

On July 3, 2002, Plaintiff submitted a request for Administrative Remedy to the Warden, in which he complained about his cavities and sought dental treatment. At that time, he was told that, in accordance with policy, the placement of a dental filling is considered routine dental care. He was further reminded that he was currently on the waiting list for routine dental care. Additionally, he was again told that if the medicated filling came out, or if he were in pain, to "please complete a sick call request." See Exhibit 3 ¶ 19, and Attachment H.

Plaintiff did not contact anyone in Health Services to complain about any pain in his tooth, or otherwise seek to be seen at dental sick call. Again, emergency care is available around the

clock.  The first time Plaintiff sought treatment as a result of any pain in his tooth from Health

Services was on November 27, 2002.  See Exhibit 3 ¶ 20, and Attachment E.

Accordingly, the record reflects that Defendants were not deliberately indifferent to

Plaintiff's dental needs during the period preceding his November 27, 2002 tooth extraction,

given that Plaintiff failed to follow proper procedures to inform Defendants of his dental needs.

Plaintiff repeatedly failed to inform Defendants that his temporary filling was causing him pain

and discomfort.  See Exhibit 3 ¶¶ 10-20, and Attachments C-H.  Thus, the filling was either not

causing Plaintiff discomfort or pain prior to November 27, 2002, or Plaintiff blatantly ignored the

repeated instructions to attend dental sick call.  Either way, Defendants provided Plaintiff with all

of the information necessary to receive treatment and, as such, were not deliberately indifferent to

Plaintiff's medical needs leading up to the November 27, 2002, examination.

### 4.    The Extraction of Plaintiff's Tooth on November 27, 2002 Does Not Constitute Deliberate Indifference

On November 27, 2002, over 13 months after his transfer to FCI McKean, Plaintiff finally

arrived at dental sick call.  See Exhibit 3 ¶ 21.  At that time, Dr. Collins examined Plaintiff's tooth

and assessed his condition as irreversible pulpitis secondary to former deep caries. See Exhibit 3 ¶

21.  Because the tooth was unsalvageable and was causing Plaintiff considerable pain, Defendant

Collins determined, in his medical judgment, that the tooth should be extracted.[7]  See Exhibit 3 ¶¶

22-25, and Attachment I.  After Defendant Collins fully informed Plaintiff of the reasons for a

tooth extraction and the possible complications, Plaintiff signed a document acknowledging that

he was informed about the procedure's risks, and consented to the extraction procedure.  See

---

[7] Plaintiff makes no allegations as to Defendant LaManna's involvement in the decision to extract Plaintiff's tooth.

Exhibit 3 ¶ 26, and Attachment J.  The tooth was extracted without complication.  See Exhibit 3 ¶ 27, and Attachment E.

Although Plaintiff now states that he does not agree with the clinical determination to extract the tooth, this latent disagreement with his dentist's professional judgment in no way constitutes deliberate indifference on the part of the physician.  White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990)(mere disagreements over medical judgment" do not rise to the level of an Eighth Amendment violation);  Lanzaro, 834 F.2d at 346; Norris v. Frame, 585 F.2d 1183 (3d Cir. 1978); Nottingham v. Peoria, 709 F.Supp. 542 (M.D. Pa. 1988); Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir.(Pa.), 1987), cert. denied, 485 U.S. 991 (1988) (A disagreement between the physician and the prisoner regarding the medical diagnosis and treatment does not constitute deliberate indifference under the Eighth Amendment.)  To the contrary, Dr. Collins' decision to extract the tooth constitutes medical judgment which is not actionable in an Eighth Amendment claim.[8] Estelle, 429 U.S. at 107. Therefore, Plaintiff has plainly failed to establish an Eighth Amendment violation with respect to the November 27, 2002 extraction of his tooth.

### C.     Plaintiff's Allegations Regarding Conditions in the UNICOR Factory Cannot Establish an Eighth Amendment Violation

Plaintiff's allegation that Defendants violated his Eighth Amendment rights by allegedly exposing him to environmental hazards must be dismissed because it is clear that Plaintiff has satisfied neither the objective nor subjective prongs of the Eighth Amendment test.  Farmer v. Brennan, 511 U.S. 825 (1994); Helling v. McKinney, 509 U.S. 25, 33-34 (1993).

---

[8] The decision to extract the tooth, rather than attempting to save the tooth through endodontic therapy (root canal) was consistent with the applicable community standard of care for treating irreversible pulpitis.  See Exhibit 3 ¶¶ 22-25, and Attachment I.

1.    **The Eighth Amendment Standard**

In <u>Helling v. McKinney</u>, 509 U.S. 25 (1993), the Supreme Court held that a cause of

action exists under the Eighth Amendment when a prisoner alleges that prison officials have

exposed him, with deliberate indifference, to levels of environmental tobacco smoke ("ETS") that

pose an unreasonable risk of harm to his future health.  <u>Id.</u>, at 35.  In <u>Helling</u>, the Court

established a two-part test that a plaintiff must satisfy to state a valid claim under the Eighth

Amendment.  The first prong is objective.  The Plaintiff must show that "he himself is being

exposed to <u>unreasonably high</u> levels of ETS."  <u>Id.</u> at 35 (emphasis added).  With respect to this

prong, the Eighth Amendment requires a court not only to make a scientific and statistical inquiry

into the seriousness of the potential harm and the likelihood that such injury to health will actually

be caused by exposure to the contaminant, but also "to assess whether society considers the risk

that the prisoner complains of to be so grave that it violates contemporary standards of decency to

expose <u>anyone</u> unwillingly to such a risk."  <u>Id.</u> at 36 (emphasis in original).

The second prong is a subjective one: a plaintiff must show that prison officials were

deliberately indifferent to a serious risk of harm.  <u>Id.</u>  The Supreme Court has held that:

> a prison official cannot be found liable under the Eighth Amendment for denying
> an inmate humane conditions of confinement unless the official knows of and
> disregards an excessive risk to inmate health or safety; the official must both be
> aware of facts for which the inference could be drawn that a substantial risk of
> serious harm exists, and he must also draw the inference.

<u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).

In this case, Plaintiff alleges that he was exposed to Micore Board fibers, sawdust  and

Lokweld adhesive without appropriate ventilation and/or protective gear.  However, the evidence

presented by Plaintiff with respect to this claim fails to establish either prong of the <u>Helling</u> test,

because Plaintiff cannot show that he was exposed to "unreasonably high" levels of air pollution

or toxins, or that Defendants exhibited deliberate indifference to such exposure.

### 2.    Plaintiff Cannot Establish that he was Actually Exposed to "Unreasonably High Levels" of Hazardous Substances

With respect to the first prong of the Eighth Amendment analysis, Plaintiff cannot show that he was exposed to levels of air pollution or toxins in the UNICOR factory that were so unreasonably high as to violate contemporary standards of decency.  Although Defendants agree that crystalline silica, an ingredient in Micore Boards, is classified as a human carcinogen, respirable silica was not detected in 2001 by Microbac Laboratories or in 2003 by OSHA inspectors.  See Exhibit 4 ¶¶ 12-13 and 18, Attachments C and E.  Indeed, with respect to all of the chemical components of Micore Board, the OSHA inspectors determined that no UNICOR worker's exposure exceeded 10% of the relevant exposure limit.  See Exhibit 4 ¶ 18, Attachment E.  Thus, OSHA determined that Plaintiff and other workers were not exposed to inappropriate levels of contaminants in the UNICOR factory.  Plaintiff simply cannot, in this case, "show that he himself is being exposed to unreasonably high levels of" harmful substances, as required by Helling, where the UNICOR facility is in compliance with relevant federal air quality standards.

Additionally, in the Fifth Amended Complaint, Plaintiff alleges that Defendants' failure to provide him with a NIOSH-approved respirator also constituted a violation of his Eighth Amendment rights.  The Micore Fiber MSDS sheet clearly discusses the circumstances under which a NIOSH-approved respirator should be used. Section VIII of the MSDS sheet indicates that special respiratory protection is "not typically necessary under normal conditions of use." See Exhibit 4 ¶ 32, and Attachment I.   A NIOSH-approved respirator is necessary only "in poorly ventilated areas, if TLV is exceeded and/or when dusty conditions exist."  See Exhibit 4 ¶¶ 34-35,

and Attachments I.   Here, however, Defendants' evidence establishes that Plaintiff was exposed

only to air that comported with federal guidelines, was not poorly ventilated or unusually dusty,

and that any American might be exposed to on a daily basis in the course of his or her job.  See

Exhibit 4 ¶¶ 18 and 36, and Attachments E and I; Exhibit 2 ¶¶ 7-10, and Attachments C-E.

