# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL W. HILL,
       PLAINTIFF

v.

JOHN LAMANNA, ET AL.,
       DEFENDANTS

Civil Action No. 03-323E

DECLARATION OF WILLIAM K. COLLINS, CHIEF DENTAL OFFICER (RETIRED)

I, William K. Collins, D.D.S., do declare and state as follows:

1. I am a retired Dentist, formerly employed by the United States Department of Justice, Federal Bureau of Prisons (BOP), and assigned to the Federal Correctional Institution, McKean, Pennsylvania (FCI McKean) as the Chief Dental Officer. I was employed by the BOP for 6 years. I served as the Chief Dental Officer at FCI McKean from January 17, 1999, until my retirement on November 3, 2005.

2. I graduated from the Temple University School of Dentistry in Philadelphia, PA in 1976, and have been a board certified dentist since August 1976. As the Chief Dental Officer at FCI McKean, I supervised all dental work performed on inmates assigned to this institution.

3. I am aware that inmate Michael Hill, Register Number 40428-133, filed a lawsuit in which he alleges that I violated his

Constitution rights by not administering dental care to his satisfaction.

4. I provided dental care to inmate Hill while he was assigned to FCI McKean. Additionally, I have access to records relating to his dental treatment in the ordinary course of business.

5. Records reflect that inmate Hill arrived at FCI McKean on or around October 18, 2001. At that time, he had a medicated (temporary) filing in tooth # 13, which had been applied in January 2001 at the United States Penitentiary in Lompoc, California (USP Lompoc). Medicated fillings are not used to repair ordinary decay of the tooth enamel. They are only used when the decay is so extensive, it has already compromised the pulp of the tooth, exposing the nerves, and resulting in damage which may not be repairable with an ordinary permanent filling. The purpose of a medicated filling, therefore, is generally to test the tooth and determine whether the tooth is salvageable. I have no personal knowledge, and records do not reflect, the reason further action or evaluation of tooth # 13 was not conducted prior to his transfer to FCI McKean.

6. Upon arrival at this institution, all inmates are required

to participate in an Admission and Orientation Seminar regarding the policies and practices of the institution. Part of this orientation is presented by representatives of the Health Services Department, and includes procedures for obtaining dental care.

7. As part of the presentation, inmates are told the difference between routine and emergency medical treatment, and the procedures for obtaining each type of care. Specifically, inmates are told that urgent or "emergency dental appointments will be given during the regular morning sick call sign-up." Otherwise, for routine dental care, inmates may request to be scheduled for an appointment by filling out an institutional "cop-out" form. **Attachment A is a true and correct copy of the Health Services Unit Admission and Orientation Presentation.**

8. Additionally, as part of the Admission and Orientation Program, each inmate is provided with an Inmate Information Handbook which provides incoming inmates with information about day-to-day life in the BOP generally and FCI McKean specifically. **Attachment B is a true and correct copy of relevant portions of the Inmate Information Handbook.**

9. The Inmate Information Handbook further explains the

procedures for seeking medical care. Specifically, it explains that if an inmate has an immediate medical problem that requires urgent care, he **must** report to the Health Services Unit and indicate that he requires urgent care. **See Attachment B .**

10. There is no record that inmate Hill reported any dental concerns to staff upon his arrival at FCI McKean. Specifically, nothing in inmate Hill's dental chart, and nothing communicated by inmate Hill orally, indicated that the medicated filling was causing any pain or discomfort, or otherwise required immediate attention. Typically, medicated fillings can remain in the tooth as long as additional pain or discomfort does not occur.

11. The first indication that inmate Hill required dental care at all was on December 3, 2001. At that time, he submitted a request to staff in which he noted that he had two cavities which would need to be filled, one of which already had a medicated filling which he would like replaced. He also requested a cleaning (prophylaxis) at that time. Notably, inmate Hill indicated his need for dental care by submitting a "cop-out", otherwise known as an "inmate request to staff." In other words, he followed the procedures for seeking **routine** dental care. He did not

report to the health services unit during sick call, or otherwise indicate that he required urgent care or an immediate evaluation of his dental problems. Had he done so, he would have been immediately evaluated and either treated, or scheduled within 14 days. **Attachment C is a true and correct copy of the note submitted by inmate Hill. See also Attachment B.**

