**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MICHAEL HILL,

                    Plaintiff,

v.

JOHN LAMANNA, ET AL.,

                    Defendants.

Civil Action No. 03-323E

Judge McLaughlin
Magistrate Judge Baxter

*(Electronic Filing)*

**DEFENDANTS' OBJECTIONS TO THE REPORT AND RECOMMENDATION**

AND NOW, come the Defendants, John LaManna, William Collins, Marty Sapko, Deborah Forsyth, Stephen Housler, Robert Klark, Robert Reome, and Beth Fantaskey (hereinafter collectively referred to as "Defendants"), by and through their attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, Christy Criswell Wiegand, Assistant United States Attorney for said district, and Douglas S. Goldring, Assistant General Counsel for Federal Prison Industries, Inc., and respectfully file their Objections to Magistrate Baxter's Report and Recommendation dated July 31, 2006 ("R&R"). In further support of said Objections, Defendants aver as follows:

I.    **Argument**

   A.    **Plaintiff's Allegations of Inadequate Dental Care Do Not Rise to the Level of a Constitutional Violation**

Defendants respectfully object to the portion of the R&R recommending denial of Defendants' Motion regarding Plaintiff's Eighth Amendment Claim regarding an alleged delay in dental care.[1] Plaintiff cannot show deliberate indifference under the Eighth Amendment relating

---

[1] Defendants do not object to the portion of the R&R recommending dismissal of Plaintiff's Eighth Amendment claim relating to the November 27, 2002 extraction of his tooth. See R&R pp. 19-21.

to the dental care he received at FCI McKean.  Specifically, he cannot show that Defendants failed to provide adequate dental care during the time period from October 18, 2001, when Plaintiff was designated to FCI McKean, to November 27, 2002.  Because Plaintiff has failed to articulate a claim under the Eighth Amendment of the United States Constitution for deliberate indifference to his serious medical needs, this cause of action should be dismissed in full.

### 1.    Applicable Legal Standard

In order to state a claim for violation of the Eighth Amendment based on inadequate medical care, a plaintiff must demonstrate that the defendants exhibited "deliberate indifference to [his] serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 104 (1976); West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978).  A plaintiff cannot satisfy this standard unless he demonstrates both: (1) that he had a serious medical need, and also that (2) the defendant was aware of this need and was deliberately indifferent to it.  See Farmer v. Brennan, 511 U.S. 825 (1994); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979); see also Wilson v. Seiter, 501 U.S. 294, 296-98 (1991).

### 2.    Plaintiff Did Not Have a Serious Medical Need

The Third Circuit has found that a medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1989); Pace v. Fauver, 479 F.Supp. 456, 458 (D.N.J.1979), aff'd, 649 F.2d 860 (3d Cir.1981). Plaintiff's condition does not rise to this level of severity.  Prior to arriving at FCI McKean, Plaintiff had been informed that he had extensive decay in tooth #13, a premolar.  Due to the

2

severity of the decay, it was not clear whether the damage to the tooth was reversible.  As such, a medicated (temporary) filling was utilized instead of a permanent filling in order to test whether the tooth was salvageable.  See Declaration of William Collins, D.D.S. ¶ 5, attached to Defendants' Brief in Support of Motion to Dismiss.

Plaintiff did not report any dental concerns to staff upon his arrival at FCI McKean. Specifically, nothing in inmate Hill's dental chart, and nothing communicated by him orally, indicated that the medicated filling was causing any pain or discomfort, or otherwise required immediate attention.  **Typically, medicated fillings can remain in the tooth as long as additional pain or discomfort does not occur.**  See Declaration of William Collins, D.D.S. ¶ 10 (emphasis added).

Plaintiff arrived at FCI McKean in October 2001.  See Declaration of Douglas S. Goldring ¶ 4, and Attachment B, attached to Defendants' Brief in Support of Motion to Dismiss. Upon his arrival, Plaintiff was provided with a copy of the FCI McKean Inmate Information Handbook ("Inmate Handbook"), which details the procedure inmates must follow to obtain medical care.  See Declaration of William Collins, D.D.S. ¶¶ 8-9, and Attachment B.  Plaintiff also received information on sick call procedures during his Admission & Orientation session at FCI McKean.  See Declaration of William Collins, D.D.S. ¶¶ 6-7, and Attachment A.  The Inmate Handbook explains that if an inmate has an immediate medical problem that requires urgent care, he must report to the Health Services Unit and indicate that he requires urgent care. See Declaration of William Collins, D.D.S. ¶¶ 8-9, and Attachment B.  The Admission and Orientation Presentation explains that urgent or "emergency dental appointments will be given during the regular morning sick call sign-up." See Declaration of William Collins, D.D.S. ¶¶ 6-7,

3

and Attachment A.  Additionally, emergency dental care is available 24-hours a day through the Health Services Department.  <u>See</u> Declaration of William Collins, D.D.S. ¶¶ 13 and 20. Otherwise, for routine dental care, inmates may request to be scheduled for an appointment by filling out an institutional "cop-out" form.  <u>See</u> Declaration of William Collins, D.D.S. ¶ 7, and Attachment A.

Plaintiff did not report any dental concerns to staff upon his arrival at FCI McKean.  <u>See</u> Declaration of William Collins, D.D.S. ¶ 10.  Plaintiff made several requests to have his fillings replaced, but he did not indicate that he was in any pain or discomfort.  Plaintiff did not report for urgent care for any dental concerns.  Accordingly, pursuant to BOP policy, FCI McKean staff treated Plaintiff's requests to have cavities filled as requests for routine dental care.  <u>See</u> Declaration of William Collins, D.D.S. ¶¶ 11-19, and Attachments C-H.

Plaintiff was repeatedly informed that if his teeth caused him any pain or discomfort, he should report to dental sick call for urgent care.  <u>See</u> Declaration of William Collins, D.D.S. ¶¶ 11-19, and Attachments C-H.  From October 18, 2001 when he arrived at FCI McKean, until November 27, 2002, Plaintiff did not report to dental sick call, or otherwise seek emergency dental treatment.  <u>See</u> Declaration of William Collins, D.D.S. ¶¶ 11-19, and Attachments C-H. Had he reported to dental sick call and notified FCI McKean staff that he was experiencing pain or difficulty with his medicated filling, his teeth would have been examined and he would have received urgent care.  <u>See</u> Declaration of William Collins, D.D.S. ¶ 11. Plaintiff's failure to report for sick call indicates that he was not experiencing pain or difficulty with his medicated filling, and that he did not have a medical need which was sufficiently serious to subject

4

Defendants to personal liability.[2]

### 3.    Defendants Were Not Deliberately Indifferent to Plaintiff's Dental Needs Between October 18, 2001 and November 27, 2002

Assuming, arguendo, that Plaintiff's desire to have his cavities filled did amount to a

serious medical need, Plaintiff still cannot show that either Defendant Collins or Defendant

LaManna was deliberately indifferent to Plaintiff's condition.[3]   In order to satisfy his steep

burden under the Eighth Amendment, Plaintiff cannot merely assert that Defendants were

negligent or that they engaged in medical malpractice.  Estelle, 429 U.S. at 106.  See also Durmer

v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993); Inmates of Allegheny County Jail v. Pierce, 612

F.2d 754, 762 (3d Cir. 1979)(negligent medical treatment is not actionable under the Eighth

---

[2]  Even assuming, arguendo, that Dr. Collins failed to adequately assess the severity of Plaintiff's need for a filling, such a mistake would amount to no more than medical malpractice or negligence.  Neither medical malpractice nor negligence subjects a doctor to individual personal liability.  Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1999); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)(negligent medical treatment is not actionable under the Eighth Amendment); Unterberg v. Correctional Medical Systems, Inc., 799 F.Supp. 490, 497 (E.D.Pa.1992)(medical malpractice is not deliberate indifference).