Based upon the tests and inspections conducted by the OSHA inspectors, the conditions in

the UNICOR factory did not require the Defendants to take any other precautions with respect to

the use and processing of Micore Board.   See Exhibit 4 ¶¶ 18 and 35, and Attachments E and I.

Although several suggestions were made to increase the safety measures available to personnel

assigned to the UNICOR factory, these were recommendations only, and OSHA fully recognized

that levels of contaminants in the UNICOR factory were well within the applicable guidelines.

See Exhibit 4 ¶ 18, and Attachment E.

Because the respiratory exposure level for dangerous contaminants amounted to a mere

10% of the relevant exposure limit, and BOP did not violate requirements regarding safety

precautions, the risk to Plaintiff simply cannot amount to a level so grave that it violates

contemporary standards of decency as required under the Helling test.  OSHA standards reflect

contemporary standards of decency – our society willingly exposes free citizens and inmates alike

to toxins, chemicals, and particulates up to the threshold values established by OSHA.  See, e.g.,

Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd

Cir., Feb 17, 2005);  Saahir v. Holligan, 2004 WL 1418790 (N.D. Tex., June 24, 2004). The

conditions present in the UNICOR building did not violate OSHA standards.  As such, Plaintiff

cannot, and has not, established the objective prong of the Eighth Amendment test, and his Eighth

Amendment claim must be dismissed.

Numerous cases support the proposition that an inmate's Eighth Amendment claim based

on exposure to hazardous substances or poor air quality cannot survive summary judgment where the correctional facility is in substantial, even if imperfect, compliance with the relevant state and/or federal standards. The United States District Court for the Western District of New York recently addressed a § 1983 claim by pro se prisoners that New York state correctional officials had violated their Eighth Amendment rights by exposing them to inadequate ventilation and poor air quality at their inmate work assignments. See Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd Cir. Feb. 17, 2005). The inmates, who worked in a print shop, alleged that the ventilation system and air quality in the shop were inadequate, causing them headaches, nausea, skin irritation, increased blood pressure, and sinus problems. See Wooten, 2004 WL 816919 at *1. In support of their claims, plaintiffs submitted a report by an OSHA specialist that he had concerns regarding the ability of the ventilation system to remove toxic chemicals from the breathing zones of the workers in order to create a safe working environment. See id. The OSHA specialist had not taken air quality samples. An industrial hygienist associated with the state department of corrections later conducted air quality tests to determine whether employees were being exposed to hazardous chemicals at levels that exceeded state guidelines. Id. at *2. The air quality tests confirmed that the substances tested were below the permissible levels set by the state. Id. Based on the air quality tests, the correctional officials determined that the air quality in the print shop did not pose an unreasonable risk to inmate employees' health. Id.

The Wooten Court agreed with the correctional officials' decision and granted summary judgment in their favor. The Court concluded that plaintiffs had not shown that the allegedly poor ventilation in the print shop was serious enough to satisfy the objective element of their Eighth Amendment claim. Id. at *5. The Court acknowledged that plaintiffs' evidence had shown that

OSHA had made recommendations for improvements to the print shop air quality.  Id.  However,

plaintiffs' evidence did not show that the air quality failed to comply with federal workplace

safety standards.  Id.  Moreover, defendants' evidence regarding air quality indicated that print

shop workers were not being "excessively exposed to hazardous materials."  Id.  Finally, plaintiffs

had not offered evidence to show that defendants' air quality tests were erroneous or unreliable.

Id.  Accordingly, plaintiffs failed to raise a triable issue of fact with respect to the objective

element of their Eighth Amendment claim.  See also Saahir v. Holligan, 2004 WL 1418790 (N.D.

Tex., June 24, 2004)(granting summary judgment to state prison officials in § 1983 Eighth

Amendment claim by asthmatic inmate who alleged his work assignment in boot factory exposed

him to hazardous chemicals, dust, and glue fumes.  Defendants were entitled to summary

judgment based on fact that boot factory had been inspected and air quality met OSHA standards).

   Similarly, the United States District Court for the District of Delaware granted summary

judgment in favor of state correctional officials on an inmate's claim that he was exposed to

unreasonably high levels of environmental tobacco smoke ("ETS"), in violation of his Eighth

Amendment rights.  See Baker v. Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002).  In

Baker, the inmate provided an affidavit that he was exposed to "cloudy," "very smoky"

conditions, as well as a chart detailing the time of day and the number of inmates smoking at any

given time over the course of a five-day period.  Id.  He also produced affidavits from several

other inmates in support of his claims.  Id.  The Baker Court granted summary judgment in favor

of defendant prison officials because, even if plaintiff had shown that he was subject to some level

of environmental tobacco smoke, he had not "provid[ed] competent evidence as to the level of

such ETS."  Id.  Accordingly, the Court found that the inmate failed to meet the Supreme Court's

requirement in Helling that he show that his exposure to a toxin "created a risk [that] is so grave

that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Id. (quoting Helling, 509 U.S. at 36). See also Jones v. Kearney, 2001 WL 1414854 (D.Del., Nov. 2, 2001)(granting defendant correctional officials' 12(b)(6) motion on inmate's Eighth Amendment claim where plaintiff inmate could not show that he himself was being exposed to "unreasonably high levels" of environmental tobacco smoke, because the institution had an "open air only" smoking policy).

Here, like the inmate in Baker, Plaintiff Hill cannot show that he was exposed to a level of air pollution, dust, or toxins that created a risk so grave as to violate contemporary standards of decency. To the contrary, Defendants have come forward with conclusive evidence establishing that the UNICOR factory certainly did not expose Plaintiff to that kind of risk.[9] See Exhibit 4 ¶¶ 12-13, 18, and Attachments C and E.

Courts have granted summary judgment in favor of prison officials even where the correctional facility is not in compliance with applicable federal standards. In Carroll v. DeTella, 255 F.3d 470 (7th Cir. 2001), the United States Court of Appeals for the Seventh Circuit granted summary judgment in favor of Illinois correctional officials on plaintiff's Eighth Amendment claim that the prison drinking water was contaminated with radium. There, it was undisputed that the radium levels in the drinking water of the correctional facility did exceed the maximum level set by the United States Environmental Protection Agency ("EPA"). See id. at 472. However,

_____

[9] It is also noteworthy that during the period of time in question, Plaintiff was assigned to a position in the evening shift in Layup 2. The Layup 2 work assignment is located in the packing area. Duties in this work assignment included cleaning boards, building palettes, and loading products onto pallets to prepare for shipping. Inmates assigned to Layup 2 do not work with Micore Fiber Board or Lokweld adhesive. In fact, the Layup 2 work area is located in a completely separate area in the factory which is not typically exposed to the Micore or Lokweld work stations. See Exhibit 2 ¶ 6, and Attachment B.

despite the fact that the correctional facility's radium level continued to exceed the federal

maximum, the state environmental agency informed the plaintiff-inmate that other communities in

Illinois had water supplies that also exceeded the federal maximum. Plaintiff was also informed

that no remedial action would be taken to address radium levels, because the EPA was

considering raising the maximum level.  However, at the time the plaintiff filed suit, the EPA had

not raised the radium standard, and the plaintiff continued to be subject to radium levels that

violated the applicable federal standards.  Nonetheless, the Seventh Circuit affirmed the District

Court's grant of summary judgment in favor of prison officials.

In granting summary judgment, the Carroll Court recognized that prisons are not under a

duty to provide a maximally safe environment, completely free from pollution or safety hazards.

Id.  Because many Americans live under conditions of exposure to various contaminants, the

Court acknowledged that the Eighth Amendment does not require prisons to provide prisoners

with "more salubrious air, healthier food, or cleaner water than are enjoyed by substantial

numbers of free Americans."  Id. (internal citations omitted).  As the Court recognized,

> It would be inconsistent with this principle to impose upon prisons in the name of
> the Constitution a duty to take remedial measures against pollution or other
> contamination that the agencies responsible for the control of these hazards do not
> think require remedial measures.  If the environmental authorities think there's no
> reason to do anything about a contaminant because its concentration is less than
> half the maximum in a proposed revision of the existing standards, prison officials
> cannot be faulted for not thinking it necessary for them to do anything either.  They
> can defer to the superior expertise of those authorities.

Id. at 472-73.

Here, Plaintiff Hill is being exposed to air quality and working conditions that OSHA and

our society deem to be entirely acceptable for all persons, whether free or incarcerated.

Accordingly, Plaintiff simply cannot show that he was subjected to "unreasonably high" levels of

air pollutants.  Rather, he has failed the objective portion of the <u>Helling</u> Eighth Amendment test, and summary judgment must be entered in favor of Defendants.