12. Typically, requests to have cavities filled are considered routine dental treatment. Pursuant to Program Statement 6000.05, <u>Health Services Manual</u>, Chapter IV, <u>Dental Services</u>, page 27, which applied at all times relevant to this action, access to routine dental care is equitably controlled through a treatment list. Inmates on the routine dental care list are typically treated according to their chronological entry date. **Attachment D is a true and correct copy of Program Statement 6000.05, <u>Health Services Manual</u>, Chapter IV: <u>Dental Services</u>.**

13. As a result, inmate Hill was placed on the waiting list for routine dental care on December 4, 2001. If, at any time, inmate Hill had experienced significant pain, discomfort or trauma associated with his cavities or the medicated filling in tooth # 13, he could have come to dental sick call 24-hours a day, and sought urgent care in order to relieve his

pain.  There is no indication in his record that he sought urgent care.  **Attachment E is a true and correct copy of Plaintiff's dental records for the period of time from October 2001 through December 2002.**  See also Attachment D.

14. Inmate Hill did not mention any concerns relating to his cavities again for four months.  It was not until April 8, 2002, that he submitted a second request for treatment.  At that time, he again noted that he had two cavities which would need to be filled, one of which already had a medicated filling which he would like replaced.  Additionally, he noted his belief that the cavities were getting worse.  Notably, he did not indicate that the cavities were causing him any pain or discomfort at that time, or that he otherwise required an immediate evaluation.  **Attachment F is a true and correct copy of the second note inmate Hill submitted to staff.**

15. Additionally, although inmate Hill indicated that the April 8, 2002, request was his fourth request for dental care, there is no indication in his records of any requests besides the two discussed in this declaration.  **See Attachment F.**

16. In response to this request, inmate Hill was told that he

was number 184 on the dental care waiting list. However, he was also instructed to, "come right to sick call," if he had, "any pain problems." **See Attachment F.**

17. Again, there is no indication that inmate Hill ever attempted to come to dental sick call. If he had done so, and complained of increased pain associated with his cavities, then his tooth pain would have been treated as urgent, and appropriate treatment would have been provided. **See Attachments D and E.**

18. The next mention of inmate Hill's tooth came in the form of an informal resolution with his counselor, in which he complained about tooth pain associated with his cavities. At that time, he was instructed to contact the dentist. There is no indication he ever attempted to contact any health services staff members about the pain in his tooth. **Attachment G is a true and correct copy of the informal resolution form completed by inmate Hill's counselor on June 30, 2002.**

19. On July 3, 2002, inmate Hill submitted a request for Administrative Remedy to the Warden. Again, he complained about his cavities and sought dental treatment. At that time, he was told that, in accordance with policy, the

placement of a dental filling is considered routine dental care. He was further reminded that he was currently on the waiting list for routine dental care. Additionally, he was again told that if the medicated filling came out, or if he were in pain, to "please complete a sick call request." **Attachment H is a true and correct copy of the request for Administrative Remedy and response from the Warden.**

20. Again, there is no indication that inmate Hill contacted anyone in Health Services to complain about any pain in his tooth, or otherwise sought to be seen at dental sick call. Again, emergency care is available around the clock. The first time inmate Hill attempted to be seen as a result of any pain in his tooth was in November 2002. **See Attachment E.**

21. Specifically, on November 27, 2002, I examined inmate Hill's tooth at dental sick call. On observation inmate Hill reported that his pain was at level 4 on a scale of 0-10. It was noted that he experienced pain when the tooth was tapped and when a finger was placed on the gum, over the root. An x-ray examination was taken of the tooth root. I suspected that inmate Hill's pain may have been caused by the original caries (tooth decay) that was treated at USP Lompoc in 2001, communicating (contacting) with the pulp of

the tooth due to a deep cavity.  Based upon my examination, I assessed inmate Hill with irreversible pulpitis of tooth #13, secondary to former deep caries.