[3]  There is clearly no basis for holding Defendant LaManna personally liable.  He is a prison administrator, not a health care provider, and was named in this lawsuit based solely upon his role as the Warden of FCI McKean.  See section E, infra.  Furthermore, the only allegation against Defendant LaManna is that Plaintiff complained to him through the Administrative Remedy process.  At that time, Defendant LaManna provided a response which outlined the procedures through which Plaintiff could seek immediate dental care.  See Declaration of William Collins, D.D.S. ¶ 19, and Attachment H. It is well settled, however, that, when an inmate is being treated by the prison doctor, a Warden may not be considered deliberately indifferent for failing to respond directly to that inmate's medical complaints. Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).  Additionally, It is well settled that "notice of [a prisoner's] problems which [defendants] may have received through the grievance system ... [is] insufficient to make them personally liable."  Johnson v. Million, 2003 WL 1194249 at *1 (6th Cir. (March 7, 2003); accord, Etheridge v. Evers, 326 F.Supp.2d 818, 823 (E.D.Mich. 2004)("Claims which are based simply on the denial of a grievance do not state a claim of constitutional dimension.").  As such, Defendant LaManna cannot be held liable for the medical care provided by Dr. Collins.

Amendment); <u>Unterberg v. Correctional Medical Systems, Inc.</u>, 799 F.Supp. 490, 497 (E.D.Pa. 1992)(medical malpractice is not deliberate indifference). Instead, to state a claim for deliberate indifference under the Eighth Amendment, Plaintiff must show "such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." <u>Estelle</u>, 429 U.S. at 106. "While the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment, his behavior will not violate a prisoner's constitutional rights." <u>Estelle</u>, 429 U.S. at 107; <u>Brown v. Borough of Chambersburg</u>, 903 F.2d 274, 278 (3d Cir. 1990).

Plaintiff cannot show that Defendants were deliberately indifferent to his dental needs between October 18, 2001 and November 27, 2002. To the contrary, for thirteen months, Plaintiff himself failed to notify Defendants that he was having any pain or difficulty with his temporary filling. Plaintiff did not report any dental concerns to staff upon his arrival at FCI McKean. <u>See</u> Declaration of William Collins, D.D.S. ¶ 10. Plaintiff's dental records did not note that the medicated filling he had received while at FCI Lompoc needed to be replaced within a specific time frame. <u>See</u> Declaration of William Collins, D.D.S. ¶ 10. Typically, medicated fillings can remain in the tooth indefinitely as long as they do not cause additional pain or discomfort. <u>See</u> Declaration of William Collins, D.D.S. ¶ 10. Plaintiff arrived at FCI McKean on October 18, 2001, yet he did not notify medical staff that his filling was causing him discomfort until November 27, 2002, well over a year after his arrival. <u>See</u> Declaration of William Collins, D.D.S. ¶¶ 10-19, and Attachments C-H.

The first indication that Plaintiff required dental care at all was on December 3, 2001. At that time, he submitted a request to staff in which he noted that he had two cavities which would

6

need to be filled, one of which already had a medicated filling which he would like to have replaced. He also requested a prophylactic cleaning at that time. Notably, Plaintiff indicated his need for a dental care by submitting a "cop-out," otherwise known as an "inmate request to staff." In other words, he followed the procedures for seeking <u>routine</u> dental care. He did not report to the health services unit during sick call, or otherwise indicate that he required urgent care or an immediate evaluation of his dental problems. Had he done so, he would have been immediately evaluated and either treated, or scheduled within 14 days. <u>See</u> Declaration of William Collins, D.D.S. ¶ 11, and Attachment C.

Typically, requests to have cavities filled are considered to be requests for routine dental treatment. Pursuant to Program Statement 6000.05, <u>Health Services Manual</u>, access to routine dental care is equitably controlled through a treatment list. Inmates on the routine dental care list are typically treated according to their chronological entry date. <u>See</u> Declaration of William Collins, D.D.S. ¶ 12, and Attachment D, p. 27.

As a result, Plaintiff was placed on the waiting list for routine dental care on December 4, 2001. If, at any time, Plaintiff had experienced significant pain, discomfort or trauma associated with his cavities or the medicated filling in tooth # 13, he could have come to dental sick call or sought emergency treatment 24-hours a day, in order to relieve his pain. There is no indication in his record that he sought any type of urgent care. <u>See</u> Declaration of William Collins, D.D.S. ¶ 13, and Attachments D and E.

Plaintiff did not mention any concerns relating to his cavities again for four months. It was not until April 8, 2002, that he submitted a second request for treatment. At that time, he again noted that he had two cavities which would need to be filled, one of which already had a

7

medicated filling which he would like to have replaced.  Additionally, he noted his belief that the

cavities were getting worse.  Notably, he did not indicate that the cavities were causing him any

pain or discomfort at that time, or that he otherwise required an immediate evaluation.  See

Declaration of William Collins, D.D.S. ¶¶ 14-15, and Attachment F.

        In response to this request, Plaintiff was told that he was number 184 on the dental care

waiting list. However, he was also instructed to "come right to sick call" if he experienced "any

pain problems."  See Declaration of William Collins, D.D.S. ¶ 16, and Attachment F.

        Plaintiff did not go to dental sick call.  If he had done so, and complained of increased

pain associated with his cavities, then his tooth pain would have been treated as urgent, and

appropriate treatment would have been provided.  See Declaration of William Collins, D.D.S. ¶

17, and Attachments D and E.

        The next mention of Plaintiff's tooth came in the form of an informal resolution with his

counselor, in which he complained about tooth pain associated with his cavities.  At that time, he

was instructed to contact the dentist.  There is no indication he ever attempted to contact any

health services staff members about the pain in his tooth.  See Declaration of William Collins,

D.D.S. ¶ 18, and Attachment G.

        On July 3, 2002, Plaintiff submitted a request for Administrative Remedy to the Warden,

in which he complained about his cavities and sought dental treatment.  At that time, he was told

that, in accordance with policy, the placement of a dental filling is considered routine dental care.

He was further reminded that he was currently on the waiting list for routine dental care.

Additionally, he was again told that if the medicated filling came out, or if he were in pain, to

"please complete a sick call request." See Declaration of William Collins, D.D.S. ¶ 19, and

Attachment H.

Plaintiff did not contact anyone in Health Services to complain about any pain in his tooth, or otherwise seek to be seen at dental sick call.  Again, emergency care is available around the clock.  The first time Plaintiff sought treatment as a result of any pain in his tooth from Health Services was on November 27, 2002.  <u>See</u> Declaration of William Collins, D.D.S. ¶ 20, and Attachment E.