   3.     **Plaintiff Cannot Establish Deliberate Indifference on the Part of Prison Officials**[10]

   Even assuming that Plaintiff had satisfied the objective portion of the Eighth Amendment test, which he has not, he cannot show deliberate indifference on the part of prison officials, as required by the subjective portion of the <u>Helling</u> test.  As discussed in section 2, <u>supra</u>, Defendants' compliance with OSHA standards clearly insulates them from liability.  <u>See</u> <u>Helling v. McKinney</u>, 509 U.S. 25 (1993); <u>Wooten v. Goord</u>, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), <u>aff'd.</u>, 2005 WL 387971 (2nd Cir., Feb 17, 2005);  <u>Saahir v. Holligan</u>, 2004 WL 1418790 (N.D. Tex., June 24, 2004);  <u>Baker v. Williams</u>, 2002 WL 31015630 (D.Del., Sept. 10, 2002); <u>Jones v. Kearney</u>, 2001 WL 1414854 (D.Del., Nov. 2, 2001).  Furthermore, even assuming, <u>arguendo</u>, that Defendants' compliance with OSHA standards is not enough, Defendants respectfully assert that they did evaluate, and comply with, the Material Safety Data Sheets for

_____

   [10] Pursuant to the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correction facility, for mental or emotional injury suffered while in custody without a **prior showing of physical injury**."  PLRA, 42 U.S.C. § 1997e(e)(emphasis added).  <u>Mitchell v. Horn</u>, 318 F.3d 523, 533-36 (3d Cir. 2003); <u>Davis v. District of Columbia</u>, 158 F. 3d 1342 (D.C. Cir. 1998); <u>Zehner v. Trigg</u>, 133 F. 3d 459 (7th Cir. 1997). It is well settled that fear of a future medical condition does not constitute a physical injury for purposes of the PLRA.  <u>See</u> <u>Fontroy v. Owens</u>, 150 F.3d 239, 243 (3d Cir. 1998); <u>Herman v. Holiday</u>, 238 F.3d 660, 665-66 (5th Cir. 2003)(§ 1997e(e) bars claims for mental and emotional damages caused by the fear that one's exposure to environmental hazards may result in exposure related diseases).  Additionally, during the periods of time in which Plaintiff was assigned to the UNICOR factory, he neither reported  <u>any</u> work-related health problems, nor did his medical records indicate that he suffered from any work related health problems or injuries.  <u>See</u> Exhibit 1 ¶ 5, and Attachment C; Exhibit 4 ¶¶ 46-47; Exhibit 2 ¶ 11; Exhibit 5, Declaration of Debora Forsyth ¶ 7.  Therefore, his Eighth Amendment claim relating to exposure to environmental hazards must be dismissed pursuant to the PLRA, 42 U.S.C. § 1997e(e).

substances utilized in the UNICOR factory.

Courts have established that, with respect to the subjective prong of the Eighth Amendment analysis, defendants are not deliberately indifferent to plaintiffs' health where they conduct air quality testing and results comply with federal standards.  In Carroll, the Seventh Circuit stated that even if inmate print shop employees had met the objective portion of their burden, they could not satisfy the subjective element despite the fact that defendants were on notice that the ventilation system may have needed improvements.  See 2004 WL 816919, at *5. "Any claim that defendants were aware that the conditions in the Print Shop posed an excessive risk to plaintiffs' health is belied by the subsequent inspections of the Print Shop, which revealed that the air quality was acceptable according to federal standards."  Id. at *5.

Here, as in Carroll, OSHA conducted air quality tests and concluded that the air quality in the UNICOR factory was well within applicable acceptable guidelines for the relevant contaminants.  See Exhibit 4 ¶¶ 12-13, 18, and Attachments C and E.  It was thus reasonable for FCI McKean to rely on available air quality test results to determine what, if any, safety equipment it needed to make available for staff and inmates assigned to the UNICOR factory. There is no genuine issue of fact as to whether Defendants were both aware of, and disregarded, an excessive and serious risk to Plaintiff Hill's health.  The Court may not hold Defendants to a higher standard than that required by federal agencies who are charged with monitoring workplace safety.  Therefore, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim, and it must be dismissed from this civil action.

Moreover, even if compliance with OSHA standards was not sufficient to insulate Defendants from being deemed deliberately indifferent, Defendants also relied on, and acted consistently with, the applicable MSDS sheets and product warning labels in determining what

protective equipment to provide for UNICOR employees.  MSDS sheets are required to, and do,

list risks associated with overexposure to various chemicals.  More importantly, however, the

MSDS sheets set forth what precautions, if any, must be taken in order to protect against such

risks.  See Exhibit 4 ¶ 33.  Defendants' decisions regarding the UNICOR work environment and

protective equipment were consistent with the MSDS sheets and with product warning labels.  See

Exhibit 4 ¶¶ 32-37, and Attachment I.

The product warning label for Micore Board states: "Dust hazard.  Cut and trim with

knife, razor, or hand saw.  Do not cut with power equipment unless a dust collector is used on the

equipment or local exhaust is used and a NIOSH/MSHA-approved respirator is worn."  See

Exhibit 4 ¶ 38, and Attachment J. Defendants do not dispute that power equipment was used to

cut Micore Board.  However, in accordance with the Micore 300 label, the UNICOR factory

employed a dust collector on the cutting equipment.  See Exhibit 4 ¶ 36; Exhibit 2 ¶¶ 7-10, and

Attachments C-E.   Because the UNICOR factory used a dust-collector system instead of local

exhaust, a NIOSH/MSHA-approved mask was not required.  See Exhibit 4 ¶¶ 35-38, and

Attachments I-J.

The MSDS for Micore Board is also instructive in establishing that NIOSH/MSHA-

approved masks are not required when a dust collecting system is in use.[11]  See Exhibit 4 ¶¶ 34-

37, and Attachment I.  An MSDS is a technical bulletin prepared by chemical manufacturers and

importers to supplement the information contained on product labels.  29 C.F.R. § 1910.1200,

---

[11]Pursuant to the Hazard Communication Standard ("HCS") promulgated by OSHA, chemical manufacturers and importers must evaluate the hazards of the chemicals they produce or import.  Using that information, they must prepare labels for containers, and the more detailed MSDS technical bulletins.  Chemical manufacturers, importers and distributors of hazardous chemicals are required to provide the appropriate labels and MSDS to the employer to which they ship the chemicals.  29 C.F.R. §1910.1200, App. E.  See Exhibit 4 ¶ 33.

App. E.  Pursuant to OSHA regulations, employers may rely on the information contained on the

product labels, as supplemented by the MSDS, and have no independent duty to analyze the

chemical or evaluate the hazards of it.  See Exhibit 4 ¶ 33.

> Section VII of the MSDS for Micore Board provides:
>
> **Respiratory protection:** Not typically necessary under normal conditions of use.
> Provide general ventilation and local exhaust ventilation to meet TLV [(Threshold
> Limit Values)]  requirements of individual ingredients and to control dusting
> conditions.  Wear a NIOSH/MSHA-approved dust respirator in poorly ventilated
> areas, if TLV is exceeded, and/or when dusty conditions exist.  Avoid prolonged
> and repeated breathing of dust.

See Exhibit 4 ¶ 34, and Attachment I.

Thus, according to the MSDS for Micore Board, there are three situations which would

necessitate the use of respirators when working with Micore Board: (1) in poorly ventilated areas;

(2) if Threshold Limit Values are exceeded; or (3) when dusty conditions exist.  See Exhibit 4 ¶

35, and Attachment I.  However, the air quality tests performed by OSHA in the UNICOR factory

definitively establish that the UNICOR factory was not poorly-ventilated, that the Threshold Limit

Values for hazardous ingredients of Micore Board were not exceeded, and that dusty conditions

did not exist.  See Exhibit 4 ¶¶ 12-13, 18, and Attachments C and E. Indeed, the evidence shows

that air quality tests conducted in 2001 and 2003, by Microbac Laboratories and by OSHA,

respectively, revealed that the respiratory particulates were well below applicable OSHA limits.

See Exhibit 4 ¶¶ 12-13, 18, and Attachments C and E.   More specifically, with respect to the level

of dust in the UNICOR factory, the objective air quality tests show that the total particulate level

was 1.1 mg per cubic meter, which is well below the applicable TLV standard for total

Particulates/Nuisance Dust – 15 mg per cubic meter.  See Exhibit 4 ¶¶ 12-13, 18, and

Attachments C and E.

Additionally, it is clear that the UNICOR factory was more than adequately ventilated. Specifically, the factory is equipped with two dust collection systems, each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal. The dust collectors have been operational in the UNICOR factory at FCI McKean since approximately September 11, 1989, and each dust collectors has the capacity to move 34,000 cubic feet of air per minute from the UNICOR factory. See Exhibit 2 ¶7, and Attachment C.