22. The Merck Manual of Diagnosis and Therapy, 17th Edition, Section 9, Dental Disorders, page 764 (1999) discusses pulpitis and indicates that, "irreversible pulpitis and its sequelae require endodontic (root canal) therapy or tooth extraction." **Attachment I is a true and correct copy of the Merck Manual of Diagnosis and Therapy, 17th Edition, Section 9, Dental Disorders, page 764 (1999).**

23. Although inmate Hill now claims that he would have preferred to attempt a root canal before the extraction, that course was not an option in this case.  The tooth in question, # 13, is a premolar, which lies between the canine tooth and molars.  A root canal generally will make the tooth in question brittle.  This is a significant problem with premolars and molars, which are primarily used for grinding food.  As such, current community standards do not recommend performing a root canal on a tooth in the back of the mouth unless a crown is used to protect the tooth from further damage.

24. The BOP does not ordinarily provide accessory treatment,

such as a crown, because such treatment goes beyond the scope of routine care. Although the BOP does allow for exceptions to this policy, where an accessory is determined to be medically necessary, such was not the case here. Accessories are only considered medically necessary when there is no other medically viable alternative. Here, the community standard recognizes two equally acceptable treatments for irreversible pulpitis: endodontic therapy (which would require a crown) and extraction. Because the treatment which would not require an accessory was equally accepted by the medical community, the accessory was not considered medically necessary to the treatment of inmate Hill's tooth. **See Attachments D and I.**

25. Because it would have been medically irresponsible for me to proceed with a root canal on tooth # 13, without applying a crown to further protect the tooth, I did not consider this to be a viable option in accordance with the community standard. I advised inmate Hill of my assessment, and advised that because the condition was painful and irreversible (the tooth could not be salvaged), the tooth should be extracted.

26. Inmate Hill was given a consent form advising him of my assessment, the recommended procedure and the possible

complications it could cause. He was provided the opportunity to ask any questions, and informed that if he consented to the extraction procedure, he should sign the consent form. Inmate Hill signed the consent form. **Attachment J is a true and correct copy of the consent form signed by inmate Hill.**

27. Upon Plaintiff's consent, I immediately conducted a successful extraction tooth #13. Although inmate Hill may have asked questions about the extraction, I have no personal recollection of him voicing any objections to the procedure at that time.

28. In my professional medical opinion, the procedures followed with respect to inmate Hill's tooth were consistent with the applicable standard of care. Specifically, the fact that a medicated filling was used initially indicates that decay had already compromised the pulp of the tooth prior to inmate Hill's arrival at FCI McKean.

29. Again, medicated fillings are not used to repair ordinary decay to the tooth enamel. They are used to repair destruction from caries which is so extensive that it has compromised the pulp and exposed the nerves of the tooth to damage. Such decay typically occurs as the result of years

of neglect and poor oral hygiene. If the pulp of the tooth does not accept the medicated filling, then the damage is not reversible, and the tooth must be extracted or treated with endodontic therapy. **See Attachment I.**

30. Thus, if inmate Hill had, at any time prior to his November 27, 2002, examination, indicated that tooth # 13 was causing pain, or that his medicated filling had fallen out, it could only have meant that there was extensive damage to the pulp of the tooth. Such damage does not occur as a result of a failure of the medicated filling, or as a result of leaving a medicated filling in the tooth too long. As I have indicated, a medicated filling can be left in a tooth until a need to replace it arises (such as the filling falling out of the tooth or causing further pain or discomfort.) To the contrary, any pain or other discomfort associated with the medicated filling in tooth # 13 was the direct result of severe decay to the pulp of the tooth resulting from years of neglect and poor oral hygiene. This condition almost certainly existed at the time the medicated filling was inserted. Inmate Hill's tooth did not necessarily worsen over time, it was simply so severely damaged that the pulp of the tooth eventually could not withstand even the presence of a specialized (medicated) filling. As such, once it became clear that the medicated filling was no

longer effective - November 27, 2002 - the only medically appropriate course of action was extraction.

31. Again, any delay in his treatment did not result in the irreversible pulpitis I diagnosed in tooth # 13, or the extraction. This condition was preexisting at the time he arrived at FCI McKean, if not longer. Furthermore, because inmate Hill never complained about any pain or discomfort in the tooth prior to November 27, 2002, there was no reason to suspect that any additional treatment of the tooth was necessary.

I declare under penalty of perjury in accordance with the provisions of 28 U.S.C. § 1746 that the above is accurate to the best of my knowledge and belief.

William K. Collins
Chief Dental Officer
FCI McKean

01/27/06
Date