Accordingly, the record reflects that Defendants were not deliberately indifferent to Plaintiff's dental needs between October 18, 2002 and November 27, 2002, given that Plaintiff failed to follow proper procedures to inform Defendants of his dental needs. **Plaintiff repeatedly failed to inform Defendants that his temporary filling was causing him pain and discomfort.**  <u>See</u> Declaration of William Collins, D.D.S. ¶¶ 10-20, and Attachments C-H (emphasis added).  Thus, the filling was either not causing Plaintiff discomfort or pain prior to November 27, 2002, or Plaintiff blatantly ignored the repeated instructions to attend dental sick call.  Either way, Defendants provided Plaintiff with all of the information necessary to receive treatment and, as such, were not deliberately indifferent to Plaintiff's medical needs leading up to the November 27, 2002, examination.  Therefore, Defendants' Motion for Summary Judgment with respect to Plaintiff's dental care should have been granted in full.

**B.    Plaintiff's Allegations Regarding Conditions in the UNICOR Factory Cannot Establish an Eighth Amendment Violation**

Defendants respectfully object to the portion of the R&R recommending denial of Defendants' Motion for Summary Judgment regarding Plaintiff's Eighth Amendment factory working conditions claim.  The Court, applying the Supreme Court's decisions in <u>Farmer v.</u>

9

Brennan, 511 U.S. 825 (1994) and Helling v. McKinney, 509 U.S. 25, 33-34 (1993), concluded

that Plaintiff had satisfied both the objective and subjective prongs of the Eighth Amendment

test. See R&R at pp. 14-19. To the contrary, Defendants respectfully assert that Plaintiff has

failed to establish either prong of the test, and the Court must dismiss his Eighth Amendment

claim.

### 1.     The Eighth Amendment Standard

In Helling v. McKinney, 509 U.S. 25 (1993), the Supreme Court held that a cause of

action exists under the Eighth Amendment when a prisoner alleges that prison officials have

exposed him, with deliberate indifference, to levels of environmental tobacco smoke ("ETS")

that pose an unreasonable risk of harm to his future health. Id., at 35. In Helling, the Court

established a two-part test that a plaintiff must satisfy to state a valid claim under the Eighth

Amendment. The first prong is objective. The Plaintiff must show that "he himself is being

exposed to unreasonably high levels of ETS." Id., at 35 (emphasis added). With respect to this

prong, the Eighth Amendment requires a court not only to make a scientific and statistical inquiry

into the seriousness of the potential harm and the likelihood that such injury to health will

actually be caused by exposure to the contaminant, but also "to assess whether society considers

the risk that the prisoner complains of to be so grave that it violates contemporary standards of

decency to expose anyone unwillingly to such a risk." Id. at 36 (emphasis in original).

The second prong is a subjective one: a plaintiff must show that prison officials were

deliberately indifferent to a serious risk of harm. Id. The Supreme Court has held that

> a prison official cannot be found liable under the Eighth Amendment for denying
> an inmate humane conditions of confinement unless the official knows of and
> disregards an excessive risk to inmate health or safety; the official must both be
> aware of facts for which the inference could be drawn that a substantial risk of

10

serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994).

In this case, Plaintiff alleges that he was exposed to Micore Board fibers and Lokweld adhesive without appropriate ventilation and/or protective gear. However, the evidence presented by Plaintiff with respect to this claim fails to establish either prong of the Helling test, because Plaintiff cannot show that he was exposed to "unreasonably high" levels of air pollution or toxins, nor that Defendants exhibited deliberate indifference to such exposure.

### 2.    Plaintiff Cannot Establish that he was Actually Exposed to "Unreasonably High Levels" of Hazardous Substances

With respect to the first prong of the Eighth Amendment analysis, Plaintiff cannot show that he was exposed to levels of air pollution or toxins in the UNICOR factory that were so unreasonably high as to violate contemporary standards of decency. Although Defendants agree that crystalline silica, an ingredient in Micore Boards, is classified as a human carcinogen, respirable silica was not detected by Occupational Safety and Health Administration ("OSHA") inspectors in the areas of the UNICOR factory where silica was present in its greatest concentrations. See Declaration of Stephen Housler ¶¶ 12-13 and 18, Attachments C and E, attached to Defendants' Brief in Support of Motion to Dismiss. Indeed, with respect to all of the chemical components of Micore Board, the OSHA inspectors determined that no UNICOR worker's exposure exceeded 10% of the relevant exposure limit. See Declaration of Stephen Housler ¶ 18, Attachment E. Thus, OSHA determined that Plaintiff and other workers were not exposed to inappropriate levels of contaminants in the UNICOR factory. Plaintiff simply cannot, in this case, "show that he himself is being exposed to unreasonably high levels of" harmful substances, as required by Helling, where the UNICOR facility is in compliance with the relevant

11

federal air quality standards.   In its R&R, the Court relies upon the "distant relation between the dates on which such test results were obtained and the period of time Plaintiff worked in the factory," to determine that the test results did not indicate the quality of the air in the factory during the relevant period of time.  See R&R, pp. 18-19.  This conclusion is simply not reasonable.  The air quality was tested in 2001, and again in 2003.  On both occasions, the levels of harmful substances in the air were well below OSHA's allowable threshold.  Furthermore, during the relevant period of time between the two tests, there is no evidence that Defendants significantly altered any of the practices, procedures or operations of the factory.  As such, the only permissible conclusion, based upon the fact that air quality levels were well within the allowable limit both before and during the relevant period of time, is that the air quality would have been within allowable levels at all times between the two tests.  Defendants' evidence, therefore, clearly  establishes that Plaintiff was exposed only to air that comported with federal guidelines, and that any American might be exposed to on a daily basis in the course of his or her job.

Based upon the tests and inspections conducted by the OSHA inspectors, the conditions in the UNICOR factory did not require the Defendants to take any other precautions with respect to the use and processing of Micore Board.  Id.  Although several suggestions were made to increase the safety measures available to personnel assigned to the UNICOR factory, these were **recommendations** only, and OSHA fully recognized that levels of contaminants in the UNICOR factory were well within the applicable guidelines.  Id.

Because the respiratory exposure level for dangerous contaminants amounted to a mere 10% of the relevant exposure limit, and BOP did not violate requirements regarding safety

12

precautions, the risk to Plaintiff simply cannot amount to a level so grave that it violates contemporary standards of decency as required under the Helling test. OSHA standards reflect contemporary standards of decency – our society willingly exposes free citizens and inmates alike to toxins, chemicals, and particulates up to the threshold values established by OSHA. See, e.g., Wooten v. Goord, 2004 WL 816919 (W.D.N.Y.), aff'd 123 Fed. Appx. 441 (2d. Cir. 2005); Saahir v. Holligan, 2004 WL 1418790 (N.D. Tex., June 24, 2004). The conditions present in the UNICOR building did not violate OSHA standards. As such, Plaintiff cannot, and has not, established the objective prong of the Eighth Amendment test, and his Eighth Amendment claim must be dismissed.