The dust collection system is connected to the furniture-manufacturing machinery in the UNICOR building. According to operational procedures in the UNICOR factory at FCI McKean, the manufacturing machinery is not to be operated unless the dust collection system is turned on first.[12] See Exhibit 2 ¶8.

---

[12] Micore Board is initially cut to size on the SCMI Horizontal Beam Panel Saw. This machine has two dust collection connections: (1) a six inch port connected to the bottom and (2) a five inch port connected to the top portion of the machine. Each of these connections provides dust collection to the saw blade at the point of machining. In the next step of the process, the four edges of the Micore Board are shaped on the Delta Shaper machine. This machine has one four inch port connected to the shaper fence, which supplies dust collection directly at the point of machining. In the third and final machining operation, the Onsrud Inverted Router is used to create a pocket in the back side of the Micore Board for support brackets. This operation is only performed on half of the quantity ordered. This machine has a six inch port connected to the bottom supplying dust collection directly to the point of machining and a four inch port connected to a hood located directly over the point of machining to supply dust collection for particles, if any, that are not collected from the bottom. All of the aforementioned machines are connected to the main dust collection plenum leading to one of the two main dust collection systems. See Exhibit 2 ¶9.

Dust and air entering the dust collection system through spiral pipes such as the ones described above are moved by fans within the dust collection system from the machinery process through smooth round ducts, to a large vacuum located on the outside of the building. The spiral pipes referenced above, are actually smooth on the inside for better dust collection. The vacuum pulls dust and air from the factory to one of the two large cone-shaped filter houses where air is filtered and dust is evacuated into to a hopper, which is also located outside of the UNICOR building. The filtered air is then returned to the factory though square ducts. The dust that is filtered from the factory air is collected in a hopper and disposed at a site away from FCI McKean and the UNICOR factory. See Exhibit 2 ¶10, and Attachments D-E.

The "Special Precautions" section of the Micore Board MSDS provides further support for the determination that a respirator was not necessary. That section indicates that "[o]ver-exposure to dust can cause eye, skin, nose, throat or respiratory irritation... Do not cut with power equipment unless either a dust collector is used on the equipment or local exhaust is used and NIOSH/MSHA-approved respirator is worn." See Exhibit 4 ¶¶ 32-35, and Attachment I. This language is similar to, but not the same as, the warning contained on the Micore Board product label. The use and placement of the words either and or in the MSDS indicates that at times when the Micore Board is cut with power equipment, the factory could implement one of two precautions: either use a dust collector system, or use local exhaust and NIOSH/MSHA-approved respirators. Defendants reasonably opted to employ a dust collector system. See Exhibit 4 ¶ 36; Exhibit 2 ¶¶ 7-10, and Attachments C-E. The MSDS does not indicate that, where a dust collector is used on the equipment, NIOSH-approved respirators are also required. See Exhibit 4 ¶¶ 32-35, and Attachment I. Defendants' interpretation of the applicable safety requirements for Micore Board is consistent with the findings of the OSHA inspectors, who recommended, but did not require, the use of NIOSH-approved respirators. See Exhibit 4 ¶ 18, and Attachment E.

With respect to Plaintiff's claims regarding exposure to Lokweld, a spray-grade adhesive that is used in the UNICOR factory, the MSDS for Lokweld expressly states that a respirator is only required "in case of insufficient ventilation." See Exhibit 4, Attachment G. Lokweld is applied to materials in the UNICOR factory using a sprayer, which is located in an enclosed spraying booth that is equipped with an independent exhaust system. See Exhibit 4 ¶ 21. The booth in which Lokweld is used is completely enclosed, and no leaks or other hazards have been identified relating to Lokweld. See Exhibit 4 ¶ 22. Had a leak developed, vapors emanating from the booth would have had a noxious and easily identifiable odor. See Exhibit 4 ¶ 22. FCI

McKean has not received any complaints about odors in or around the Lokweld station, nor has Safety Manager Housler ever noticed any unusual odors in the area. See Exhibit 4 ¶ 22.

Moreover, when OSHA inspected the UNICOR factory between April and August of 2003, the inspectors conducted a full inspection of the Lokweld spray booth. See Exhibit 4 ¶ 23. The OSHA inspectors did not reveal any concerns relating to Lokweld fumes emanating from the spray booth. See Exhibit 4 ¶¶ 24-25, and Attachment F. The only concerns the OSHA inspectors had regarding the use of Lokweld in the UNICOR factory related to (1) the combustibility of Lokweld when stored near certain wood products; and (2) an isolated unauthorized use of Lokweld by an inmate to glue two boards by hand in the factory. See Exhibit 4 ¶¶ 24-27, and Attachment F. Each of OSHA's concerns relating to Lokweld were corrected by September 22, 2003. See Exhibit 4 ¶ 29, and Attachment H. Accordingly, Plaintiff's concerns about Lokweld are contradicted by the results from the OSHA inspection, the MSDS sheet for Lokweld, and the Declaration of Safety Manager Housler, each of which indicate that Lokweld fumes were not emanating into the UNICOR factory, and that Plaintiff was not improperly exposed to Lokweld.

In conclusion, Defendants properly relied on objective air quality data, results of the OSHA inspection of the UNICOR factory, and relevant MSDS sheets in making decisions about UNICOR factory conditions and necessary protective equipment. They were in no way deliberately indifferent to Plaintiff's health and safety in relying on this objective, federally sanctioned information, and Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim.[13]

---

[13] Plaintiff further alleges that Defendants violated his Fifth and Eighth Amendment rights by altering the Material Safety Data Sheet (MSDS) for Micore Fiber. See Complaint ¶ 38. Even if this allegation could satisfy Fifth or Eighth Amendment standards, Plaintiff has provided no evidence that he was actually harmed by the alleged alteration to the MSDS sheet.

**D.    Any Claim Pursuant to the Fifth Amendment Substantive Due Process Clause is Foreclosed by Plaintiff's Eighth Amendment Claim.**

As part of the First Count of his Fifth Amended Complaint, Plaintiff alleges that the claims raised in the Complaint deprived him of his rights under the Fifth Amendment of the Constitution.  See Fifth Amended Complaint ¶ 52.

It is well settled that if a constitutional claim is covered by a specific constitutional provision, it must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.  See U.S. v. Lanier, 520 U.S. 259, 272 n.7 (1997).  Any substantive due process claim raised by Plaintiff as a result of his alleged exposure to silica dust relates to a specific government behavior against which the Eighth Amendment explicitly protects.  Helling v. McKinney, 509 U.S. 25 (1993).  As such, Plaintiff cannot obtain relief pursuant to the Fifth Amendment Substantive Due Process Clause, and this claim must be dismissed with prejudice.[14]

---

Specifically, Plaintiff was not provided with a respirator because: a) it was determined that a respirator was not required, and b) he never requested one.  See Exhibit 2 ¶ 12; Exhibit 4 ¶¶ 32-42; Exhibit 5 ¶ 8.  Because copies of the MSDS sheets are readily available on the factory floor, any staff or inmate in the factory could place an unauthorized marking or alteration on an MSDS sheet.  Such handwritten alterations to an MSDS sheet are not authorized by Defendant Housler or anyone else in the institution.  See Exhibit 2 ¶ 13; Exhibit 4 ¶¶ 43-45; Exhibit 5 ¶ 9.  Nonetheless, if an alteration to the MSDS sheet had been brought to the attention of staff, it would have been replaced as soon as practicable.   See Exhibit 2 ¶ 13; Exhibit 4 ¶¶ 43-45; Exhibit 5 ¶ 9.

[14] To the extent Plaintiff's Complaint states a Procedural Due Process claim, that claim is clearly without merit.  In order to establish a procedural due process claim, Plaintiff must demonstrate that he was deprived of a constitutionally-protected property or liberty interest.  Daniels v. Williams, 474 U.S. 327, 339 (1986); Sandin v. Connor, 515 U.S. 472 (1995).  Additionally, in order to state a due process claim, Plaintiff must be able to further show that he was denied an opportunity to be heard with regard to the conditions to which he was exposed.  Id. In his complaint, however, Plaintiff acknowledges that he exhausted the administrative remedy process that was made available to him with regard to the conditions in the UNICOR factory.

**E.     Defendants LaManna, Fantaskey, Reome, and Klark Must Be Dismissed Because Plaintiff Has Plead No Claims Against Them And, Therefore, Can Show No Personal Involvement.**

A plaintiff, in order to state a viable civil rights claim, must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of law; and 2) that said conduct deprived the Plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Shaw by Strain v. Stackhouse, 920 F.2d 1135, 1141-42 (3d Cir.1990).