Numerous cases support the proposition that an inmate's Eighth Amendment claim based on exposure to hazardous substances or poor air quality cannot survive summary judgment where the correctional facility is in substantial, even if imperfect, compliance with the relevant state and/or federal standards.

The United States District Court for the Western District of New York recently addressed a § 1983 claim by pro se prisoners that New York state correctional officials had violated their Eighth Amendment rights by exposing them to inadequate ventilation and poor air quality at their inmate work assignments. See Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004). The inmates, who worked in a print shop, alleged that the ventilation system and air quality in the shop were inadequate, causing them headaches, nausea, skin irritation, increased blood pressure, and sinus problems. See id. at *1. In support of their claims, plaintiffs submitted a report by an OSHA specialist that he had concerns regarding the ability of the ventilation system to remove toxic chemicals from the breathing zones of the workers in order to create a safe working

13

environment.  See id.  The OSHA specialist had not taken air quality samples.  An industrial

hygienist associated with the state department of corrections later conducted air quality tests to

determine whether employees were being exposed to hazardous chemicals at levels that exceeded

state guidelines.  Id. at *2.  The air quality tests confirmed that the substances tested were below

the permissible levels set by the state.  Id.  Based on the air quality tests, the correctional officials

determined that the air quality in the print shop did not pose an unreasonable risk to inmate

employees' health.  Id.

       The Wooten Court agreed with correctional officials' decision and granted summary

judgment in their favor.  The Court concluded that plaintiffs had not shown that the allegedly

poor ventilation in the print shop was serious enough to satisfy the objective element of their

Eighth Amendment claim.  Id. at *5.  The Court acknowledged that plaintiffs' evidence had

shown that OSHA had made recommendations for improvements to the print shop air quality.

Id.  However, plaintiffs' evidence did not show that the air quality failed to comply with federal

workplace safety standards.  Id.  Moreover, defendants' evidence regarding air quality indicated

that print shop workers were not being "excessively exposed to hazardous materials."  Id.

Finally, plaintiffs had not offered evidence to show that defendants' air quality tests were

erroneous or unreliable.  Id.  Accordingly, plaintiffs failed to raise a triable issue of fact with

respect to the objective element of their Eighth Amendment claim.  See also Saahir v. Holligan,

2004 WL 1418790 (N.D. Tex., June 24, 2004)(granting summary judgment to state prison

officials in § 1983 Eighth Amendment claim by asthmatic inmate who alleged his work

assignment in boot factory exposed him to hazardous chemicals, dust, and glue fumes.

Defendants were entitled to summary judgment based on fact that boot factory had been

14

inspected and air quality met OSHA standards).

Similarly, the United States District Court for the District of Delaware granted summary judgment in favor of state correctional officials on an inmate's claim that he was exposed to unreasonably high levels of environmental tobacco smoke ("ETS"), in violation of his Eighth Amendment rights.  See Baker v. Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002).  In Baker, the inmate provided an affidavit that he was exposed to "cloudy," "very smoky" conditions, as well as a chart detailing the time of day and the number of inmates smoking at any given time over the course of a five-day period.  Id.  He also produced affidavits from several other inmates in support of his claims.  Id.   The Baker Court granted summary judgment in favor of defendant prison officials because, even if plaintiff had shown that he was subject to some level environmental tobacco smoke, he had not "provid[ed] competent evidence as to the level of such ETS."  Id.  Accordingly, the Court found that the inmate failed to meet the Supreme Court's requirement in Helling that he show his exposure to a toxin "created a risk [that] is so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk."  Id. (quoting Helling, 509 U.S. at 36).  See also Jones v. Kearney, 2001 WL 1414854 (D.Del., Nov. 2, 2001)(granting defendant correctional officials' 12(b)(6) motion on inmate's Eighth Amendment claim where plaintiff inmate could not show that he himself was being exposed to "unreasonably high levels" of environmental tobacco smoke, because institution had an "open air only" smoking policy).  Here, like the inmate in Baker, Plaintiff Hill cannot show that he was exposed to a level of air pollution, dust, or toxins that created a risk so grave as to violate contemporary standards of decency.  To the contrary, Defendants have come forward with conclusive evidence establishing that the UNICOR factory certainly did not expose Plaintiff to

15

that kind of risk.

Courts have granted summary judgment in favor of prison officials even where the correctional facility is not in compliance with applicable federal standards. In Carroll v. Ditella, 255 F.3d 470 (7th Cir. 2001), the United States Court of Appeals for the Seventh Circuit granted summary judgment in favor of Illinois correctional officials on plaintiff's Eighth Amendment claim that the prison drinking water was contaminated with radium. There, it was undisputed that the radium levels in the drinking water of the correctional facility did exceed the maximum level set by the United States Environmental Protection Agency ("EPA"). See id. at 472. However, despite the fact that the correctional facility's radium level continued to exceed the federal maximum, the state environmental agency informed the plaintiff-inmate that other communities in Illinois had water supplies that also exceeded the federal maximum. Plaintiff was also informed that no remedial action would be taken to address radium levels, because the EPA was considering raising the maximum level. However, at the time plaintiff filed suit, the EPA had not raised the radium standard, and the plaintiff continued to be subject to radium levels that violated the applicable federal standards. Nonetheless, the Seventh Circuit granted summary judgment in favor of prison officials.

In granting summary judgment, the Carroll Court recognized that prisons are not under a duty to provide a maximally safe environment, completely free from pollution or safety hazards. Id. Moreover, because many Americans live under conditions of exposure to various contaminants, the Court acknowledged that the Eighth Amendment does not require prisons to provide prisoners with "more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." Id. (internal citations omitted). As the Court

16

recognized,

> It would be inconsistent with this principle to impose upon prisons in the name of
> the Constitution a duty to take remedial measures against pollution or other
> contamination that the agencies responsible for the control of these hazards do not
> think require remedial measures.  If the environmental authorities think there's no
> reason to do anything about a contaminant because its concentration is less than
> half the maximum in a proposed revision of the existing standards, prison officials
> cannot be faulted for not thinking it necessary for them to do anything either.
> They can defer to the superior expertise of those authorities.

Id. at 472-73.

Here, Plaintiff Hill is being exposed to air quality and working conditions that OSHA,
and our society, deems to be entirely acceptable for all persons, whether free or incarcerated.
Accordingly, Plaintiff simply cannot show that he was subjected to "unreasonably high" levels of
air pollutants,  he has failed the objective portion of the Helling Eighth Amendment test, and
summary judgment must be entered in favor of Defendants.

> **3.      Plaintiff Cannot Establish Deliberate Indifference on the Part of
> Prison Officials**

Even assuming that Plaintiff had satisfied the objective portion of the Eighth Amendment
test, which he has not, he cannot show deliberate indifference on the part of prison officials, as
required by the subjective portion of the Helling test.  Defendants respectfully disagree with the
Court's conclusion that compliance with OSHA standards does not insulate Defendants from
liability.  See R&R,  pp. 18-19.  Furthermore, even assuming, arguendo, that Defendants'
compliance with OSHA standards is not enough, Defendants respectfully assert that they did
evaluate, and comply with, the Material Safety Data Sheets for substances utilized in the
UNICOR factory.