An inmate must plead and later prove that some affirmative act or omission was committed by the individual Defendant to submit him to personal liability for the actions of another person.  Bracey v. Grenoble, 494 F.2d 566 (3d Cir. 1974).  Indeed, complaints combining conclusory allegations, absent reference to material facts, will not survive motions to dismiss. Geter v. Fortenberry, 849 F.2d 1550, 1553 (5th Cir. 1988).  See also Kennedy v. City of Cleveland, 797 F.2d 297 (6th Cir. 1986), cert. denied, 479 U.S. 1103 (1987); Cotner v. Hopkins, 795 F.2d 900 (10th Cir. 1986);  Elliott v. Perez, 751 F.2d 1472, 1482 (5th Cir. 1985)(a plaintiff attempting to present a civil action against individual government officials must: present material facts on which he contends he can establish a right to recovery; state those facts with some particularity; and show why the official cannot show a valid defense of immunity).

Furthermore, the doctrine of respondeat superior cannot form the basis of a Bivens claim. Robertson v. Sichel, 127 U.S. 507, 515-17 (1988); Rizzo v. Goode, 423 U.S. 362, 371 (1976). Supervisory personnel are generally not liable in a civil rights action under the theory of vicarious

---

See Complaint ¶7.  See also 28 C.F.R. § 542.10, et seq.  As a result, Plaintiff cannot support a claim that he was deprived of the procedural protections of the Due Process Clause.

liability.  Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir.) (en banc), cert. denied,

502 U.S. 1074 (1992); Hansen v. Black, 885 F.2d 642, 645-646 (9th Cir. 1989); See also Terrell v.

Brewer, 935 F.2d 1015, 1018 (9th Cir. 1991).  To find a supervisory official personally liable for

the unconstitutional acts of his subordinates, it must be shown that the supervisor had a duty to

instruct the subordinate to prevent constitutional harm, and that "as a result of the official's failure

to instruct, the Plaintiff was harmed in the manner threatened." Haynesworth v. Miller, 820 F.2d

1245, 1262 (D.C. Cir. 1987); MacKinney v. Nielsen, 69 F.3d 1002, 1008 (9th Cir. 1995); Redman,

942 F.2d at 1446-1447; Hansen, 885 F.2d at 646; See also Larez v. City of Los Angeles, 946 F.2d

630, 646 (9th Cir. 1991) (supervisory liability is imposed against a supervisory official in his

individual capacity for his own culpable action or inaction in the training, supervision, or control

of his subordinates; for his acquiescence in the constitutional deprivations of which the complaint

is made; or for conduct that showed a reckless or callous indifference to the rights of others.);

Hunt v. Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989) (inmate fails to allege any facts showing

role head of state department of corrections played in denial of dental care); Ouzts v. Cummins,

825 F.2d 1276, 1277 (8th Cir. 1987) (per curiam) (warden's responsibility for generally

supervising the operations of the prison not sufficient to establish personal involvement).

Therefore, personal involvement or some affirmative action on the part of a defendant is necessary

before he may be found liable for a civil rights violation. See Rode v. Dellarciprete, 845 F.2d

1195 (3d Cir. 1988); Stoneking v. Bradford Area School District, 882 F.2d 720, 729-30 (3d Cir.),

cert. denied, 493 U.S. 1044 (1990).

A sufficient causal connection may be established by showing that the supervisor set in

motion a series of acts by others which the supervisor knew or reasonably should have known

would cause others to inflict the injury.  Larez, 946 F.2d at 645; Redman, 942 F.2d at 1447.  A

supervisor may also be liable for constitutional violations by his subordinates if the supervisor knew of the violations and failed to prevent them.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 680-81 (9th Cir. 1984). Finally, supervisors may be liable if the alleged deprivation resulted from a failure to properly train or supervise personnel, or from an official policy or custom for which the defendants were responsible.  Ybarra, 723 F.2d at 680.

In the Fifth Amended Complaint, Plaintiff has not alleged any facts implicating Defendant LaManna in the alleged denial of any constitutional rights.  Rather, Defendant LaManna has been named in this lawsuit solely based upon his position as the Warden and CEO of FCI McKean. Accordingly, the Plaintiff's claims against him should be dismissed for failure to show personal involvement.

It is also clear from the face of the Fifth Amended Complaint that there are no longer any pending allegations involving Defendants Fantaskey, Reome, or Klark.  These three Defendants had been named in the previous complaints solely based upon Plaintiff's retaliation claim, which alleged that Defendants Fantaskey, Reome, and Klark participated in Plaintiff's removal from UNICOR.  That claim is no longer raised in the Fifth Amended Complaint.

Furthermore, Defendants Fantaskey, Reome, and Klark are employees of BOP who are not assigned to FPI, and did not have any direct involvement in the operation of the UNICOR factory. Defendant Fantaskey is the former Supervisor of Education (retired), Defendant Reome is the Unit Manager, and  Defendant Klark is the former Executive Assistant to the Warden (retired). See Fifth Amended Complaint ¶¶  8, 9. As such, Defendants Fantaskey, Reome and Klark no longer play any role in this litigation, and they should be dismissed from this action.

**F.     Defendants Are Protected from Suit by the Doctrine of Qualified Immunity, Because Plaintiff's Clearly Established Constitutional Rights Were Not Violated.**

Summary judgment is appropriate with regard to all of the named Defendants based on the doctrine of qualified immunity.   A plaintiff may maintain an action for damages against a federal employee personally, thereby subjecting him or her to personal responsibility for payment of damages, for violating the plaintiff's constitutionally protected rights.  Davis v. Passman, 442 U.S. 228 (1979); Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, (1971).  The Supreme Court, however,  has held that federal executive officials, other than those performing adjudicatory or prosecutorial functions, are entitled to qualified good faith immunity from personal liability for civil damages. Saucier v. Katz, 533 U.S. 194 (2001); Harlow v. Fitzgerald, 457 U.S. 800 (1982); Butz v. Economou, 438 U.S. 478 (1978).  "[G]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818.  See also Jeffers v. Gomez, 267 F.3d 895, 910-912 (9th Cir. 2001).  This is an "immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511 (1985); see also Hunter v. Bryant, 502 U.S. 224 (1991) (per curiam).   Therefore, once an individual raises qualified immunity in a Bivens action, the plaintiff cannot maintain the action against the federal official in his or her individual capacity unless the plaintiff can show that the defendant violated a clearly established Constitutional right. Siegart v. Gilley, 500 U.S. 226 (1991); Abdul-Akbar v. Watson, 4 F.3d 195 (3d Cir. 1993). This inquiry focuses on whether a reasonable official would have found the defendants' conduct to be illegal. Abdul-Akbar, 4 F.3d  at 205; Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993), cert. denied, 114 S.Ct. 559 (1993).   Normally, qualified immunity should be decided by the court

before trial.  Hunter, 502 U.S. at 227.  See also Cunningham v. Gates, 229 F.3d 1271 (9th Cir.

2000).  The Plaintiff has the burden of showing that the defendant federal employees violated his

clearly established Constitutional rights.  Zeigler v. Jackson, 716 F.2d 847 (11th Cir. 1983).

The Harlow rule on qualified immunity was further clarified by the Supreme Court in

Anderson v. Creighton, 483 U.S. 635 (1987), as follows: "whether an official protected by

qualified immunity may be held personally liable for an allegedly unlawful official action

generally turns on the "objective legal reasonableness" of the action, ... assessed in light of the

legal rules that were "clearly established" at the time it was taken."  Id. at 639 (citation to Harlow

omitted).  Both questions are to be decided by the court. This standard "gives ample room for

mistaken judgments by protecting all but the plainly incompetent or those who knowingly violated

the law."  Hunter v. Bryant, 502 U.S. 224, 229 (1991) (per curiam) (quoting Malley v. Briggs, 475

U.S. 335, 343 (1986)).  As long as a defendant government employee could reasonably have

thought his actions were consistent with the rights he was alleged to have violated, said employee

is entitled to qualified immunity.  Anderson, 483 U.S. at 638.

Government officials are not expected to be legal scholars like law professors.  Ward v.

San Diego County, 791 F.2d 1329, 1332 (9th Cir.), cert. denied sub nom., Duffy v. Ward, 483 U.S.

1020 (1987).  The contours of the right allegedly violated must be sufficiently clear so that a

reasonable government official would understand that his or her conduct violated the plaintiff's

constitutional rights.  Officers who reasonably but mistakenly conclude their conduct was lawful

are entitled to immunity.  Anderson, 483 U.S. at 641;  Hunter, 502 U.S. at 228-229.