17

Courts have established that, with respect to the subjective prong of the Eighth Amendment analysis, Defendants are not deliberately indifferent to plaintiffs' health where they conduct air quality testing and results comply with federal standards.  In Carroll, the Seventh Circuit stated that even if inmate print shop employees had met the objective portion of their burden, they could not satisfy the subjective element despite the fact that defendants were on notice that the ventilation system may have needed improvements.  See 2004 WL 816919, at *5.  "Any claim that defendants were aware that the conditions in the Print Shop posed an excessive risk to plaintiffs' health is belied by the subsequent inspections of the Print Shop, which revealed that the air quality was acceptable according to federal standards."  Id. at *5.

 Here, as in Carroll, OSHA conducted air quality test results and concluded that the air quality in the UNICOR factory was well within applicable acceptable guidelines for the relevant contaminants.  It was thus reasonable for FCI McKean to rely on available air quality test results to determine what, if any, safety equipment it needed to make available for staff and inmates assigned to the UNICOR factory.  There is no genuine issue of fact as to whether Defendants were both aware of, and disregarded, an excessive and serious risk to Plaintiff Hill's health.  The Court may not hold Defendants to a higher standard than that required by federal agencies who are charged with monitoring workplace safety.  Therefore, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim, and it must be dismissed from this civil action.

Moreover, even if compliance with OSHA standards was not sufficient to insulate Defendants from being deemed deliberately indifferent, Defendants also relied on, and acted consistently with, the applicable MSDS sheets and product warning labels in determining what

protective equipment to provide for UNICOR employees.  MSDS sheets are required to, and do, list risks associated with overexposure to various chemicals.  More importantly, however, the MSDS sheets set forth what precautions, if any, must be taken in order to protect against such risks.  Defendants' decisions regarding the UNICOR work environment and protective equipment were consistent with the MSDS sheets and with product warning labels.

The product warning label for Micore Board states: "Dust hazard.  Cut and trim with knife, razor, or hand saw.  Do not cut with power equipment unless a dust collector is used on the equipment or local exhaust is used and a NIOSH/MSHA-approved respirator is worn."  See Declaration of Stephen Housler ¶ 38, and Attachment J.  Defendants do not dispute that power equipment was used to cut Micore Board.  However, in accordance with the Micore 300 label, the UNICOR factory employed a dust collector on the cutting equipment.  See Declaration of Stephen Housler ¶ 36; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E.   Because the UNICOR factory used a dust-collector system instead of local exhaust, a NIOSH/MSHA-approved mask was not required.  See Declaration of Stephen Housler ¶¶ 35-38, and Attachments I-J.

The MSDS for Micore Board is also instructive in establishing that NIOSH/MSHA-approved masks are not required when a dust collecting system is in use.[4]  See Declaration of Stephen Housler  ¶¶ 34-37, and Attachment I.  An MSDS is a technical bulletin prepared by

---

[4]Pursuant to the Hazard Communication Standard ("HCS") promulgated by OSHA, chemical manufacturers and importers must evaluate the hazards of chemicals they produce or import.  Using that information, they must prepare labels for containers, and the more detailed MSDS technical bulletins.  Chemical manufacturers, importers and distributors of hazardous chemicals are required to provide the appropriate labels and MSDS to the employer to which they ship the chemicals. 29 C.F.R. §1910.1200, App. E.  See Declaration of Stephen Housler ¶ 33.

chemical manufacturers and importers to supplement the information contained on product

labels. 29 C.F.R. § 1910.1200, App. E. Pursuant to OSHA regulations, employers may rely on

the information contained on the product labels, as supplemented by the MSDS, and have no

independent duty to analyze the chemical or evaluate the hazards of it. See Declaration of

Stephen Housler ¶ 33.

 Section VII of the MSDS for Micore Board provides:

 **Respiratory protection:** Not typically necessary under normal conditions of use.
Provide general ventilation and local exhaust ventilation to meet TLV [(Threshold
Limit Values)] requirements of individual ingredients and to control dusting
conditions. Wear a NIOSH/MSHA-approved dust respirator in poorly ventilated
areas, if TLV is exceeded, and/or when dusty conditions exist. Avoid prolonged
and repeated breathing of dust.

See Declaration of Stephen Housler ¶ 34, and Attachment I.

 Thus, according to the MSDS for Micore Board, there are three situations which would

necessitate the use of respirators when working with Micore Board: (1) in poorly ventilated

areas; (2) if Threshold Limit Values are exceeded; or (3) when dusty conditions exist. See

Declaration of Stephen Housler ¶ 35, and Attachment I. However, the air quality tests performed

by OSHA in the UNICOR factory definitively establish that the UNICOR factory was not poorly-

ventilated, that the Threshold Limit Values for hazardous ingredients of Micore Board were not

exceeded, and that dusty conditions did not exist. See Declaration of Stephen Housler ¶¶ 12-13,

18, and Attachments C and E. Indeed, the evidence shows that air quality tests conducted in 2001

and 2003, by Microbac Laboratories and by OSHA, respectively, revealed that the respiratory

particulates were well below applicable OSHA limits. See Declaration of Stephen Housler ¶¶

12-13, 18, and Attachments C and E. More specifically, with respect to the level of dust in the

UNICOR factory, the objective air quality tests show that the total particulate level was 1.1 mg

per cubic meter, which is well below the applicable TLV standard for total Particulates/Nuisance Dust – 15 mg per cubic meter.  See Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E.

The "Special Precautions" section of the Micore Board MSDS provides further support for the determination that a respirator was not necessary.  That section indicates that "[o]ver-exposure to dust can cause eye, skin, nose, throat or respiratory irritation...  Do not cut with power equipment unless either a dust collector is used on the equipment or local exhaust is used and NIOSH/MSHA-approved respirator is worn."  See Declaration of Stephen Housler ¶¶ 32-35, and Attachment I.

This language is similar, but not the same as, the warning contained on the Micore Board product label.  The use and placement of the words either and or in the MSDS indicates that at times when the Micore Board is cut with power equipment, the factory could implement one of two precautions: either use a dust collector system, or use local exhaust and  NIOSH/MSHA-approved respirators.   Defendants reasonably opted to employ a dust collector system.  See Declaration of Stephen Housler ¶ 36, and Attachment J; Declaration of Martin Sapko  ¶¶ 7-10, and Attachments C-E.  The MSDS does not indicate that, where a dust collector is used on the equipment, NIOSH-approved respirators are also required.  See Declaration of Stephen Housler¶¶ 32-35, and Attachment I.  Defendants' interpretation of the applicable safety requirements for Micore Board is consistent with the findings of the OSHA inspectors, who recommended, but did not require, the use of NIOSH-approved respirators.  See Declaration of Stephen Housler ¶ 18, and Attachment E.