Furthermore, the Supreme Court recently clarified the standard for the qualified immunity

defense, making it much more difficult for Plaintiff to prevail.  Saucier v. Katz, 533 U.S. 194

(2001).  In Saucier, the Court held that the lower courts had been ignoring a significant threshold

question.  Specifically, this Court must consider whether, "[t]aken in the light most favorable to

the party asserting the injury, [] the facts alleged show the officer's conduct violated a

constitutional right?"  Saucier, 533 U.S. at 200-01.   Only if Plaintiff's allegations make out a

constitutional violation does the analysis move to the second sequential step, asking "whether the

right in question was clearly established."  Id.  The Court went on to caution, however, that this

second inquiry is not taken in a broad, general context, but must be "undertaken in light of the

specific context of the case."  Id.  The reason for such an analysis is to avoid treating prison

administrators as attorneys or holding them to an impossible standard.  As such:

> The contours of the right must be sufficiently clear that a reasonable official would
> understand that what he is doing violates that right.  The relevant, dispositive inquiry in
> determining whether a right is clearly established is whether it would be clear to a
> reasonable officer that his conduct was unlawful in the situation he confronted.

Id. (internal citations omitted).  Thus, if the law "did not put the officer on notice that his conduct

would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  Id.

(citing Harlow v. Fitzgerald, 457 U.S. 800 (1982); Malley v. Briggs, 475 U.S. 335 (1986)).

In the present case, Plaintiff has not shown that Defendants violated any of his

Constitutional rights.  See discussion in Sections B-E, supra.  Therefore, he has failed to establish

his burden of proof, as required by Saucier, Anderson and Harlow.  Assuming for the sake of

argument, however,  that any of Plaintiff's allegations constituted violations of his  Constitutional

rights, none of those rights were so clearly established as to satisfy the second prong of the

Saucier analysis.

Because none of Plaintiff's clearly established Constitutional rights were intentionally

violated by any of the named Defendants, all of the Defendants are entitled to qualified immunity.

**FEDERAL TORT CLAIMS ACT**

> **G.**    **Plaintiff's Federal Tort Claims Act Claim Relating to Conditions in the UNICOR Factory (Count Two) Must Be Dismissed for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1).**

The United States as a sovereign is immune from lawsuit except to the extent it consents to be sued. FDIC v. Meyer, 510 U.S. 471, 475 (1994); Lehman v. Nakshian, 453 U.S. 156 (1981); Matsko v. United States, 372 F.3d 556 (3rd Cir. 2004). Thus, it is axiomatic that unless the United States expressly waives this immunity, a district court will have no subject matter jurisdiction to hear the suit.[15] Meyer, 510 U.S. at 475; U.S. v. Mitchell, 463 U.S. 206, 212 (1983); U.S. v.

---

[15] A defense of lack of jurisdiction over the subject matter may come in one of two forms: a facial attack or a factual attack. Gould Electronics, Inc. v. United States, 220 F.3d 169, 176 (3rd Cir. 2000); Mortensen v. First. Fed. Sav. And Loan Ass'n., 549 F.2d 884, 891 (3rd Cir. 1977). In a facial attack, the defense merely files a Rule 12 (b)(1) motion with no supporting documents, affidavits or other factual allegations. Id.; PBGC v. White, 998 F.3d 1192, 1196 (3rd Cir. 1993); Paterson v. Weinberger, 644 F. 2d 521, 523 (5th Cir. 1981). In reviewing a facial attack, therefore, the court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." Id.
    The Court, however, is not limited to the face of the complaint in determining a Rule 12(b)(1) motion. In a factual attack, the court may also consider evidence outside the pleadings, including affidavits, testimony, depositions, documents and other evidence to resolve factual issues bearing upon jurisdiction. Gould Electronics, 220 F.2d at 176; Gotha v. United States, 115 F.3d 176, 178-79 (3rd Cir. 1997); Biotecs Research Corp. v. Heckler, 710 F.2d 1375, 1379 (9th Cir 1983) (consideration of materials outside the pleadings will not convert a 12(b)(1) motion into one for summary judgment). Unlike a Rule 12(b)(6) motion, in a Rule 12(b)(1) Motion to Dismiss, the Court may resolve issues of fact relating to jurisdiction for itself. Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir.), cert. denied, 454 U.S. 897 (1981); Biase v. Kaplan, 852 F. Supp. 2d 268, 277 (D. NJ 1994).
    Regardless of whether the motion is based upon a facial attack or a factual attack, once the defense of lack of jurisdiction over the subject matter is raised, the Plaintiff bears the burden of showing why the case should not be dismissed. Gibbs v. Buck, 307 U.S. 66, 72 (1939); Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3rd Cir.), cert. denied, 501 U.S. 1222 (1991); Mortensen, 549 F.2d at 891. Plaintiff's burden, however, is lighter than a motion to dismiss pursuant to Rule 12(b)(6). Dismissal here is only appropriate where, "the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a Federal controversy." Growth Horizons, Inc. v. Delaware Cty., Pa., 938 F.2d 1277, 1280-81 (3rd Cir. 1993)(citing cases).

Testan, 424 U.S. 392 (1976).  Further, there can be no consent by implication or by use of
ambiguous language.  Library of Congress v. Shaw, 478 U.S. 310, 318 (1986); United States v.
Mitchell, 445 U.S. 535, 538 (1980)(waiver of sovereign immunity may not be found in the
absence of unequivocally expressed Congressional intent.)

In the case of actions sounding in tort, however, Congress has expressly issued a limited
waiver of sovereign immunity in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 2671,
et seq. Livera v. First National State Bank of New Jersey, 879 F.2d 1186, 1194 (3rd Cir), cert.
denied sub nom, Livera v. United States Small Business Ass'n, 493 U.S. 937 (1989); Matsko, 372
F. 3d at 558; Gotha, 115 F.3d at 179.  This is the only waiver of sovereign immunity for actions
sounding in tort against the United States, and it must be strictly construed, and all doubt is to be
resolved in favor of the government.  Meyer, 510 U.S. at 474-75.  Further, limitations placed upon
the waiver are to be expansively reviewed, and only express exceptions to these limits may be
recognized.  U.S. v. Nordic Village, Inc., 503 U.S. 30 (1992); Bowen v. City of New York, 476
U.S. 467 (1986). Thus, if any limitations upon this waiver of sovereign immunity apply, then a
12(b)(1) motion to dismiss for lack of jurisdiction over the subject matter is the appropriate means
for disposal of the action against the United States.  Matsko, 372 F. 3d at 558 (The district court
may only exercise jurisdiction if the FTCA waives sovereign immunity).

**1.    Plaintiff Failed to Exhaust His Administrative Remedies Prior to Filing
Suit**

Plaintiff's claim against the United States under the FTCA should be dismissed for lack of
subject matter jurisdiction, because Plaintiff did not fully exhaust his administrative remedies
under the FTCA prior to the filing of the complaint in this civil action.  28 U.S.C. § 2675(a).

The exclusive remedy for Plaintiff's negligence claim is an action against the United States

44

pursuant to the FTCA, 28 U.S.C. §§ 2671-2680.   The FTCA represents a limited waiver of

sovereign immunity for certain types of alleged tortious conduct. However, the FTCA expressly

limits the Court's jurisdiction to hear such claims by imposing strict administrative requirements

for claimants wishing to file a federal lawsuit.   The statute requires that a claimant <u>must</u> file an

administrative claim with the relevant agency before commencing suit:

> An action shall not be instituted upon a claim against the United States for money
> damages for injury or loss of property or personal injury or death cause by the
> negligent or wrongful act or omission of any employee of the government who
> acted within the scope of his office or employment, unless the claimant <u>shall have
> first presented the claim to the appropriate federal agency and his claim shall have
> been finally denied by the agency in writing</u>

28 U.S.C. §2675(a) (emphasis added).  <u>See</u> <u>also</u> <u>McNeil v. United States</u>, 508 U.S. 106, 113

(1993)(Plaintiff must present administrative tort claim to appropriate agency and tort claim must

be finally denied by agency before civil action may be initiated).

The filing of an administrative tort claim for a claim of negligence is a jurisdictional

prerequisite to an FTCA suit which cannot be waived.  28 U.S.C. § 2675(a).  <u>See</u> <u>Peterson v.

United States</u>, 694 F.2d 943, 944-45 (3d Cir. 1982); <u>Bialowas v. United States</u>, 443 F.2d 1047,

1049 (3d Cir. 1971). Thus, if a plaintiff files suit without first having submitted a timely claim for

administrative adjustment, the suit must be dismissed.  <u>McNeil</u>, 508 U.S. at 112-13.

In this case, Plaintiff filed his original Complaint on December 3, 2003.  <u>See</u> Docket No.