With respect to Plaintiff's claims regarding exposure to Lokweld, a spray-grade adhesive that is used in the UNICOR factory, the MSDS for Lokweld expressly states that a respirator is only required "in case of insufficient ventilation."  See Declaration of Stephen Housler, Attachment G.  Lokweld is applied to materials in the UNICOR factory using a sprayer, which is located in an enclosed spraying booth with an independent exhaust system.  See Declaration of Stephen Housler ¶ 21.  The booth in which Lokweld is used is completely enclosed, and no leaks or other hazards have been identified relating to Lokweld.  See Declaration of Stephen Housler ¶ 22.  Had a leak developed, vapors emanating from the booth would have had a noxious and easily identifiable odor.  See Declaration of Stephen Housler ¶ 22.  FCI McKean has not received any complaints about odors in or around the Lokweld station, nor has the Safety Manager ever noticed any unusual odors in the area. See Declaration of Stephen Housler ¶ 22.

Moreover, when OSHA inspected the UNICOR factory between April and August of 2003, they fully inspected the Lokweld spray booth.  See Declaration of Stephen Housler ¶ 23. The OSHA inspectors did not reveal any concerns relating to any Lokweld fumes emanating from the spray booth.  See Declaration of Stephen Housler ¶¶ 24-25, and Attachment F.  The only concerns the OSHA inspectors had regarding the use of Lokweld in the UNICOR factory related to (1) the combustibility of Lokweld when stored near certain wood products; and (2) an isolated unauthorized use of Lokweld by an inmate to glue two boards by hand in the factory. See Declaration of Stephen Housler ¶¶ 24-27, and Attachment F.  FCI McKean corrected each of OSHA's concerns relating to Lokweld by September 22, 2003.  See Declaration of Stephen Housler ¶ 29, and Attachment H.  Accordingly, Plaintiff's concerns about Lokweld are contradicted by the results from the OSHA inspection, the MSDS sheet for Lokweld, and the

Declaration of Safety Manager Housler, each of which indicates that Lokweld fumes were not

emanating into the UNICOR factory, and that Plaintiff was not improperly exposed to Lokweld.

In conclusion, Defendants properly relied on objective air quality data, the results of the

OSHA inspection of the UNICOR factory, and the relevant MSDS sheets in making decisions

regarding UNICOR factory conditions and necessary protective equipment.  They were in no way

deliberately indifferent to Plaintiff's health and safety in relying on this objective, federally

sanctioned information, and Defendants are entitled to summary judgment on Plaintiff's Eighth

Amendment claim.[5]

### C.    Plaintiff Has Provided No Evidence of Defendant LaManna's, Fantaskey's, Reome's or Klark's Personal Involvement in this Case

Defendants also respectfully disagree with the Court's conclusion that Defendants

LaManna, Fantaskey, Reome, and Klark  had any personal involvement with this case.  The

Plaintiff here has not alleged any facts implicating these Defendants in the alleged denial of any

Constitutional right. As was noted in section A, Defendant LaManna was the Warden at FCI

McKean.  The sole allegation against him is that he responded to Plaintiff's Administrative

---

[5] The Court's R&R does not address Plaintiff's allegation that Defendants violated his Eighth Amendment rights by altering the Material Safety Data Sheet (MSDS) for Micore Fiber. See Fifth Amended Complaint ¶ 38.  Even if this allegation could satisfy Fifth or Eighth Amendment standards, Plaintiff has provided no evidence that he was actually harmed by the alleged alteration to the MSDS sheet.  Specifically, Plaintiff was not provided with a respirator because: a) it was determined that a respirator was not required, and b) he never requested one. See Declaration of Martin Sapko ¶ 12; Declaration of Stephen Housler ¶¶ 32-42; Declaration of Debora Forsyth ¶ 8.  Because copies of the MSDS sheets are readily available on the factory floor, any staff or inmate in the factory could place an unauthorized marking or alteration on an MSDS sheet.  Such handwritten alterations to an MSDS sheet are not authorized by Defendant Housler or anyone else in the institution.  See Declaration of Martin Sapko ¶ 13; Declaration of Stephen Housler ¶¶ 43-45; Declaration of Debora Forsyth ¶ 9.  Nonetheless, if an alteration to the MSDS sheet had been brought to the attention of staff, it would have been replaced as soon as practicable.  See Declaration of Martin Sapko ¶ 13; Declaration of Stephen Housler ¶¶ 43-45; Declaration of Debora Forsyth ¶ 9.

Remedies.  It is well settled, however,  that "notice of [a prisoner's] problems which [defendants]

may have received through the grievance system ... [is] insufficient to make them personally

liable." Johnson v. Million, 2003 WL 1194249 at *1 (6th Cir. March 7, 2003); accord, Etheridge

v. Evers, 326 F.Supp.2d 818, 823 (E.D.Mich. 2004)("Claims which are based simply on the

denial of a grievance do not state a claim of constitutional dimension.").  Accordingly, the

Plaintiff's claims against him should be dismissed for failure to show personal involvement.

Bracey v. Grenoble, 494 F.2d 566 (3rd  Cir. 1974); Geter v. Fortenberry, 849 F.2d 1550, 1553 (5th

Cir. 1988)(complaints combining conclusory allegations, absent reference to material facts, will

not survive motions to dismiss);  Robertson v. Sichel, 127 U.S. 507, 515-17 (1988)(the doctrine

of respondeat superior cannot form the basis of a Bivens claim.); Rizzo v. Goode, 423 U.S. 362,

371 (1976)(same); Farmer v. Carlson, 685 F.Supp. 1335 (M.D. Pa 1988)(same); Redman v.

County of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc), cert. denied, 502 U.S. 1074

(1992) (Supervisory personnel are generally not liable in a civil rights action under the theory of

vicarious liability).

Likewise, the claims against Defendants Fantaskey, Reome, and Klark must also be

dismissed.  It is clear from the face of the Fifth Amended Complaint that there are no longer any

pending allegations involving Defendants Fantaskey, Klark or Reome.  They had been named in

the previous complaints solely based upon Plaintiff's retaliation claim, which alleged that they

participated in Plaintiff's removal from UNICOR.  Plaintiff no longer raises a retaliation claim in

the Fifth Amended Complaint.  Furthermore, none of these Defendants are associated with

UNICOR work assignments.  As such, none of these Defendants play any continuing role in this

litigation, and they should be dismissed from this action.[6]

### D. Defendants Are Protected from Suit by the Doctrine of Qualified Immunity

Finally, Defendants assert that they are entitled to be protected from suit based upon the

doctrine of qualified immunity.  The Supreme Court has held that federal executive officials,

other than those performing adjudicatory or prosecutorial functions, are entitled to qualified good

faith immunity from personal liability for civil damages.  Saucier v. Katz, 533 U.S. 194 (2001)[7];

Harlow v. Fitzgerald, 457 U.S. 800 (1982); Butz v. Economou, 438 U.S. 478 (1978).  This is an

"immunity from suit rather than a mere defense to liability."  Mitchell v. Forsyth, 472 U.S. 511

(1985); see also Hunter v. Bryant, 502 U.S. 224 (1991) (per curiam).[8]

---

[6] The role of these three Defendants in this case is identical to the role played by Defendant Watson in a similar case filed in this District: Ward v. Lamanna, Civil Action No. 04-11 (W.D.Pa.).  In Ward, Watson was named in the original complaint only as to his role in the alleged retaliatory job transfer.  Subsequently, the retaliation claim was dropped in the amended complaint.  There, the Court recommended dismissal of Defendant Watson, because, "Plaintiff's Second Amended Complaint does not reassert the retaliation claim against Defendant Watson and does not assert any other claim against him."  Ward v. LaManna, Civil Action No. 04-11, Doc. 52, p. 15.  On that same basis, Defendants Fantaskey, Klark and Reome are entitled to be dismissed from present case as well.