5. At that time, Plaintiff did not allege a negligence claim with respect to the conditions in the

UNICOR factory, and had submitted no administrative tort claims relating to the those

allegations.[16]  Furthermore, he has made no attempt to resolve this matter administratively since

---

[16] Additionally, the period of time in which Plaintiff could have filed an administrative
tort claim with respect to the allegations in Count Two of the Fifth Amended Complaint has now
expired.  Title 28 U.S.C. § 2401(b) requires all administrative claims to be filed within two years

that time. See Exhibit 6, Declaration of Joyce Horikawa ¶¶ 3-5; Exhibit 7, Declaration of Debbie

Stevens ¶¶ 3-4.

Therefore, because Plaintiff failed to exhaust his available administrative remedies under

the FTCA with respect to Count II, this Court lacks subject matter jurisdiction and Count II of

Plaintiff's Fifth Amended Complaint must be dismissed.[17]

> **2.    Plaintiff's Claim Against the United States Is Barred by the Prison Industries Fund, 18 U.S.C. § 4126(c)(4), Which Provides Procedures for Compensating Inmates Who Have Been Injured at Their Institution Work Assignment.**

It is well settled that the exclusive remedy for any injury suffered by an inmate during the

course of his work assignment is the Inmate Accident Compensation system, 18 U.S.C. §

4126(c)(4). U.S. v. Demko, 385 U.S. 149, 151-52 (1966); Joyce v. United States, 474 F.2d 215,

219 (3rd Cir. 1973)(discussing the same issue with respect to the analogous FECA statute);

Vaccaro v. Dobre, 81 F.3d 854, 857 (9th Cir. 1996)(Demko establishes that 18 U.S.C. § 4126 is

the exclusive remedy against the government); Aston v. U.S., 625 F.2d 1210, 1211 (5th Cir.

1980)(citing Demko); Granade v. U.S., 356 F.2d 837, 840-41 (2nd Cir.), cert. denied 385 U.S.

---

of the underlying conduct. Any ensuing appeal of that claim to the District Court would then
have to be filed within 6 months after the administrative claim was denied. 28 U.S.C. § 2401(b)

Records reflect that Plaintiff was finally and permanently removed from UNICOR on
November 13, 2003; and was transferred from FCI McKean to FCI Gilmer on December 23,
2003. See Exhibit 2 ¶ 6, and Attachment B; Exhibit 1 ¶ 4, and Attachment B. As such, Plaintiff
would have been required to file an administrative claim on or before November 13, 2005, and
he is now time-barred.

[17] Even if Plaintiff were to file an administrative claim now, this defect could not be
cured. Duplan v. Harper, 188 F. 3d 1195 (10th Cir. 1999); Gaerman v. FBI, 2003 WL 23537963
(D. Or. 1995); Webster v. U.S., 2005 WL 3031154 (E.D. Cal. 2005); Sparrow v. US Postal
Service, 825 F.Supp. 252, 254-55 (E.D.Cal. 1993).

1012 (1967). Thus, the FTCA's waiver of sovereign immunity does not and cannot extend to actions relating to an injury suffered by an inmate during the course of performing his institution work assignment. Demko, 385 U.S. at 151-52.

Here, because Plaintiff's alleged injuries in Count II were purportedly suffered while working, this Court must dismiss the FTCA claim in Count II for lack of subject matter jurisdiction. Demko, 385 U.S. at 153; Premachandra v. U.S., 739 F.2d 392, 394 (8th Cir. 1984)(a precisely drawn, detailed statute pre-empts more general remedies); Aston, 625 F.2d at 1211 (where an inmate was injured "on the job," the district court lacks jurisdiction to hear a cause of action grounded on the Federal Tort Claims Act); Wooten v. United States, 825 F.2d 1039, 1044 (6th Cir. 1987)(whether Plaintiff's injuries were caused by the performance of work is irrelevant; as long as the injury occurred while inmate was on the job, section 4126 is the exclusive remedy.)

Count II of Plaintiff's Fifth Amended Complaint focuses on the conditions at his UNICOR work assignment, and Plaintiff does not allege he has been exposed to unsafe conditions anywhere else within the institution. Rather, he contends that the air quality in the UNICOR factory was unsafe. Thus, the allegations raised pursuant to the FTCA must be dismissed because section 4126 is Plaintiff's exclusive remedy against the United States.

### H.    Plaintiff's FTCA Claim Relating to Dental Care (Count Four) Must Be Dismissed Because There Has Been No Negligent Conduct Which Would Warrant Recovery Against the United States.

Count Four of Plaintiff's Fifth Amended Complaint should be dismissed because he has failed to show any negligence on the part of BOP staff at FCI McKean with respect to the extraction of tooth # 13.[18]  Plaintiff brought this claim pursuant to the FTCA, which provides a

---

[18] Plaintiff properly exhausted his administrative tort claim with respect to his dental care at FCI McKean. See Exhibit 6 ¶ 4, and Attachment A.

cause of action against the United States for common law torts.  28 U.S.C. § 2674; U.S. v. Muniz, 374 U.S. 150, 153 (1963).  The FTCA establishes that the United States, except in limited circumstances, can be held liable for negligence to the same extent as a private individual.  Id.

Under the FTCA, the substantive law of the state in which the act or omission occurred normally should be applied. 28 U.S.C. § 1346(b)(1); Turner v. Miller, 679 F. Supp. 441, 443 (M.D. Pa. 1987); Hossic v. United States, 682 F. Supp 23, 24 (M.D. Pa. 1987).  In Pennsylvania, the standard for negligence is: 1) there must be a legally recognizable duty; 2) the defendant must have failed to conform to this duty; 3) there must be a causal connection between the legally recognized duty and the plaintiff's damages; and 4) there must be actual damages.  Dean v. Commonwealth Department of Transportation, 1998 WL 650070, p. 2 (Pa. Cmwlth. Ct. 1998); The Mason & Dixon Lines v. Mognet, 645 A.2d 1370, 1373, n.3 (Pa. Cmwlth. Ct. 1994).

While the FTCA would normally look to state law to establish the government's duty of care, Congress has established a statutory duty of care to be applied when federal prisoners sue the United States for monetary damages.  Title 18 U.S.C. § 4042 requires only "the exercise of ordinary diligence" to keep inmates safe from and free from harm.  See also Turner, 679 F. Supp. at 443; Hossic, 682 F. Supp. at 25; Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976). This duty requires BOP to provide for the care of all inmates in its custody.  Included in this statutory duty is the duty to provide adequate medical care to all inmates.  Yosuf, 642 F. Supp. 415, 427 (M.D. Pa. 1986). [19]

---

[19] To the extent any portion of Plaintiff's FTCA survives this motion, he may not recover more than the $10,000 he presented to BOP in his Administrative Tort Claim, see Exhibit 6 ¶ 4, and Attachment A, unless he can come forward with "newly discovered evidence" or show "intervening facts" as mandated by 28 U.S.C. § 2675(b).  See generally Martinez v. United States, 780 F.2d 525 (5th Cir. 1986).  The manifest purpose of this requirement is to ensure that Federal agencies charged with making an initial attempt to settle tort claims against the United

1.     **BOP Did Not Breach its Duty to Provide Plaintiff with Adequate Medical Care.**

In the medical context, the relationship between BOP and an inmate is not that of jailor-jailee, but of a physician to a patient. Id. Nevertheless, the standard of care owed to an inmate in the custody of the Bureau of Prisons is not altered merely because the inmate has raised an issue relating to his medical care. McPhee v. Reichel, 461 F.2d 947, 949 (3d Cir. 1972). A doctor within BOP is held to the same standard of care as any doctor practicing at the same time in the same relative location. Yosuf, 642 F. Supp. at 427. In Pennsylvania, a doctor is required merely to treat the patient with a reasonable degree of skill, competence and diligence. No doctor (either within the Bureau of Prisons or otherwise) is required to practice medicine with such a degree of skill as to guarantee a cure. Yosuf, 642 F. Supp. at 427; Salis v. United States, 522 F. Supp. 989, 994 (M.D. Pa. 1981); Hodgson v. Bigelow, 7 A.2d 338, 342 (Pa. Sct. 1939). Therefore, a doctor cannot be held liable based solely on the fact that a chosen course of treatment was unsuccessful, as long as the chosen course of treatment was accepted by a significant portion of the medical community. Salis, 522 F. Supp. at 996-97; Yosuf, 642 F. Supp. at 427-28.

Thus, a doctor practicing medicine in Pennsylvania who applies a medically recognized and accepted treatment, can only be held liable if the doctor is found to have failed to exercise ordinary skill, care or diligence; resulting in an injury to the Plaintiff, regardless of the result. Yosuf, 642 F. Supp. at 428.