[7] In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court held that the lower courts had been ignoring a significant threshold question.  Specifically, this Court must consider whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier, 533 U.S. at 200-01.  Only if a constitutional violation could be made out from the Plaintiff's allegations does the analysis move to the second sequential step, asking "whether the right in question was clearly established."  Id.  The Court went on to caution, however, that this second inquiry, is not taken in a broad, general context, but must be "undertaken in light of the specific context of the case."  Id. The reason for such an analysis is to avoid treating prison administrators as attorneys, and holding them to an impossible standard.

[8] Government officials are not expected to be legal scholars like law professors.  Ward v. San Diego County, 791 F.2d 1329, 1332 (9th Cir. 1986), cert. denied sub nom., Duffy v. Ward, 483 U.S. 1020 (1987).  The contours of the right allegedly violated must be sufficiently clear so that a reasonable government official would understand that his or her conduct violated the plaintiff's constitutional rights.  Officers who reasonably but mistakenly conclude their conduct was lawful are entitled to immunity.  Hunter, 502 U.S. at 228-29.

In the present case, Plaintiff has not shown that the Defendants violated his clearly

established Constitutional rights.  Thus, his Complaint fails to satisfy either prong of the <u>Saucier</u>

analysis. As such, all of the Defendants are entitled to qualified immunity.

      **E.**      **To the Extent Plaintiff States a Claim Pursuant to the Federal Tort Claims Act Relating to His Dental Care this Case must Be Dismissed Because There Has Been No Negligent Conduct Which Would Warrant Recovery Against <u>the United States</u>**

Defendants respectfully object to the Court's recommendation that Plaintiff's FTCA

claim regarding his dental care should not be dismissed.  Plaintiff has not shown any negligence

on the part of BOP staff at FCI McKean with respect to the extraction of tooth # 13.  Plaintiff

brought this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq.,

which provides a cause of action against the United States for common law torts.  28 U.S.C. §

2674; <u>U.S. v. Muniz</u>, 374 U.S. 150, 153 (1963).  The FTCA establishes that the United States,

except in limited circumstances, can be held liable for negligence to the same extent as a private

individual.  <u>Id.</u>

The general rule under the FTCA is that the substantive law of the state in which the act

or omission occurred should be applied. 28 U.S.C. § 1346(b)(1); <u>Turner v. Miller</u>, 679 F. Supp.

441, 443 (M.D. Pa. 1987); <u>Hossic v. United States</u>, 682 F. Supp 23, 24 (M.D. Pa. 1987).  In

Pennsylvania, the standard for negligence is: 1) there must be a legally recognizable duty; 2) the

defendant must have failed to conform to this duty; 3) there must be a causal connection between

the legally recognized duty and the plaintiff's damages; and 4) there must be actual damages.

<u>Dean v. Commonwealth Department of Transportation</u>, 1998 WL 650070, p. 2 (Pa. Cmwlth. Ct.

1998); <u>The Mason & Dixon Lines v. Mognet</u>, 645 A.2d 1370, 1373, n.3 (Pa. Cmwlth. Ct. 1994).

While the FTCA would normally look to state law to establish the government's duty of care, Congress has established a statutory duty of care to be applied when federal prisoners sue the United States for monetary damages. Title 18 U.S.C. § 4042 requires only "the exercise of ordinary diligence" to keep inmates safe from and free from harm. See also Turner, 679 F. Supp. at 443; Hossic, 682 F. Supp. at 25; Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976). This duty requires BOP to provide for the care of all inmates in its custody. Included in this statutory duty is the duty to provide adequate medical care to all inmates. Yosuf, 642 F. Supp. 415, 427 (M.D. Pa. 1986).

### 1.    BOP did not Breach its Duty to Provide Plaintiff With Adequate Medical Care

In the medical context, the relationship between BOP and an inmate is not that of jailor-jailee, but of a physician to a patient. Id. Nevertheless, the standard of care owed to an inmate in the custody of the Bureau of Prisons is not altered merely because the inmate has raised an issue relating to his medical care. McPhee v. Reichel, 461 F.2d 947, 949 (3d Cir. 1972). A doctor within BOP is held to the same standard of care as any doctor practicing at the same time in the same relative location. Yosuf, 642 F. Supp. at 427. In Pennsylvania, a doctor is required merely to treat the patient with a reasonable degree of skill, competence and diligence. No doctor (either within the Bureau of Prisons or otherwise) is required to practice medicine with such a degree of skill as to guarantee a cure. Yosuf, 642 F. Supp. at 427; Salis v. United States, 522 F. Supp. 989, 994 (M.D. Pa. 1981); Hodgson v. Bigelow, 7 A.2d 338, 342 (Pa. Sct. 1939). Therefore, a doctor cannot be held liable based solely on the fact that a chosen course of treatment was unsuccessful, as long as the chosen course of treatment was accepted by a significant portion of the medical community. Salis, 522 F. Supp. at 996-97; Yosuf, 642 F. Supp. at 427-28.

Thus, a doctor practicing medicine in Pennsylvania who applies a medically recognized and accepted treatment, can only be held liable if the doctor is found to have failed to exercise ordinary skill, care or diligence; resulting in an injury to the Plaintiff, regardless of the result. Yosuf, 642 F. Supp. at 428.

In the present case, Plaintiff first alleges that Dr. Collins negligently ignored his requests for dental treatment for over one year. A review of the record, however, indicates that the reason for this delay rests solely with Plaintiff, not with Dr. Collins. In 2001, prior to his arrival at FCI McKean, Plaintiff was diagnosed with severe decay, which compromised the pulp of tooth # 13. See Declaration of William Collins, D.D.S. ¶ 5. In order to determine whether the tooth was salvageable, Plaintiff was treated with a medicated filling. See Declaration of William Collins, D.D.S.¶ 5. A medicated filling can remain in the tooth as long as it does not cause further pain or discomfort. See Declaration of William Collins, D.D.S.¶ 10.

After his arrival at FCI McKean, Plaintiff indicated his desire to have the medicated filling replaced with a permanent filling. At no time did he indicate that the medicated filling was causing additional pain or discomfort in his tooth. Additionally, he never indicated that the medicated filling had fallen out. As such, Dr. Collins had no indication that there may have been any problems with the medicated filling which would indicate the need for emergency dental treatment. See Declaration of William Collins, D.D.S.¶¶ 11-20, and Attachments C-H. If Plaintiff, at any time prior to November 27, 2002, had indicated that the tooth was in pain or distress, or that he was otherwise in need of emergency treatment, he would have been examined by the dentist. See Declaration of William Collins, D.D.S.¶¶ 11-20, and Attachments C-H. Certainly, no medical professional could be held responsible for failing to adequately treat any medical condition which was not properly reported. See e.g., Kilburn v. United States, 938 F.2d

28

666, 676 (6th Cir. 1991).