In the present case, Plaintiff first alleges that Dr. Collins negligently ignored his requests for dental treatment for over one year. A review of the record, however, indicates that the reason

---

States are given full notice of the government's potential liability. Id. See also Caidin v. United States, 564 F.2d 284, 287 (9th Cir.1977); Adams v. United States, 615 F.2d 284, 288-90 (5th Cir.1980) (reviewing legislative history of 28 U.S.C. § 2675).

for this delay rests solely with Plaintiff, not with Dr. Collins.  In 2001, prior to his arrival at FCI McKean, Plaintiff was diagnosed with severe decay, which compromised the pulp of tooth # 13. See Exhibit 3 ¶ 5.  In order to determine whether the tooth was salvageable, Plaintiff was treated with a medicated filling.  See Exhibit 3 ¶ 5.  A medicated filling can remain in the tooth as long as it does not cause further pain or discomfort.  See Exhibit 3 ¶ 10.

After his arrival at FCI McKean, Plaintiff expressed his desire to have the medicated filling replaced with a permanent filling.  At no time did Plaintiff indicate that the medicated filling was causing additional pain or discomfort in his tooth.  Additionally, he never informed the heath staff that the medicated filling had fallen out.  As such, Dr. Collins had no indication that there may have been any problems with the medicated filling which would indicate the need for emergency dental treatment.  See Exhibit 3 ¶¶ 11-20, and Attachments C-H.  If Plaintiff, at any time prior to November 27, 2002, had indicated that the tooth was in pain or distress, or that he was otherwise in need of emergency treatment, he would have been examined by the dentist.  See Exhibit 3 ¶¶ 11-20, and Attachments C-H.  Certainly, no medical professional could be held responsible for failing to adequately treat any medical condition which was not properly reported. See e.g., Kilburn v. United States, 938 F.2d 666, 676 (6th Cir. 1991).

The first time Plaintiff indicated he was in any pain at all was on November 27, 2002.  See Exhibit 3 ¶ 21.  At that time, Plaintiff, for the first time, reported that his pain was at level 4 on a scale of 0-10.  It was noted that he experienced pain when the tooth was tapped and when a finger was placed on the gum over the tooth root.  An x-ray examination was also taken of the tooth root. Dr. Collins suspected that Plaintiff's pain may have been caused by the original caries (tooth decay), communicating (contacting) the pulp of the tooth due to a deep cavity.  Based upon this examination, Dr. Collins assessed Plaintiff with irreversible pulpitis of tooth #13, secondary to

former deep caries.  See Exhibit 3 ¶ 21.

Although Plaintiff now claims that he would have preferred to attempt a root canal before the extraction, that course was not an option in this case.  The tooth in question, # 13, is a premolar, which lies between the canine tooth and molars.  A root canal generally will make the tooth in question brittle.  This is a significant problem with premolars and molars, which are primarily used for grinding food.  As such, current community standards do not recommend performing a root canal on a tooth in the back of the mouth unless a crown is used to protect the tooth from further damage.  At the present time, the BOP does not typically authorize the use of dental crowns.  See Exhibit 3 ¶¶ 22-24, and Attachments D and I.

After completing his assessment of the tooth, Dr. Collins determined that because the condition was painful and irreversible (the tooth could not be salvaged), Plaintiff's only option was to extract the tooth.  See Exhibit 4 ¶ 25.

Upon Plaintiff's consent, Dr. Collins immediately conducted a successful extraction tooth #13.  See Exhibit 3 ¶ 26, and Attachment J.  The decision to perform this extraction was based upon Plaintiff's fully informed consent to the procedure, and was medically appropriate and consistent with the applicable community standard.  As such, neither Plaintiff's decision to wait over thirteen months before seeking treatment of the tooth, nor Dr. Collins' decision to extract the tooth, constitutes a breach of the United States' duty to provide medical care to inmates.

## 2.    The Medical Care Provided to Plaintiff Did Not Lead to the Need to Extract His Tooth.

Even if the Court finds that the medical staff at FCI McKean breached their duty to provide Plaintiff with adequate medical care, this failure to act could not have been the proximate cause of Plaintiff's injury – specifically, the need for the November 27 tooth extraction.

The mere occurrence of an injury does not prove negligence.  In fact, in Pennsylvania, even an admittedly negligent act does not necessarily entail liability.  Hamil v. Bashline, 392 A.2d 1280, 1284 (Pa. Sct. 1978).  In order for liability to be imposed, there must be a direct causal link between the doctor's negligence and the harm suffered by the Plaintiff.  Salis, 522 F. Supp. at 995; Hamil, 392 A.2d at 1284.  A causal connection only exists if the alleged conduct is a substantial factor in bringing about the harm.  Barrett v. U.S., 845 F. Supp. 774, 778 (D.Kan. 1994).  Furthermore, in order for liability to be imposed, it must appear "more likely than not that the defendant was the cause."  A mere speculation or possibility that the medical staff at FCI McKean provided inadequate medical care is not enough.  Barrett, 845 F. Supp. at 778.  Additionally, the doctor's alleged negligent act cannot have been a substantial factor in causing the plaintiff's injuries if the plaintiff would have suffered the same harm regardless of the doctor's involvement.  Hamil, 392 A.2d at 1284.

Here, Plaintiff suffered from irreversible pulpitis of tooth # 13, which had been previously treated with medicated fillings.   Medicated fillings are not used to repair ordinary decay to the tooth enamel.  They are used to repair damage which is so extensive that it has compromised the pulp and exposed the nerves of the tooth to damage.  Such decay typically occurs as the result of years of neglect and poor oral hygiene.  If the pulp of the tooth does not accept the medicated filling, then the damage is not reversible, and the tooth must be extracted or treated with endodontic therapy.  See Exhibit 3 ¶ 29.

Thus, if Plaintiff had, at any time prior to his November 27, 2002, examination, indicated that tooth # 13 was causing pain, or that his medicated filling had fallen out, it could only have meant that there was extensive damage to the pulp of the tooth.  Such damage does not occur as a result of a failure of the medicated filling, or as a result of leaving a medicated filling in the tooth

too long.  Again, a medicated filling can be left in a tooth until a need to replace it arises (such as

the filling falling out of the tooth or causing further pain or discomfort.)  To the contrary, any pain

or other discomfort associated with the medicated filling in tooth # 13 can only have been the

direct and proximate result of severe decay to the pulp of the tooth resulting from years of neglect

and poor oral hygiene.  This condition almost certainly existed at the time the medicated filling

was inserted.  Inmate Hill's tooth did not necessarily worsen over time, it was simply so severely

damaged that the pulp of the tooth could not withstand eventually even the presence of a

specialized (medicated) filling.  As such, once it became clear that the medicated filling was no

longer effective – November 27, 2002 – the only medically appropriate course of action was

extraction.  See Exhibit 3 ¶¶ 30-31.

     As such, the damage to Plaintiff's tooth was the direct and proximate result of years of

neglect and poor oral hygiene, and nothing Dr. Collins did would have made any difference in the

decision to extract the tooth.  There is, therefore, no basis upon which to hold the United States

liable for Plaintiff's dental treatment.[20]

---

[20] Pennsylvania law requires Plaintiff to show some injury or damages as a result of the
alleged negligent medical care.  Plaintiff has not done so.  Specifically, he has alleged solely that
the tooth was extracted.  There is no indication, however, that the extraction caused additional
pain, was improperly performed, or led to other medical complications.  In fact, a careful reading
of Plaintiff's complaint indicates that the extraction actually alleviated the pain caused by the
decay in the tooth.  As such, Plaintiff has alleged no facts indicating that the alleged negligence
resulted in any damages or other physical injury, and this claim must be dismissed pursuant to 28
U.S.C. § 1346(b)(2).

V.    **CONCLUSION**

WHEREFORE, for the reasons stated above, Defendants' respectfully request that the

Court grant Defendants' Motion to Dismiss Plaintiff's Fifth Amended Complaint, or, in the

Alternative, for Summary Judgment.

Respectfully Submitted,

MARY BETH BUCHANAN
United States Attorney


/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
Assistant U.S. Attorney
Western District of PA
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7452


OF COUNSEL:

Douglas S. Goldring
Assistant General Counsel
Federal Prison Industries (UNICOR)
400 First Street, NW, 8th Floor
Washington, DC 20534

## CERTIFICATE OF SERVICE

I hereby certify that I have served this date a copy of the within **DEFENDANTS'**

**MOTION TO DISMISS PLAINTIFF'S FIFTH AMENDED COMPLAINT OR, IN THE**

**ALTERNATIVE, FOR SUMMARY JUDGMENT**, either electronically or by first-class United

States mail, upon the following:

Richard A. Lanzillo, Esquire
Knox, McLaughlin, Gornall & Sennett
120 West Tenth Street
Erie, PA 16501

**Counsel for Plaintiff**

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
Assistant U.S. Attorney

Date: February 16, 2006