The first time Plaintiff indicated he was in any pain at all was on November 27, 2002.

See Declaration of William Collins, D.D.S.¶ 21.  At that time, Plaintiff, for the first time,

reported that his pain was at level 4 on a scale of 0-10.  It was noted that he experienced pain

when the tooth was tapped and when a finger was placed on the gum over the tooth root.  An x-

ray examination was also taken of the tooth root.  Dr. Collins suspected that Plaintiff's pain may

have been caused by the original caries (tooth decay), communicating (contacting) the pulp of the

tooth due to a deep cavity.  Based upon this examination, Dr. Collins assessed Plaintiff with

irreversible pulpitis of tooth #13, secondary to former deep caries.  See Declaration of William

Collins, D.D.S.¶ 21.

Although Plaintiff now claims that he would have preferred to attempt a root canal before

the extraction, that course was not an option in this case.  The tooth in question, # 13, is a

premolar, which lies between the canine tooth and molars.  A root canal generally will make the

tooth in question brittle.  This is a significant problem with premolars and molars, which are

primarily used for grinding food.  As such, current community standards do not recommend

performing a root canal on a tooth in the back of the mouth unless a crown is used to protect the

tooth from further damage.  At the present time, the BOP does not typically authorize the use of

dental crowns.  See Declaration of William Collins, D.D.S.¶¶ 22-24, and Attachments D and I.

After completing his assessment of the tooth, Dr. Collins determined that because the

condition was painful and irreversible (the tooth could not be salvaged), Plaintiff's only option

was to extract the tooth.  See Exhibit 4 ¶ 25.

Upon Plaintiff's consent, Dr. Collins immediately conducted a successful extraction tooth

#13.  See Declaration of William Collins, D.D.S.¶ 26, and Attachment J.  The decision to

perform this extraction was based upon Plaintiff's fully informed consent to the procedure, and was medically appropriate and consistent with the applicable community standard. As such, neither Plaintiff's decision to wait over thirteen months before seeking treatment of the tooth, nor Dr. Collins' decision to extract the tooth, constitutes a breach of the United States' duty to provide medical care to inmates.

### 2. The Medical Care Provided to Plaintiff Did Not Lead to the Need to Extract His Tooth

Even if the Court finds that the medical staff at FCI McKean breached their duty to provide Plaintiff with adequate medical care, this failure to act could not have been the proximate cause of Plaintiff's injury – specifically, the need for the November 27 tooth extraction.

The mere occurrence of an injury does not prove negligence. In fact, in Pennsylvania, even an admittedly negligent act does not necessarily entail liability. Hamil v. Bashline, 392 A.2d 1280, 1284 (Pa. Sct. 1978). In order for liability to be imposed, there must be a direct causal link between the doctor's negligence and the harm suffered by the Plaintiff. Salis, 522 F. Supp. at 995; Hamil, 392 A.2d at 1284. A causal connection only exists if the alleged conduct is a substantial factor in bringing about the harm. Barrett v. U.S., 845 F. Supp. 774, 778 (D.Kan. 1994). Furthermore, in order for liability to be imposed, it must appear "more likely than not that the defendant was the cause." A mere speculation or possibility that the medical staff at FCI McKean provided inadequate medical care is not enough. Barrett, 845 F. Supp. at 778. Additionally, the doctor's alleged negligent act cannot have been a substantial factor in causing the plaintiff's injuries if the plaintiff would have suffered the same harm regardless of the doctor's involvement. Hamil, 392 A.2d at 1284.

Here, Plaintiff suffered from irreversible pulpitis of tooth # 13, which had been previously treated with medicated fillings.   Medicated fillings are not used to repair ordinary decay to the tooth enamel.  They are used to repair damage which is so extensive that it has compromised the pulp and exposed the nerves of the tooth to damage.  Such decay typically occurs as the result of <u>years</u> of neglect and poor oral hygiene.  If the pulp of the tooth does not accept the medicated filling, then the damage is not reversible, and the tooth must be extracted or treated with endodontic therapy.  <u>See</u> Declaration of William Collins, D.D.S.¶ 29.

Thus, if Plaintiff had, at any time prior to his November 27, 2002, examination, indicated that tooth # 13 was causing pain, or that his medicated filling had fallen out, it could only have meant that there was extensive damage to the pulp of the tooth.  Such damage does not occur as a result of a failure of the medicated filling, or as a result of leaving a medicated filling in the tooth too long.  Again, a medicated filling can be left in a tooth until a need to replace it arises (such as the filling falling out of the tooth or causing further pain or discomfort.)  To the contrary, any pain or other discomfort associated with the medicated filling in tooth # 13 can only have been the direct and proximate result of severe decay to the pulp of the tooth resulting from years of neglect and poor oral hygiene.  This condition almost certainly existed at the time the medicated filling was inserted.  Inmate Hill's tooth did not necessarily worsen over time, it was simply so severely damaged that the pulp of the tooth could not withstand eventually even the presence of a specialized (medicated) filling.  As such, once it became clear that the medicated filling was no longer effective – November 27, 2002 – the only medically appropriate course of action was extraction.  <u>See</u> Declaration of William Collins, D.D.S.¶¶ 30-31.

As such, the damage to Plaintiff's tooth was clearly the direct and proximate result of years of neglect and poor oral hygiene, and nothing Dr. Collins did would have made any

31

difference in the decision to extract the tooth. There is, therefore, no basis upon which to hold the United States liable for Plaintiff's dental treatment.[9]

II.    **Conclusion**

WHEREFORE, for the foregoing reasons, Defendants respectfully object to the R&R and request that this Court dismiss Plaintiff's Fifth Amended Complaint with prejudice or, in the alternative, grant summary judgment in favor of Defendants.

Respectfully Submitted,

MARY BETH BUCHANAN
United States Attorney


/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
Assistant U.S. Attorney
Western District of PA
U.S. Post Office and Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7452


OF COUNSEL:

Douglas S. Goldring
Assistant General Counsel
Federal Prison Industries (UNICOR)
400 First Street, NW, 8th Floor
Washington, DC 20534

---

[9] It also bears noting that Pennsylvania law requires Plaintiff to show some injury or damages as a result of the alleged negligent medical care. Plaintiff has not done so. Specifically, he has alleged solely that the tooth was extracted. There is no indication, however, that the extraction caused additional pain, was improperly performed, or led to other medical complications. In fact, a careful reading of Plaintiff's complaint indicates that the extraction actually alleviated the pain caused by the decay in the tooth. As such, Plaintiff has alleged no facts indicating that the alleged negligence resulted in any damages or other physical injury, and this claim must be dismissed pursuant to 28 U.S.C. § 1346(b)(2).

32

## CERTIFICATE OF SERVICE

I hereby certify that I have served this date a copy of the within **DEFENDANTS'**

**OBJECTIONS TO THE REPORT AND RECOMMENDATION** by first-class United States

mail, upon the following:

Richard A. Lanzillo
Knox, McLaughlin, Gornall & Sennett
120 West Tenth Street
Erie, PA 16501


**Counsel for Plaintiff**

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
Assistant U.S. Attorney


Date:  August 9, 2006