IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL HILL, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 03-323E |
| | ) | |
| v. | ) | JUDGE McLAUGHLIN |
| | ) | MAGISTRATE JUDGE BAXTER |
| JOHN LAMANNA, et al., | ) | |
| | ) | (Electronic Filing) |
| Defendants. | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE, MOTION TO DISMISS**

AND NOW, come the Defendants, John LaManna, William Collins, and the United

States of America ("United States") by and through their attorneys, Mary Beth Buchanan, United

States Attorney for the Western District of Pennsylvania, Michael C. Colville, Assistant United

States Attorney for said district, and Douglas S. Goldring, Assistant General Counsel for Federal

Prison Industries, Inc., and respectfully request that the Court dismiss Plaintiff's Fifth Amended

Complaint inasmuch as it relates to his dental care pursuant to Fed. Rule Civ. Pro. 12(b).  In the

alternative, Defendants request that the Court grant summary judgment in favor of Defendants

pursuant to Federal Rule of Civil Procedure 56.

## I.   INTRODUCTION

Plaintiff Hill, a Federal inmate, has brought a pro se action styled after the type

recognized by the Supreme Court in Bivens v. Six Unknown Named Agents of the Federal

Bureau of Narcotics, 403 U.S. 388 (1971).  Plaintiff's claims generally relate to dental care he

received while incarcerated at the Federal Correctional Institution in McKean, Pennsylvania,

("FCI McKean").[1]

As relief, Plaintiff seeks: (1) unspecified compensatory and punitive damages from each Defendant and the United States; (2) reasonable attorney's fees, costs, and interest; and (3) such other relief as the Court deems proper and just. For the reasons that follow, the Court should dismiss Plaintiff's Complaint or, in the alternative, grant summary judgment in favor of the Defendants. For the reasons that follow, the Court should dismiss Plaintiff's Fifth Amended Complaint or, in the alternative, grant summary judgment in favor of the Defendants.

## II.    PROCEDURAL BACKGROUND

The procedural history of this case spans a period of over three years, involving Five Amendment Complaints and numerous Motions to Dismiss and for Summary Judgment. Defendants will not repeat the entire procedural history at this time, as it is well known to the Court.

Currently pending before the Court is Plaintiff's Fifth Amended Complaint, which asserts the following claims relating to his dental care: 1) Plaintiff received inadequate dental care, which rose to the level of a Constitutional violation, and 2) Plaintiff was provided with negligently inadequate dental care.

In a Report and Recommendation (R&R) dated July 31, 2006 (Dkt. No. 89), this Court dismissed part of the Bivens action in this case, holding that the decision to extract the tooth did not rise to the level of a Constitutional violation. This R&R were respectively adopted in full by the Court on August 18, 2006 (Dkt. No. 92). As such, the only remaining claims in these actions are: 1) whether Plaintiff's Constitutional Rights were violated when the institution staff waited to

---

[1] Plaintiff's other claims relating to the conditions in the UNICOR factory are briefed separately.

2

examine his tooth until Plaintiff complained of pain; and 2) whether any prison staff acted negligently with respect to Plaintiff's dental care.  For the reasons that follow, the Court should grant summary judgment in favor of the Defendants.

## III.    FACTUAL BACKGROUND

Plaintiff is Michael Hill, Register Number 40428-133, a Federal inmate currently in the custody of the United States Marshals Service pursuant to a Write of Habeas Corpus Ad Testificandum (Dkt No. 100).  To the best of the Defendants' knowledge, he is currently being housed in the Erie County Jail awaiting trial in this case.  He was convicted in the District of Columbia Superior Court of Manslaughter While Armed, and sentenced to 21 years in prison on May 1, 1994.  His projected release date is January 16, 2014, via Mandatory Parole.  See Declaration of Douglas S. Goldring ¶ 3, and Attachment A.[2]

When inmate Hill arrived at FCI McKean on approximately October 18, 2001, he had a medicated (temporary) filing in tooth # 13, which had been applied in January 2001 at the United States Penitentiary in Lompoc, California ("USP Lompoc").  See Declaration of William Collins, D.D.S. ¶ 5; Report of John R. Bush, D.M.D.

Upon arrival at FCI McKean, all inmates – including Plaintiff –  are required to participate in an Admission and Orientation Seminar regarding the policies and practices of the institution.  Part of this orientation is conducted by representatives of the Health Services Department, and includes procedures for obtaining dental care.  As part of the presentation, inmates are informed about the difference between routine and emergency medical treatment, and the procedures for obtaining each type of care.  Additionally, each inmate receives an Inmate

---

[2] All Declarations cited herein refer to exhibits to Defendants' previous Motion for Summary Judgment, which were previously submitted, and are part of the record in this case.

Information Handbook, which further explains the procedures for seeking medical care. Specifically, the Handbook explains that if an inmate has an immediate medical problem that requires urgent care, he <u>must</u> report to the Health Services Unit and indicate that he requires urgent care. <u>See</u> Declaration of William Collins, D.D.S. ¶¶ 6-9, and Attachments A and B; Report of John R. Bush, D.M.D. At his deposition, Plaintiff clearly articulated his knowledge of the emergency care procedures, both now, and at all times relevant to this action. <u>See</u> Deposition of Michael Hill, page 41, lines 8-16 (November 1, 2006).

Plaintiff did not report any dental concerns to staff upon his arrival at FCI McKean.[3] Nothing in his dental chart, and nothing communicated by inmate Hill orally, indicated that the tooth was causing any discomfort, or otherwise required immediate attention. <u>See</u> Declaration of William Collins, D.D.S. ¶ 10.

The first indication that he required dental care at all was on December 3, 2001, several months after his arrival at FCI McKean. At that time, Plaintiff, for the first time, submitted a request to staff, noting that he had two cavities which would need to be filled, one of which already had a medicated filling which he wished to have replaced. He also requested a prophylactic cleaning at that time. At that time, he did <u>not</u> indicate to Dr. Collins that he was experiencing any pain or discomfort. Plaintiff was placed on the waiting list for routine dental care on December 4, 2001. <u>See</u> Declaration of William Collins, D.D.S. ¶¶ 11-13, and

---

[3] In his deposition, Plaintiff alleges that he was examined by Dr. Collins upon his arrival at FCI McKean as part of an initial examination. <u>See</u> Deposition of Michael Hill, page 51, lines 12-19 (November 1, 2006). There is, however, no evidence to support this self-serving statement. In fact, all of the evidence indicates that he was not seen by Dr. Collins when he arrived at the institution. Notably, there is no notation in his medical or dental records (previously submitted) which would indicate that his teeth were examined at any time prior to November 27, 2002.

4

Attachments B-E; Deposition of William Collins, page 49, line 16 thru page 50, line 13 (November 1, 2006).

Plaintiff did not mention any concerns relating to his cavities again for four months. Not until April 8, 2002 did Plaintiff submit a second request for treatment. At that time, he noted that he had two cavities which would need to be filled, one of which already had a medicated filling which he wished to have replaced. He also noted his belief that the cavities were getting worse. Again, he did not indicate that the cavities were causing him any pain or discomfort, or that he otherwise required an immediate evaluation. See Declaration of William Collins, D.D.S. ¶¶ 14-15, and Attachment F; Deposition of William Collins, page 49, line 16 thru page 50, line 13 (December 5, 2006); Report of John Bush, D.M.D.

In response to his April 8 request, Plaintiff was told that he was number 184 on the dental care waiting list. However, he was also instructed to "come right to sick call" if he developed "any pain problems." See Declaration of William Collins, D.D.S. ¶ 16, and Attachment F; Deposition of William Collins, page 59, lines 4-25 (December 5, 2006); Report of John Bush, D.M.D.

Plaintiff did not come to dental sick call at any time prior to November 27, 2002. See Deposition of William Collins, page 57, line 11 thru page 58, line 6 (December 5, 2006). Specifically, at that deposition, the following exchange took place:

Q: Did Mr. Hill ever come to you prior to November 27, 2002 and tell you that he was having pain with Tooth No. 13?

A: No, he did not.

Q: Did you ever see Mr. Hill in a sick call visit or open house prior to November 27, 2002?

A: I did not see him in a sick call visit at all, and at that time, we had not really
quite started open house – the institution open house.  So, I did not see him at all.

See Deposition of William Collins, page 57, lines 11-19 (December 5, 2006).   If he had

done so, and complained of increased pain associated with his cavities, then his tooth pain would

have been treated as urgent, and appropriate treatment would have been provided.[4]  See

Declaration of William Collins, D.D.S. ¶ 17, and Attachments D and E.

Plaintiff next raised his dental concerns to staff in connection with the administrative

remedy process.  At that time, he was again told that if the medicated filling came out, or if he

was in pain, to "please complete a sick call request."  See Declaration of William Collins, D.D.S.

¶¶ 18-19, and Attachments G and H.

Plaintiff did not contact anyone in Health Services to complain about any pain in his

tooth, or otherwise seek to be seen at dental sick call.[5]  The first time Plaintiff attempted to be

seen as a result of any pain in his tooth was on November 27, 2002, when Dr. Collins examined

his tooth at dental sick call.  At that time, Plaintiff reported that his pain level was a "4"on the

pain index, a scale of 1-10; 10 being the worst.  See Deposition of William Collins, page 22, line

---

[4] There is no evidence to suggest, as Plaintiff appears to allege, that if he had come to the
health services unit, he would have been turned away without seeing a health care professional.
Denise Tanner, a health services employee, testified that, "all people who show up for dental are
seen that day."  See Deposition of Denise Tanner, page 10, lines 11-12 (December 5, 2006);
Deposition of Tina Petruzzi, page 15, lines 4-25 (December 6, 2006).

[5] There is also some evidence that, during this period of time, Plaintiff complained to his
case manager about the dental care he was receiving.  His case manager passed on these concerns
to Dr. Collins, who, "instructed her to have the patient **come to sick call** so that he can be
examined."  See Deposition of William Collins, page page 17, line 16 thru page 18, line 23, page
58, lines 4-13 (December 5, 2006).  Despite these instructions, which were given in August and
September 2002, Plaintiff made no known effort to come to sick call or see Dr. Collins prior to
November 2002.  Id., page 58, lines 14-21.

22 thru page 23, line 2. A pain level of 4 would indicate "mild to moderate discomfort, not a situation for emergency care." See Report of John Bush, D.M.D. Based upon that examination, Dr. Collins assessed Plaintiff with irreversible pulpitis of tooth #13, secondary to former deep caries. See Declaration of William Collins, D.D.S. ¶¶ 20-21, and Attachment E. Dr. Collins advised Plaintiff that because the condition was painful and irreversible (the tooth could not be salvaged), the tooth should be extracted. See Declaration of William Collins, D.D.S. ¶¶ 22-25, and Attachments D and I; Report of John Bush, D.M.D.; Deposition of William Collins, passim.

Upon Plaintiff's consent, Dr. Collins immediately conducted a successful extraction tooth #13. Although he may have asked questions about the extraction, Plaintiff did not voice any objections to the procedure. See Declaration of William Collins, D.D.S. ¶¶ 26-31, and Attachments I and J, Report of John Bush, D.M.D.

## IV.    **LEGAL ARGUMENTS**

### A.    **Standard for Summary Judgment**

Federal Rule of Civil Procedure 56 provides that summary judgment shall be rendered "forthwith" if there is no genuine issue as to any "material fact." In recent years there has been a dramatic change and much greater willingness of the courts to grant this remedy. Older case law would not grant summary judgment if there was the "slightest doubt" about the facts of a case. Moore's Fed. Prac., vol. 11 §56.03[1], pp. 56-22 to 56-23. However, in 1986 the Supreme Court decided three cases which greatly liberalized summary judgment practice and encouraged a much greater use of summary judgment by trial courts. See Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348 (1986); Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 106 S.Ct. 2505 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986); 11 Moore's Fed. Prac., supra, p. 56-24.

As stated by Chief Justice Rehnquist, summary judgment now:

is properly regarded not as a disfavored procedural shortcut but rather as an integral part of the Federal Rules as a whole... Rule 56 must be construed with due regard not only for the rights of person asserting claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Celotex, 477 U.S. at 327, 106 S.Ct. at 2555.   "Modern, post-trilogy summary judgment doctrine is a stronger and more aggressive approach to summary judgment practice that places a reduced burden on the movant, greater burdens on the nonmovant, and makes summary judgment more likely to be granted than the pre-trilogy approach."  Moore's Fed. Prac., vol. 11, p. 56-312.1.

One of the essential purposes of the motion is to "isolate and dispose of factually unsupported claims or defenses." Celotex, 477 U.S. at 323-324, 106 S.Ct. at 2552-2553.  The defendants have the initial burden of showing that there is an absence of evidence to support an essential element of the plaintiff's case; and then the plaintiff has the burden to come forward with "specific facts" showing that there is a genuine issue for trial.  LaBounty v. Coughlin, 137 F.3d 68, 73 (2nd Cir. 1998).  The failure to sufficiently support all elements necessary to support a case will render all other facts immaterial.  Celotex, 477 U.S. at 323, 106 S.Ct. at 2553; Moore's Fed. Prac., vol. 11, p. 56-143.

The fact that a plaintiff has some facts on his side, or that there are some factual disputes, is not enough to deny the motion.  The "mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512;  Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S.Ct. at 1356 (The motion will not be denied merely

because of "some metaphysical doubt" about the material facts); <u>Davidson v. Scully</u>, 114 F.3d 12, 14 (2nd Cir. 1997)(The existence of "some" alleged factual dispute is not enough to defeat summary judgment, the opponent must show that there is no "genuine" issue of material fact"); <u>Cifarelli v. Village of Babylon</u>, 93 F.3d 47, 51 (2nd Cir. 1996)(Mere "conclusory allegations, speculation or conjecture" also will not defeat the motion); <u>Sunshine Brooks Ltd. v. Temple University</u>, 697 F.2d 90 (3rd Cir. 1982)(The responding party may not rest on the allegations of his/her pleading but must present by affidavit or otherwise specific facts sufficient to create a genuine issue of material fact. Fed.R.Civ.P. 56(e)).

Professor Moore uses an illustration to show the foregoing need for a genuine issue of fact: "If plaintiff alleges the light was green in his favor but an actual and authentic videotape of the intersection at the time of the accident and 40 uninterested witnesses all attest to the light being red against plaintiff, there appears to be no need for a trial on this question: the court can safely decide the light was red. If this fact is determinative (e.g., the defendant cannot be negligent under these circumstances or plaintiff's contributory negligence in running the red light bars recovery), the court may grant summary judgment for defendant in this hypothetical intersection accident case." Moore's Fed. Prac., vol. 11, pp. 56-99 to 56-100.

**B.    Both the PLRA and FTCA Require an Inmate to Show Some Physical Injury in Addition to Emotional Injury**

Pursuant to the Prison Litigation Reform Act, Pub.L.No. 104-134, 110 Stat. 1321 (April 26, 1996) (PLRA) "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correction facility, for mental or emotional injury suffered while in custody without a **prior showing of physical injury**." PLRA, 42 U.S.C. § 1997e(e)(emphasis added). <u>Mitchell v. Horn</u>, 318 F.3d 523, 533-36 (3rd Cir. 2003); <u>Davis v. District of Columbia</u>, 158 F. 3d

9

1342 (D.C. Cir. 1998); <u>Zehner v. Trigg</u>, 133 F. 3d 459 (7th Cir. 1997).  The Federal Tort Claims

Act (FTCA), 28 U.S.C. § 1346(b)(2), has a virtually identical provisions which reads, "No

person convicted of a felony who is incarcerated while awaiting sentencing or while serving a

sentence may bring a civil action against the United States or an agency, officer, or employee of

the Government, for mental or emotional injury suffered while in custody without a prior

showing of physical injury."[6] 28 U.S.C. § 1346*b)(2).

   The physical injury requirement was discussed at length by the Third Circuit in the

landmark decision <u>Mitchell v. Horn</u>, 318 F.3d 523 (3rd Cir. 2003).  There, the Third Circuit held

that the physical injury requirement required, "a less-than-significant-but-more-than-*de minimus*

physical injury as a predicate to allowing the successful pleading of an emotional injury."

<u>Mitchell</u>, 318 F.3d at 534.  The court reasoned this standard was most appropriate because:

> reading 1997e(e) to allow a plaintiff to allege any physical injury, no matter how
> minor, would produce an unintended (indeed absurd) result. Were we not to read
> 1997(e) as requiring more than a de minimis physical injury, we would turn its
> physical injury prerequisite into a mere pleading requirement, thereby rendering
> the requirement meaningless as a practical matter. Another prisoner might be able
> to assert an emotional injury by pleading that he received a paper cut, for example.
> This result runs counter to Congress's intent to curtail frivolous and abusive
> prisoner litigation. In so doing, Congress noted that, unlike physical injuries,
> emotional injuries are inherently difficult to verify and therefore tend to be
> concocted for frivolous suits. On the other hand, we do not adopt a test that would
> prevent those experiencing real physical injury at the hands of government
> officials from pursuing their rights.

   <u>Mitchell</u>, 318 F.3d at 535-36 (internal quotes and citations omitted).  <u>See also Allah v.</u>

<u>Al-Hafeez</u>, 226 F.3d 247 (3rd Cir. 2000);  <u>Ostrander v. Horn</u>, 145 F. Supp. 2d 614 (M.D. Pa.

2001); <u>Mayo v. Morris</u>, 2006 WL 3337385 (W.D. Va. 2006(citing cases); .

---

[6] Because these provisions are substantively identical, it is reasonable to analyze them together.

In the present case, Plaintiff has alleged nothing more than a long wait for medical treatment.  The evidence in this case does not support the conclusion that he was in any kind of distress during this period of time, or that his condition became worse during this period of time. See Deposition of William Collins, page 49, line 16 thru page 50, line 13, page 57, line 11 thru page 58, line 6 (December 5, 2002).  Declaration of William Collins, DDS ¶¶ 11-19, Attachments B-H; Report of John R. Bush, D.M.D.

During the entire period of time in question, Plaintiff never indicated that he was in pain. All of his contemporaneous complaints were limited to fear of experiencing future pain, not of an ongoing or actual sensitivity or pain.  See Deposition of Michael Hill, page 46, lines 1-4 ("I was trying to avoid pain"), page 59, lines 15-19 (Plaintiff did not say that he was in pain in his Administrative Remedies, but that he was trying to avoid pain). Id.

In fact, there were several periods of time in which he would make no complaints for a period of months.  See Report of John R. Bush, D.M.D.  This would seem to indicate that he was completely asymptomatic and experiencing no discomfort during these periods of time.  Clearly, the fear of potential, but as yet unrecognized, pain or injury cannot rise to the level of a Constitutional violation.  Mitchell v. Horn, 318 F.3d 523 (3rd Cir. 2003).  See also Snipes v. DeTella, 95 F.3d 586 (7th Cir. 1996)(fear and emotional distress experienced from contemplating the risk of contracting pain or illness in the future does not rise to the level of an Eighth Amendment claim); Mayo v. Morris, 2006 WL 3337385 (W.D. Va 2006)(same); Canell v. Multomah County, 141 F. Supp. 2d 1046 (D. Or. 2001)(same).   While it is true that Plaintiff alleges in his deposition that he experienced sensitivity in his tooth to cold, air and touch,   See Deposition of Michael Hill, page 49, lines 5-7 (November 1, 2006); as noted above, there is simply no objective evidence in the record to support these claims.   Additionally, when he was

ultimately examined by Dr. Collins, he denied any such sensitivities in his tooth. See Deposition

of William Collins, page 31, line 22 thru page 32, line 6, page 54, line 21 thru page 55, line 4

(December 5, 2006). As such, it is clear that these phantom sensitivities must have developed

only in retrospect, and in contemplation of this lawsuit.

In fact, on November 22-27, 2002, when Plaintiff's alleged pain was at a climax and he

could stand it no longer, he finally came to sick call.  See Deposition of Michael Hill, page 52,

lines 6-11.[7]  At this time, while experience what must have presumably been the worst pain he

experienced since arriving at FCI McKean, he reported that his pain as a "4" on the pain index, a

scale from 1 to 10, 10 being the worst.  See Deposition of William Collins, page 22, line 22 thru

page 23, line 2.  "A pain level of 4 would be mild to moderate discomfort, not a situation for

emergency care."  Report of John R. Bush, D.M.D.   In other words, what was presumably the

worst pain Plaintiff experienced during the entire period of time he was at FCI McKean,

amounted to nothing more – by his own report – than a mild discomfort.  Id., not the searing pain

that Plaintiff would have us believe he experienced.[8]

Nonetheless, even if Plaintiff had been experiencing the mild to moderate discomfort he

expressed on November 27, 2002, for the entire period of time in question,[9] he simply has not

---

[7] According to the record in this case, Plaintiff came to sick call on November 22, 2007,
where he was examined by Dr. Menon, who is presumably a general practitioner.  He was told to
return to see the dentist, which he did on November 27, 2002.

[8] Pennsylvania law further requires that in order to successfully defeat summary judgment
and show the existence of a physical injury in this case, Plaintiff must also produce expert
testimony that would refute Dr. Bush' testimony.  See Gindraw v. Dendler, 967 F.Supp 833
(E.D.Pa. 1997) (quoting, Mitzelfelt v. Kamrin, 526 Pa. 54,62, 584 A.2d 888, 892 (1990).

[9] The evidence indicates that he did not experience this level of continuous discomfort for
the entire period of time in question.  In fact, much of the time, the evidence suggest that he was

alleged an injury which would rise above the level of de-minimus as envisioned by the Third

Circuit in Mitchell v. Horn, 318 F.3d 523 (3rd Cir. 2003). As such, because Plaintiff cannot

show that he experienced any physical injury, there is no basis for liability in this case, either

under the PLRA or under the FTCA. Because there is no basis for liability, the complaint must

be dismissed, to the extent that it raises any allegations with respect to Plaintiff's dental treatment

at FCI McKean.

**BIVENS ACTIONS**

    **C.    Plaintiff's Allegations of Inadequate Dental Care Do Not Rise to the Level of a Constitutional Violation**

    Plaintiff has not stated a claim of deliberate indifference under the Eighth Amendment

relating to the dental care he received at FCI McKean. He alleges that the Defendants did not

provide adequate dental care during the time period from October 18, 2001, when he was

designated to FCI McKean, to November 27, 2002.[10]  Because Plaintiff cannot satisfy his burden

of proof, and show that the Defendants were deliberately indifferent to his to his serious medical

needs, in violation of the Eighth Amendment, this cause of action should be dismissed.

---

most likely asymptomatic. See Report of John R. Bush, D.M.D. Additionally, during much of
the time in question, he did not seek relief from pain, but sought to avoid future pain. See
Deposition of Michael Hill, page 46, lines 1-4, page 59, lines 15-19 (November 1, 2006);
Deposition of William Collins, page 49, line 16 thru page 50, line 13, page 57, line 4 thru page
58, line 6 (December 5, 2006);Declaration of William Collins, DDS ¶¶ 11-19, and Attachments
B-H.

    [10] Plaintiff had also alleged that Defendants were deliberately indifferent to his serious
dental needs because Dr. Collins extracted a severely decayed tooth instead of attempting to
salvage it on November 27, 2002. This claim was dismissed in the Court's Report and
Recommendation dated July 31, 2006 (Dkt. No. 89)

1.    **Applicable Legal Standard**

In order to state a claim for violation of the Eighth Amendment based on inadequate

medical care, a plaintiff must demonstrate that the defendants exhibited "deliberate indifference

to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976); West v. Keve, 571

F.2d 158, 161 (3d Cir. 1978).  A plaintiff cannot satisfy this standard unless he demonstrates

both: (1) that he had a serious medical need, and also that (2) the defendant was aware of this

need and was deliberately indifferent to it.  See Farmer v. Brennan, 511 U.S. 825 (1994); Inmates

of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979); see also Wilson v. Seiter,

501 U.S. 294, 296-98 (1991).

Moreover, the actions of a physician encompass matters not within the ordinary

knowledge and experience of laypersons.  As such, Pennsylvania law requires that allegations of

medical malpractice generally may not be proven without the testimony of "an expert witness

who will testify, to a reasonable degree of medical certainty, that the act of the physician deviated

from good and acceptable medical standards, and that such deviation was the proximate cause of

the harm suffered." Flanagan v. Labe, 666 A.2d at 335(emphasis in original)(quoting Mitzelfelt

v. Kamrin, 584 A.2d at 892). See also Joyce v. Boulevard Physical Therapy & Rehabilitation

Center, P.C., 694 A.2d 648, 654 & n.3 (Pa. Super. 1997); Maurer v. Trustees of the University of

Pennsylvania, 614 A.2d 754, 757-58 (Pa. Super. 1992)(en banc)(citing cases). See also Gindraw

v. Dendler, 967 F.Supp 833 (E.D.Pa. 1997) (quoting, Mitzelfelt v. Kamrin, 526 Pa. 54,62, 584

A.2d 888, 892 (1990).   Additionally, to be admissible, the expert's opinion must be rendered

within a reasonable degree of medical certainty.  Montgomery v. South Philadelphia Medical

Group, 656 A.2d 1385, 1390 (Pa. Super. 1995).  The only exception to this rule is where the

matter "is so simple, and [the] lack of skill or want of care is so obvious, as to be within the

range of ordinary experience and comprehension of even nonprofessional persons." See <u>Toogood v. Rogal</u>, 573 Pa. 245, 824 A.2d 1140 (Pa. 2003)(<u>quoting</u>, <u>Hightower-Warren v. Silk</u>, 548 Pa. 459, 698 A.2d 52, 54 n.1 (1997)); <u>Brannan v. Lankenau</u>, 490 Pa. 588 597 (1980).

### 2.    Plaintiff Did Not Have a Serious Medical Need

The Third Circuit has found that a medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." <u>Monmouth County Correctional Institution Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987), <u>cert</u>. <u>denied</u>, 486 U.S. 1006 (1989); <u>Pace v. Fauver</u>, 479 F.Supp. 456, 458 (D.N.J.1979), <u>aff'd</u>, 649 F.2d 860 (3d Cir.1981). Plaintiff's condition does not rise to this level of severity.  Prior to arriving at FCI McKean, in January 2001:

> Mr. Hill presented with a large distal carious lesion in tooth # 13.  He was examined and treated in the United States Penitentiary in Lompoc, CA.  The lesion was removed and the opening created was restored with a medicated "filling".  These restorations typically are a two part mix containing filling materials and cements.  They may also contain eugenol, which is a sedative dressing meant to soothe a tooth pulp (nerve center) that is inflammed.  This condition of nerve inflammation is referred to as pulpitis, which can be reversible or irreversible.  These types of restorations, although not as permanent as some harder materials **may last in serviceable condition for many years**.

Report of John R. Bush, D.M.D.  <u>See also</u> Declaration of William Collins, D.D.S. ¶ 5.

Plaintiff was then transferred to FCI McKean on October 18, 2001.  <u>See</u> Declaration of Douglas S. Goldring ¶ 4, and Attachment B.  Upon his arrival at that institution, however, there is no evidence that he reported any dental concerns to staff upon.  Specifically, nothing in Plaintiff's dental chart, and nothing communicated by him orally, indicated that the medicated filling was causing any pain or discomfort, or otherwise required immediate attention.  As Dr. Bush noted in his report, typically, medicated fillings can remain in the tooth as long as

additional pain or discomfort does not occur.  See Declaration of William Collins, D.D.S. ¶ 10; Report of John R. Bush, D.M.D.

Upon Plaintiff's arrival to FCI McKean in October 2001, he was provided with a copy of the FCI McKean Inmate Information Handbook ("Inmate Handbook"), which details the procedure inmates must follow to obtain medical care.  See Declaration of William Collins, D.D.S. ¶¶ 8-9, and Attachment B.  Plaintiff also received information on sick call procedures during his Admission & Orientation session at FCI McKean.  See Declaration of William Collins, D.D.S. ¶¶ 6-7, and Attachment A.  The Inmate Handbook explains that if an inmate has an immediate medical problem that requires urgent care, he must report to the Health Services Unit and indicate that he requires urgent care.  See Declaration of William Collins, D.D.S. ¶¶ 8-9, and Attachment B; Report of John R. Bush, D.M.D.  The Admission and Orientation Presentation explains that urgent or "emergency dental appointments will be given during the regular morning sick call sign-up."  See Declaration of William Collins, D.D.S. ¶¶ 6-7, and Attachment A.  Additionally, emergency dental care is available 24-hours a day through the Health Services Department.  See Declaration of William Collins, D.D.S. ¶¶ 13 and 20.  Otherwise, for routine dental care, inmates may request to be scheduled for an appointment by filling out an institutional "cop-out" form.  See Declaration of William Collins, D.D.S. ¶ 7, and Attachment A; Report of John R. Bush.  At his deposition, Plaintiff clearly articulated his knowledge of the emergency care procedures, both now, and at all times relevant to this action.  See Deposition of Michael Hill, page 41, lines 8-16 (November 1, 2006).

Plaintiff did not report any dental concerns to staff upon his arrival at FCI McKean.  See Declaration of William Collins, D.D.S. ¶ 10.  Plaintiff made several requests to have his fillings replaced, but he did not indicate that he was in any pain or discomfort.  Plaintiff did not report for

urgent care for any dental concerns. Accordingly, pursuant to BOP policy, FCI McKean staff treated Plaintiff's requests to have cavities filled as requests for routine dental care. <u>See</u> Declaration of William Collins, D.D.S. ¶¶ 11-19, and Attachments C-H; Report of John R. Bush, D.M.D.

Plaintiff, however, appears to allege in his complaint and deposition testimony that he did attempt to seek dental care. There is a complete lack of evidence to support this self serving attempt to fabricate a material issue of fact where none existed. As Professor Moore famously illustrated in another context, "If plaintiff alleges the light was green in his favor but an actual and authentic videotape of the intersection at the time of the accident and 40 uninterested witnesses all attest to the light being red against plaintiff, there appears to be no need for a trial on this question: the court can safely decide the light was red. If this fact is determinative (e.g., the defendant cannot be negligent under these circumstances or plaintiff's contributory negligence in running the red light bars recovery), the court may grant summary judgment for defendant in this hypothetical intersection accident case." Moore's Fed. Prac., vol. 11, pp. 56-99 to 56-100.

This case is no different. Although Plaintiff alleges that he was examined by Dr. Collins on several occasions, a fact which Dr. Collins vehemently denies, Plaintiff has the burden of providing objective evidence to support his conclusion that the "light was green". To the contrary, however, all of the evidence available in this case demands the conclusion that the light

was red.[11]  As such, the Court has no choice but to conclude that the light was green, and rule in favor the Defendant.

In fact, the only contact Plaintiff had with the dental clinic was to repeatedly write notes, and receive the same response, "if you have any pain problems, though, come right to sick call," for urgent care.  See Declaration of William Collins, D.D.S. ¶¶ 11-19, and Attachments C-H; Deposition of William Collins, page 59, lines 17-19 (December 5, 2006).   From October 18, 2001 when he arrived at FCI McKean, until November 27, 2002, Plaintiff did not report to dental sick call, or otherwise seek emergency dental treatment.[12]  See Declaration of William Collins, D.D.S. ¶¶ 11-19, and Attachments C-H; Deposition of William Collins page 59, lines 19-24 (December 5, 2006).  His failure to seek emergency care or indicate any pain at all during this time is conclusive, "that Mr. Hill was asymptomatic...and experiencing no dental discomfort." See Report of John Bush, D.M.D.   Had he reported to dental sick call and notified FCI McKean staff that he was experiencing pain or difficulty with his medicated filling, his teeth would have

---

[11] Plaintiff further alleges that he spoke with Dr. Collins on several occasions during "open house" hours.  See Deposition of Michael Hill, page 43, line 13 thru page 54, line 15 (October 31, 2006).  This contention, however, is directly contradicted by the fact that Warden LaManna never instituted an open house procedure at FCI Mckean.  In fact, open houses were not begun until mid-2003, well after the period of time in question.  See Deposition of William Collins, page 57, line 20 thru page 58, line 3 (December 5, 2006); Deposition of John J. LaManna, page 22, line 10 thru page 23, line 6 (December 6, 2006).

[12] There is also some evidence that, during this period of time, Plaintiff complained to his case manager about the dental care he was receiving.  His case manager passed on these concerns to Dr. Collins, who, "instructed her to have the patient **come to sick call** so that he can be examined."  See Deposition of William Collins, page page 17, line 16 thru page 18, line 23, page 58, lines 4-13 (December 5, 2006).  Despite these instructions, which were given in August and September 2002, Plaintiff made no known effort to come to sick call or see Dr. Collins prior to November 2002.  Id., page 58, lines 14-21.

been examined and he would have received urgent care.  See Declaration of William Collins, D.D.S. ¶ 11; Report of John Bush, D.M.D.

This conclusion is further bolstered by the fact that on November 22-27, 2002, when Plaintiff's alleged pain was at a climax and he could stand it no longer, he finally came to sick call.  See Deposition of Michael Hill, page 52, lines 6-11.[13]  At this time, while experience what must have presumably been the worst pain he experienced since arriving at FCI McKean, he reported that his pain as a "4" on the pain index, a scale from 1 to 10, 10 being the worst.  See Deposition of William Collins, page 22, line 22 thru page 23, line 2.  "A pain level of 4 would be mild to moderate discomfort, not a situation for emergency care."  Report of John R. Bush, D.M.D.   In other words, what was presumably the worst pain Plaintiff experienced during the entire period of time he was at FCI McKean, amounted to nothing more – by his own report – than a mild discomfort.  Id., not the searing pain that Plaintiff would have us believe he experienced.  Clearly then, Plaintiff did not experience even a significant, let alone a serious, medical condition while incarcerated at FCI McKean, which would subject Defendants to personal liability.[14]

---

[13] According to the record in this case, Plaintiff came to sick call on November 22, 2007, where he was examined by Dr. Menon, who is presumably a general practitioner.  He was told to return to see the dentist, which he did on November 27, 2002.

[14] Even assuming, arguendo, that Dr. Collins failed to adequately assess the severity of Plaintiff's need for a filling, such a mistake would amount to no more than medical malpractice or negligence.  Neither of which subject a doctor to individual personal liability.  Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1999); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)(negligent medical treatment is not actionable under the Eighth Amendment); Unterberg v. Correctional Medical Systems, Inc., 799 F.Supp. 490, 497 (E.D.Pa.1992)(medical malpractice is not deliberate indifference).

### 3.     Defendants Were Not Deliberately Indifferent to Plaintiff's Dental Needs Between October 18, 2001 and November 27, 2002

Assuming, arguendo, that Plaintiff's desire to have his cavities filled did amount to a serious medical need, Plaintiff still cannot show that either Defendant Collins or Defendant LaManna was deliberately indifferent to Plaintiff's condition.[15]  In order to satisfy his steep burden under the Eighth Amendment, Plaintiff cannot merely assert that Defendants were negligent or that they engaged in medical malpractice.  Estelle, 429 U.S. at 106.  See also Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)(negligent medical treatment is not actionable under the Eighth Amendment); Unterberg v. Correctional Medical Systems, Inc., 799 F.Supp. 490, 497 (E.D.Pa. 1992)(medical malpractice is not deliberate indifference).  Instead, to state a claim for deliberate indifference under the Eighth Amendment, Plaintiff must show "such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment."  Estelle, 429 U.S. at 106.  "While the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment, his behavior will not violate a prisoner's constitutional rights."  Estelle, 429 U.S. at 107; Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3rd Cir. 1990).

---

[15]   There is clearly no basis for holding Defendant LaManna personally liable.  He is a prison administrator, not a health care provider, and was named in this lawsuit based solely upon his role as the Warden of FCI McKean.  See section D, infra.  Furthermore, the only allegation against Defendant LaManna is that Plaintiff complained to him through the Administrative Remedy process.  At that time, Defendant LaManna provided a response which outlined the procedures through which Plaintiff could seek immediate dental care.  See Declaration of William Collins, D.D.S. ¶ 19, and Attachment H. It is well settled, however, that, when an inmate is being treated by the prison doctor, a Warden may not be considered deliberately indifferent for failing to respond directly to that inmate's medical complaints. Durmer v. O'Carroll, 991 F.2d 64, 69 (3rd Cir. 1993).  As such, Defendant LaManna cannot be held liable for the medical care provided by Dr. Collins.

Plaintiff cannot show that Defendants were deliberately indifferent to his dental needs between October 18, 2001 and November 27, 2002. To the contrary, for thirteen months, Plaintiff himself failed in his ultimate responsibility to notify Defendants that he was having any pain or difficulty with his filling, and seek prompt dental care. See Report of John R. Bush, D.M.D. Plaintiff did not report any dental concerns to staff upon his arrival at FCI McKean. See Declaration of William Collins, D.D.S. ¶ 10; Deposition of William Collins, page 59, lines 17-24 (December 5, 2006). Plaintiff's dental records did not note that the medicated filling he had received while at FCI Lompoc needed to be replaced within a specific time frame. See Declaration of William Collins, D.D.S. ¶ 10. Although these types of fillings are sometimes deemed temporary, "dentists often leave these restorations in place for years as the tooth's symptoms remain tolerable and the restoration remains intact." See Report of John R. Bush, D.M.D.; Declaration of William Collins, D.D.S. ¶ 10. Plaintiff arrived at FCI McKean on October 18, 2001, yet he did not notify medical staff that his filling was causing him discomfort until November 27, 2002, well over a year after his arrival. Thus, it is clear that Plaintiff failed in his ultimate responsibility to notify staff of his dental complaints, thereby supplanting his own medical and dental judgment for that of Dr. Collins, an experienced practicing dentist. Plaintiff's actions precluded Dr. Collins from exercising any professional judgment in this case, or otherwise assessing Plaintiff's tooth at any time prior to November 27, 2002. See Declaration of William Collins, D.D.S. ¶¶ 10-19, and Attachments C-H.

The first indication that Plaintiff required dental care at all was on December 3, 2001. At that time, he submitted a request to staff in which he noted that he had two cavities which would need to be filled, one of which already had a medicated filling which he would like to have replaced. He also requested a prophylactic cleaning at that time. Notably, Plaintiff indicated his

21

need for a dental care by submitting a "cop-out," otherwise known as an "inmate request to staff." In other words, he followed the procedures for seeking <u>routine</u> dental care. Despite the fact that as discussed in section 2, supra, the emergency care procedures had been clearly explained, and were well understood by Plaintiff, he did not report to the health services unit during sick call, or otherwise indicate that he required urgent care or an immediate evaluation of his dental problems. Had he done so, he would have been immediately evaluated and either treated, or scheduled within 14 days. <u>See</u> Declaration of William Collins, D.D.S. ¶ 11, and Attachment C.

Typically, requests to have cavities filled are considered to be requests for routine dental treatment. Pursuant to Program Statement 6000.05, <u>Health Services Manual</u>, access to routine dental care is equitably controlled through a treatment list. Inmates on the routine dental care list are typically treated according to their chronological entry date. <u>See</u> Declaration of William Collins, D.D.S. ¶ 12, and Attachment D, p. 27; Report of John R. Bush, D.M.D.

As a result, Plaintiff was placed on the waiting list for routine dental care on December 4, 2001. If, at any time, Plaintiff had experienced significant pain, discomfort or trauma associated with his cavities or the medicated filling in tooth # 13, he could have come to dental sick call or sought emergency treatment 24-hours a day, in order to relieve his pain. There is no indication in his record that he sought any type of urgent care. <u>See</u> Declaration of William Collins, D.D.S. ¶ 13, and Attachments D and E.

Plaintiff did not mention any concerns relating to his cavities again for four months. It was not until April 8, 2002, that he submitted a second request for treatment. Based upon this passage of time, it may be concluded that Plaintiff was completely asymptomatic from December 2001, at least until April 2002, and experiencing no significant dental discomfort. <u>See</u> Report of

John R. Bush, D.M.D.  At that time, he again noted that he had two cavities which would need to be filled, one of which already had a medicated filling which he would like to have replaced. Additionally, he noted his belief that the cavities were getting worse.  Notably, he did not indicate that the cavities were causing him any pain or discomfort at that time, or that he otherwise required an immediate evaluation.  See Declaration of William Collins, D.D.S. ¶¶ 14-15, and Attachment F.

In response to this request, Plaintiff was told that he was number 184 on the dental care waiting list. However, he was also instructed to "come right to sick call" if he experienced "any pain problems."  See Declaration of William Collins, D.D.S. ¶ 16, and Attachment F; Report of John R. Bush, D.M.D.; Deposition of William Collins, page 59, lines 15-18 (December 5, 2006).

**Plaintiff did not go to dental sick call**.  See Deposition of William Collins, page 59, line 19-24 (December 5, 2006) (emphasis added); Report of John R. Bush, D.M.D.  If he had done so, and complained of any pain associated with his cavities, then his tooth pain would have been treated as urgent, and appropriate treatment would have been provided.  See Declaration of William Collins, D.D.S. ¶ 17, and Attachments D and E; Report of John R. Bush.

Nonetheless, it is also important to note that removing the medicated filling, as Plaintiff now indicates should have been done, would likely not have been recommended at any time.  As Dr. Bush noted in his report, "Removal of the restoration unnecessarily, may have caused further irritation and inflammation of tooth 13.  This then, would have necessitated an earlier extraction."  See Report of John R. Bush, D.M.D.  As is evidence from the November 27, 2002, x-rays, Plaintiff's filling was not falling out as he now alleges.  In fact, it was perfectly intact due to the fact that, " Dr. Rose did a remarkable job of placing this restoration."  See Report of John R. Bush, D.M.D.; Deposition of William Collins, page 24, lines 2-18 (December 5, 2006).

Therefore, even if Plaintiff had been seen by Dr. Collins earlier, it is likely Dr. Collins would have taken no action with respect to Plaintiff's tooth, unless he had complained of pain, in which case Dr. Collins would have simply extracted the tooth at that earlier date. Removing or replacing the medicated filling in Plaintiff's tooth would not have been advisable at any time, because removal of the restoration, unnecessarily, could only have lead to increased irritation and inflammation of the tooth. Id. The passage of time played little role in Dr. Collins' decision to extract the tooth, or in assessing any of Plaintiff's treatment options. In short, the extraction of Plaintiff's tooth was likely a foregone conclusion. Id.

The next mention of Plaintiff's tooth came in the form of an informal resolution with his counselor, in which he complained about tooth pain associated with his cavities. At that time, he was instructed to contact the dentist. There is no indication he ever attempted to contact any health services staff members about the pain in his tooth. See Declaration of William Collins, D.D.S. ¶ 18, and Attachment G.

On July 3, 2002, Plaintiff submitted a request for Administrative Remedy to the Warden, in which he complained about his cavities and sought dental treatment. At that time, he was told that, in accordance with policy, the placement of a dental filling is considered routine dental care. He was further reminded that he was currently on the waiting list for routine dental care. Additionally, he was again told that if the medicated filling came out, or if he were in pain, to "please complete a sick call request." See Declaration of William Collins, D.D.S. ¶ 19, and Attachment H; Report of John R. Bush, D.M.D.

Plaintiff did not contact anyone in Health Services to complain about any pain in his tooth, or otherwise seek to be seen at dental sick call. Again, emergency care is available around the clock. The first time Plaintiff sought treatment as a result of any pain in his tooth from

Health Services was on November 22, 2002, which resulted in his referral to Dr. Collins on

November 27, 2002.  See Declaration of William Collins, D.D.S. ¶ 20, and Attachment E.

Accordingly, the record reflects that Defendants were not deliberately indifferent to

Plaintiff's dental needs between October 18, 2002 and November 27, 2002, given that Plaintiff

failed to follow proper procedures to inform Defendants of his dental needs. Plaintiff repeatedly

failed to inform Defendants that his temporary filling was causing him pain and discomfort,

choosing instead to supplant his own medical and dental judgment for that of Dr. Collins, an

experienced practicing dentist. Plaintiff's actions precluded Dr. Collins from exercising any

professional judgment in this case, or otherwise assessing Plaintiff's tooth at any time prior to

November 27, 2002.  .  See Declaration of William Collins, D.D.S. ¶¶ 10-20, and Attachments

C-H.

The fact that Plaintiff failed to inform Defendant Collins that he was experiencing any

problems with his fillings, or even that he was in any pain at all, clearly indicates the filling was

either not causing Plaintiff discomfort or pain prior to November 27, 2002, or Plaintiff blatantly

ignored the repeated instructions to attend dental sick call.  Either way, Defendants provided

Plaintiff with all of the information, and ample opportunity necessary to receive dental treatment

and yet, Plaintiff failed in his ultimate responsibility to report his pain and express his desire to

seek dental care.  As such, it is clear that Defendants were not deliberately indifferent to

Plaintiff's medical needs leading up to the November 27, 2002, examination.

### D.    Defendant LaManna Must Be Dismissed Because Plaintiff Has Plead No Claims Against Them And, Therefore, Can Show No Personal Involvement

A plaintiff, in order to state a viable civil rights claim, must plead two essential elements:

1) that the conduct complained of was committed by a person acting under color of law; and 2)

that said conduct deprived the Plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Shaw by Strain v. Stackhouse, 920 F.2d 1135, 1141-42 (3d Cir.1990).

An inmate must plead and later prove that some affirmative act or omission was committed by the individual Defendant to submit him to personal liability for the actions of another person.  Bracey v. Grenoble, 494 F.2d 566 (3d Cir. 1974).  Indeed, complaints combining conclusory allegations, absent reference to material facts, will not survive motions to dismiss. Geter v. Fortenberry, 849 F.2d 1550, 1553 (5th Cir. 1988).  See also Kennedy v. City of Cleveland, 797 F.2d 297 (6th Cir. 1986), cert. denied, 479 U.S. 1103 (1987); Cotner v. Hopkins, 795 F.2d 900 (10th Cir. 1986);  Elliott v. Perez, 751 F.2d 1472, 1482 (5th Cir. 1985)(a Plaintiff attempting to present a civil action against individual government officials must be able to present material facts on which he contends he can establish a right to recovery, such a Plaintiff should also be able to state those facts with some particularity, and finally must show why the official cannot show a valid defense of immunity).

Furthermore, the doctrine of respondeat superior cannot form the basis of a Bivens claim. Robertson v. Sichel, 127 U.S. 507, 515-17 (1988); Rizzo v. Goode, 423 U.S. 362, 371 (1976). Supervisory personnel are generally not liable in a civil rights action under the theory of vicarious liability.  Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir.) (en banc), cert. denied, 502 U.S. 1074 (1992); Hansen v. Black, 885 F.2d 642, 645-646 (9th Cir. 1989); See also Terrell v. Brewer, 935 F.2d 1015, 1018 (9th Cir. 1991).  To find a supervisory official personally liable for the unconstitutional acts of his subordinates, it must be shown that the supervisor had a duty to instruct the subordinate to prevent constitutional harm, and that "as a result of the official's failure to instruct, the Plaintiff was harmed in the manner threatened."

Haynesworth v. Miller, 820 F.2d 1245, 1262 (D.C. Cir. 1987); MacKinney v. Nielsen, 69 F.3d 1002, 1008 (9th Cir. 1995); Redman, 942 F.2d at 1446-1447; Hansen, 885 F.2d at 646; See also Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991) (supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivations which the complaint is made; or for conduct that showed a reckless or callous indifference to the rights of others.); Hunt v. Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989) (inmate fails to allege any facts showing role head of state department of corrections played in denial of dental care); Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987) (per curiam) (warden's responsibility for generally supervising the operations of the prison not sufficient to establish personal involvement). Therefore, personal involvement or some affirmative action on the part of a Defendant is necessary before he may be found liable for a civil rights violation. See Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988); Stoneking v. Bradford Area School District, 882 F.2d 720, 729-30 (3d Cir.), cert. denied, 493 U.S. 1044 (1990).

A sufficient causal connection may be established by showing that the supervisor set in motion a series of acts by others which the supervisor knew or reasonably should have known would cause others to inflict the injury. Larez, 946 F.2d at 645; Redman, 942 F.2d at 1447. A supervisor may also be liable for constitutional violations by his subordinates if the supervisor knew of the violations and failed to prevent them. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 680-81 (9th Cir. 1984). Finally, supervisors may be liable if the alleged deprivation resulted from a failure to properly train or supervise personnel, or from an official policy or custom for which the defendants were responsible. Ybarra, 723 F.2d at 680.

27

Plaintiff has not alleged any facts implicating Defendant LaManna in the alleged denial of any Constitutional rights.  Rather, Warden LaManna has been named in this lawsuit solely based upon his position as the Warden and CEO of FCI McKean.   It is well settled, however, that, when an inmate is being treated by the prison doctor, a Warden may not be considered deliberately indifferent for failing to respond directly to that inmate's medical complaints. Durmer v. O'Carroll, 991 F.2d 64, 69 (3rd Cir. 1993). Accordingly, the Plaintiff's claims against him should be dismissed for failure to show personal involvement.

### E.    Defendants Are Protected From Suit by the Doctrine of Qualified Immunity, Because Plaintiff's Clearly Established Constitutional Rights Were Not Violated

Summary judgment is appropriate with regard to all of the named Defendants based on the doctrine of qualified immunity.   A plaintiff may maintain an action for damages against a federal employee personally, thereby subjecting him or her to personal responsibility for payment of damages, for violating the plaintiff's constitutionally protected rights.  Davis v. Passman, 442 U.S. 228 (1979); Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, (1971).  The Supreme Court, however,  has held that federal executive officials, other than those performing adjudicatory or prosecutorial functions, are entitled to qualified good faith immunity from personal liability for civil damages. Saucier v. Katz, 533 U.S. 194 (2001); Harlow v. Fitzgerald, 457 U.S. 800 (1982); Butz v. Economou, 438 U.S. 478 (1978). "[G]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818.  See also Jeffers v. Gomez, 267 F.3d 895, 910-912(9th Cir. 2001).  This is an "immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511 (1985); see also Hunter v.

Bryant, 502 U.S. 224 (1991) (*per curiam*).   Therefore, once an individual raises qualified immunity in a Bivens action, the plaintiff cannot maintain the action against the federal official in his or her individual capacity unless the plaintiff can show that the defendant violated a clearly established Constitutional right. Siegart v. Gilley, 500 U.S. 226 (1991); Abdul-Akbar v. Watson, 4 F.3d 195 (3d Cir. 1993). This inquiry focuses on whether a reasonable official would have found the defendants' conduct to be illegal. Abdul-Akbar, 4 F.3d at 205; Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993), cert. denied, 114 S.Ct. 559 (1993).   Normally, qualified immunity should be decided by the court before trial.  Hunter, 502 U.S. at 227.  See also Cunningham v. Gates, 229 F.3d 1271 (9th Cir. 2000).  The Plaintiff has the burden of showing that the defendant federal employees violated his clearly established Constitutional rights. Zeigler v. Jackson, 716 F.2d 847 (11th Cir. 1983).

The Harlow rule on qualified immunity was further clarified by the Supreme Court in Anderson v. Creighton, 483 U.S. 635 (1987), as follows: "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, ... assessed in light of the legal rules that were "clearly established" at the time it was taken." Id. at 639 (citation to Harlow omitted).  Both questions are to be decided by the court. This standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violated the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (per curiam) (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)).  As long as a defendant government employee could reasonably have thought his actions were consistent with the rights he was alleged to have violated, said employee is entitled to qualified immunity.  Anderson, 483 U.S. at 638.

Government officials are not expected to be legal scholars like law professors. Ward v. San Diego County, 791 F.2d 1329, 1332 (9th Cir.), cert. denied sub nom., Duffy v. Ward, 483 U.S. 1020 (1987). The contours of the right allegedly violated must be sufficiently clear so that a reasonable government official would understand that his or her conduct violated the plaintiff's constitutional rights. Officers who reasonably but mistakenly conclude their conduct was lawful are entitled to immunity. Anderson, 483 U.S. at 641; Hunter, 502 U.S. at 228-229.

Furthermore, the Supreme Court recently clarified the standard for the qualified immunity defense, making it much more difficult for Plaintiff to prevail. Saucier v. Katz, 533 U.S. 194 (2001). In Saucier, the Court held that the lower courts had been ignoring a significant threshold question. Specifically, this Court must consider whether, "[t]aken in the light most favorable to the party asserting the injury, [] the facts alleged show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 200-01. Only if Plaintiff's allegations make out a constitutional violation does the analysis move to the second sequential step, asking "whether the right in question was clearly established." Id. The Court went on to caution, however, that this second inquiry is not taken in a broad, general context, but must be "undertaken in light of the specific context of the case." Id. The reason for such an analysis is to avoid treating prison administrators as attorneys or holding them to an impossible standard. As such:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

Id. (internal citations omitted). Thus, if the law "did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982); Malley v. Briggs, 475 U.S. 335 (1986)).

30

In the present case, Plaintiff has not shown that Defendants violated any of his

Constitutional rights.  See discussion in Sections B-E, supra.  Therefore, he has failed to establish

his burden of proof, as required by Saucier, Anderson and Harlow.  Assuming for the sake of

argument, however,  that any of Plaintiff's allegations constituted violations of his

Constitutional rights, none of those rights were so clearly established as to satisfy the second

prong of the Saucier analysis.

Because none of Plaintiff's clearly established Constitutional rights were intentionally

violated by any of the named Defendants, all of the Defendants are entitled to qualified

immunity.

## FEDERAL TORT CLAIMS ACT ACTION

**F.    To the Extent Plaintiff States a Claim Pursuant to the Federal Tort Claims Act (FTCA), Relating to His Dental Care (Count Four) this Case must Be Dismissed Because There Has Been No Negligent Conduct Which Would Warrant Recovery Against the United States.**

Plaintiff's complaint should be dismissed because he has failed to show any negligence

on the part of BOP staff at FCI McKean with respect to the extraction of tooth # 13.  Plaintiff

brought this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq.,

which provides a cause of action against the United States for common law torts.  28 U.S.C. §

2674; U.S. v. Muniz, 374 U.S. 150, 153 (1963).  The FTCA establishes that the United States,

except in limited circumstances, can be held liable for negligence to the same extent as a private

individual.  Id.

The general rule under the FTCA is that the substantive law of the state in which the act

or omission occurred should be applied. 28 U.S.C. § 1346(b)(1); Turner v. Miller, 679 F. Supp.

441, 443 (M.D. Pa. 1987); Hossic v. United States, 682 F. Supp 23, 24 (M.D. Pa. 1987).  In

Pennsylvania, the standard for negligence is: 1) there must be a legally recognizable duty; 2) the defendant must have failed to conform to this duty; 3) there must be a causal connection between the legally recognized duty and the plaintiff's damages; and 4) there must be actual damages. Dean v. Commonwealth Department of Transportation, 1998 WL 650070, p. 2 (Pa. Cmwlth. Ct. 1998); The Mason & Dixon Lines v. Mognet, 645 A.2d 1370, 1373, n.3 (Pa. Cmwlth. Ct. 1994).

While the FTCA would normally look to state law to establish the government's duty of care, Congress has established a statutory duty of care to be applied when federal prisoners sue the United States for monetary damages. Title 18 U.S.C. § 4042 requires only "the exercise of ordinary diligence" to keep inmates safe from and free from harm. See also Turner, 679 F. Supp. at 443; Hossic, 682 F. Supp. at 25; Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976). This duty requires BOP to provide for the care of all inmates in its custody. Included in this statutory duty is the duty to provide adequate medical care to all inmates. Yosuf, 642 F. Supp. 415, 427 (M.D. Pa. 1986). [16]

---

[16] To the extent any portion of Plaintiff's FTCA survives this motion, he may not recover more than the $10,000 he presented to the Bureau of Prisons in his Administrative Tort Claim, See Declaration of Joyce Horikawa ¶ 4, and Attachment A, unless he can come forward with "newly discovered evidence" or show "intervening facts" as mandated by 28 U.S.C. § 2675(b). See generally Martinez v. United States, 780 F.2d 525 (5th Cir. 1986). The manifest purpose of this requirement is to ensure that Federal agencies charged with making an initial attempt to settle tort claims against the United States are given full notice of the government's potential liability. Id. See also Caidin v. United States, 564 F.2d 284, 287 (9th Cir.1977); Adams v. United States, 615 F.2d 284, 288-90 (5th Cir.1980) (reviewing legislative history of 28 U.S.C. § 2675). This interpretation is also consistent with the legislative history of the sum certain provision. In summarizing what is now § 2675(b), the House Committee on the Judiciary said, "Suit may not be instituted upon a claim presented to an agency until it has been finally disposed of by the agency.... In any case, the suit cannot be brought for more than the amount of the claim presented to the agency, in the absence of intervening facts or newly discovered evidence." H.R.Rep. No. 1287, 79th Cong., 1st Sess. 5 (1945). When the FTCA was amended in 1966 to expand the authority of federal agencies to settle tort claims without litigation, the "shall not be instituted" language in § 2675(b) was retained without comment. See S.Rep. No. 1327, 89th Cong., 2d Sess., reprinted in 1966 U.S.Code Cong. & Ad.News 2515-27.

Furthermore, the actions of a physician encompass matters not within the ordinary knowledge and experience of laypersons.  As such, Pennsylvania law requires that allegations of medical malpractice generally may not be proven without the testimony of "an expert witness who will testify, to a reasonable degree of medical certainty, that the act of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered."  Flanagan v. Labe, 666 A.2d at 335(emphasis in original)(quoting Mitzelfelt v. Kamrin, 584 A.2d at 892). See also Joyce v. Boulevard Physical Therapy & Rehabilitation Center, P.C., 694 A.2d 648, 654 & n.3 (Pa. Super. 1997); Maurer v. Trustees of the University of Pennsylvania, 614 A.2d 754, 757-58 (Pa. Super. 1992)(en banc)(citing cases). See also Gindraw v. Dendler, 967 F.Supp 833 (E.D.Pa. 1997) (quoting, Mitzelfelt v. Kamrin, 526 Pa. 54,62, 584 A.2d 888, 892 (1990).   Additionally, to be admissible, the expert's opinion must be rendered within a reasonable degree of medical certainty.  Montgomery v. South Philadelphia Medical Group, 656 A.2d 1385, 1390 (Pa. Super. 1995).  The only exception to this rule is where the matter "is so simple, and [the] lack of skill or want of care is so obvious, as to be within the range of ordinary experience and comprehension of even nonprofessional persons." See Toogood v. Rogal, 573 Pa. 245, 824 A.2d 1140 (Pa. 2003)(quoting, Hightower-Warren v. Silk, 548 Pa. 459, 698 A.2d 52, 54 n.1 (1997)); Brannan v. Lankenau, 490 Pa. 588 597 (1980).

**1.    BOP did not Breach its Duty to Provide Plaintiff With Adequate Medical Care**

In the medical context, the relationship between BOP and an inmate is not that of jailor-jailee, but of a physician to a patient.  Id.  Nevertheless, the standard of care owed to an inmate in the custody of the Bureau of Prisons is not altered merely because the inmate has raised an issue relating to his medical care.  McPhee v. Reichel, 461 F.2d 947, 949 (3d Cir. 1972).  A doctor

within BOP is held to the same standard of care as any doctor practicing at the same time in the same relative location. Yosuf, 642 F. Supp. at 427. In Pennsylvania, a doctor is required merely to treat the patient with a reasonable degree of skill, competence and diligence. No doctor (either within the Bureau of Prisons or otherwise) is required to practice medicine with such a degree of skill as to guarantee a cure. Yosuf, 642 F. Supp. at 427; Salis v. United States, 522 F. Supp. 989, 994 (M.D. Pa. 1981); Hodgson v. Bigelow, 7 A.2d 338, 342 (Pa. Sct. 1939). Therefore, a doctor cannot be held liable based solely on the fact that a chosen course of treatment was unsuccessful, as long as the chosen course of treatment was accepted by a significant portion of the medical community. Salis, 522 F. Supp. at 996-97; Yosuf, 642 F. Supp. at 427-28.

Thus, a doctor practicing medicine in Pennsylvania who applies a medically recognized and accepted treatment, can only be held liable if the doctor is found to have failed to exercise ordinary skill, care or diligence; resulting in an injury to the Plaintiff, regardless of the result. Yosuf, 642 F. Supp. at 428.

In the present case, Plaintiff first alleges that Dr. Collins negligently ignored his requests for dental treatment for over one year. A review of the record, however, indicates that this is simply not the case. In fact, the record reveals that Plaintiff was given ample opportunity to seek dental treatment on numerous occasions, and he neglected to do so. It was Plaintiff, not Defendants, who failed in his ultimate responsibility to report his pain and express his desire for dental care. See Report of John R. Bush, D.M.D. In 2001, prior to his arrival at FCI McKean, Plaintiff was diagnosed with severe decay, which compromised the pulp of tooth # 13. See Declaration of William Collins, D.D.S. ¶ 5. In order to determine whether the tooth was salvageable, Plaintiff was treated with a medicated filling. See Declaration of William Collins, D.D.S.¶ 5. Although these types of fillings are sometimes deemed temporary, "dentists often

34

lave these restorations in place for years as the tooth's symptoms remain tolerable and the restoration remains intact." <u>See</u> Report of John R. Bush, D.M.D.; Declaration of William Collins, D.D.S.¶ 10.

After his arrival at FCI McKean, Plaintiff indicated his desire to have the medicated filling replaced with a permanent filling. At no time did he indicate that the medicated filling was causing additional pain or discomfort in his tooth. Additionally, he never indicated his apparent, but ultimately mistaken belief that the medicated filling had fallen out. As such, Dr. Collins had no reason to suspect that there may have been any problems with Plaintiff's teeth which would indicate the need for emergency dental treatment. <u>See</u> Declaration of William Collins, D.D.S.¶¶ 11-20, and Attachments C-H; Report of John R. Bush, D.M.D. If Plaintiff, at any time prior to November 27, 2002, had indicated that the tooth was in pain or distress, or that he was otherwise in need of emergency treatment, he would have been examined by the dentist. <u>See</u> Declaration of William Collins, D.D.S.¶¶ 11-20, and Attachments C-H. Certainly, no medical professional could be held responsible for failing to adequately treat any medical condition which was not properly reported. <u>See e.g.</u>, <u>Kilburn v. United States</u>, 938 F.2d 666, 676 (6th Cir. 1991).

The first time Plaintiff indicated he was in any pain at all was on November 27, 2002. <u>See</u> Declaration of William Collins, D.D.S.¶ 21. At that time, Plaintiff, for the first time, reported that his pain was at level 4 on the pain index, a scale of 1-10, with 10 being the worst. A pain level of 4, "would be mild to moderate discomfort, not a situation for emergency care." <u>See</u> Report of John R. Bush, D.M.D.; Deposition of William Collins, page 22, line 22 thru page 23,line 9 (December 5, 2006). It was noted that he experienced pain when the tooth was tapped and when a finger was placed on the gum over the tooth root. <u>See</u> Deposition of William

Collins, page 23, lines 10-15 (December 5, 2006). An x-ray examination was also taken of the tooth root. Dr. Collins suspected that Plaintiff's pain may have been caused by the original caries (tooth decay), communicating (contacting) the pulp of the tooth due to a deep cavity. Based upon this examination, Dr. Collins assessed Plaintiff with irreversible pulpitis of tooth #13, secondary to former deep caries. See Declaration of William Collins, D.D.S.¶ 21; Deposition of William Collins, page 23, line 16 thru page 24, line 14 (December 5, 2006); Report of John R. Bush, D.M.D.

Although Plaintiff now claims that he would have preferred to attempt a root canal before the extraction, that course was not an option in this case. The tooth in question, # 13, is a premolar, which lies between the canine tooth and molars. A root canal generally will make the tooth in question brittle. This is a significant problem with premolars and molars, which are primarily used for grinding food. As such, current community standards do not recommend performing a root canal on a tooth in the back of the mouth unless a crown is used to protect the tooth from further damage. At the present time, the BOP does not typically authorize the use of dental crowns. See Declaration of William Collins, D.D.S.¶¶ 22-24, and Attachments D and E; Report of John R. Bush, D.M.D. (Dr. Collins had only one option to relieve Mr. Hill of his dental pain. Extracting tooth 13 was the only treatment option, based upon the record.); Deposition of William Collins, p 33, line 16 thru page 42, line 18 (December 5, 2006).

After completing his assessment of the tooth, Dr. Collins determined that because the condition was painful and irreversible (the tooth could not be salvaged), Plaintiff's only option was to extract the tooth. Id.

Upon Plaintiff's **consent**, Dr. Collins immediately conducted a successful extraction tooth #13. See Declaration of William Collins, D.D.S.¶ 26, and Attachment J; Report of John R.

Bush, D.M.D.  The decision to perform this extraction was based upon Plaintiff's fully informed

consent to the procedure, and was medically appropriate and consistent with the applicable

community standard.  As such, neither Plaintiff's decision to wait over thirteen months before

seeking treatment of the tooth, nor Dr. Collins' decision to extract the tooth, constitutes a breach

of the United States' duty to provide medical care to inmates.[17]  In fact, after reviewing the file in

this case, Dr. Bush concluded that it would not be appropriate to hold anyone affiliated with the

Federal Prison system accountable for Plaintiff's indecisiveness.  See Report of John R. Bush,

D.M.D.

> **2.     The Medical Care Provided to Plaintiff Did Not Lead to the Need to Extract His Tooth**

Even if the Court finds that the medical staff at FCI McKean breached their duty to

provide Plaintiff with adequate medical care, this failure to act could not have been the proximate

cause of Plaintiff's injury – specifically, the need for the November 27 tooth extraction.

The mere occurrence of an injury does not prove negligence.  In fact, in Pennsylvania,

even an admittedly negligent act does not necessarily entail liability.  Hamil v. Bashline, 392

A.2d 1280, 1284 (Pa. Sct. 1978).  In order for liability to be imposed, there must be a direct

causal link between the doctor's negligence and the harm suffered by the Plaintiff.  Salis, 522 F.

Supp. at 995; Hamil, 392 A.2d at 1284.  A causal connection only exists if the alleged conduct is

---

[17] It should also be noted that, to the extent Plaintiff experienced any pain in his tooth, or
was otherwise aware of his need for dental treatment on a more urgent basis, he was also
negligent inasmuch as he was aware of the procedures for obtaining treatment and utterly failed
to avail himself of this opportunity.  As such, the liability of the United States should be
"diminished in proportion to the amount of negligence attributed to the plaintiff."  42 Pa. C.S.A.§
7102(a).  But see, DeWeese v. Weaver, 880 A.2d 54 (Pa.Cmwlth. 2005), order affirmed by
DeWeese v. Cortes, 906 A.2d 1193 (Pa. 2006) (finding amendments to other sections of the
statute to be unconstitutional).

a substantial factor in bringing about the harm.  Barrett v. U.S., 845 F. Supp. 774, 778 (D.Kan.

1994).  Furthermore, in order for liability to be imposed, it must appear "more likely than not that

the defendant was the cause."  A mere speculation or possibility that the medical staff at FCI

McKean provided inadequate medical care is not enough. Barrett, 845 F. Supp. at 778.

Additionally, the doctor's alleged negligent act cannot have been a substantial factor in causing

the plaintiff's injuries if the plaintiff would have suffered the same harm regardless of the

doctor's involvement.  Hamil, 392 A.2d at 1284.

　　　Here, Plaintiff was diagnosed with irreversible pulpitis of tooth # 13, which had been

previously treated with medicated fillings.   Medicated fillings are not used to repair ordinary

decay to the tooth enamel.  They are used to repair damage which is so extensive that it has

compromised the pulp and exposed the nerves of the tooth to damage.  Such decay typically

occurs as the result of years of neglect and poor oral hygiene.  If the pulp of the tooth does not

accept the medicated filling, then the damage is not reversible, and the tooth must be extracted or

treated with endodontic therapy.  See Declaration of William Collins, D.D.S.¶ 29; Report of John

R. Bush, D.M.D; Deposition of William Collins, page 33, line 16 thru page 42, line 18

(December 5, 2006).

　　　Thus, if Plaintiff had, at any time prior to his November 27, 2002, examination, indicated

that tooth # 13 was causing pain, or that his medicated filling had fallen out, it could only have

meant that there was extensive damage to the pulp of the tooth.  Such damage does not occur as a

result of a failure of the medicated filling, or as a result of leaving a medicated filling in the tooth

too long.  Again, "although these types of fillings are sometimes deemed temporary, Dr. Rose did

a remarkable job of placing this restoration.  Dentists often leave these restorations in place for

years as the tooth's symptoms remain tolerable and the restoration remains intact."  See Report of

38

John R. Bush, D.M.D.   Thus, if Dr. Collins had seen Plaintiff prior to November 27, 2002, and

Plaintiff had not indicated any pain, not only would it have been unadvisable and contrary to the

community standard of care to remove or replace the medicated filling, but it also could have led

to further irritation and inflammation of the tooth.  Id.  Any pain or other discomfort associated

with the medicated filling in tooth # 13 can only have been the direct and proximate result of

severe decay to the pulp of the tooth resulting from years of neglect and poor oral hygiene.  This

condition almost certainly existed at the time the medicated filling was inserted.  Inmate Hill's

tooth did not necessarily worsen over time, it was simply so severely damaged that the pulp of

the tooth could not withstand eventually even the presence of a specialized (medicated) filling.

As such, once it became clear that the medicated filling was no longer effective – November 27,

2002 – the only medically appropriate course of action was extraction.  See Declaration of

William Collins, D.D.S.¶¶ 30-31; Report of John R. Bush, D.M.D; Deposition of William

Collins, page 33, line 16 thru page 42, line 18.

As such, the damage to Plaintiff's tooth was clearly the direct and proximate result of

years of neglect and poor oral hygiene, and nothing Dr. Collins did would have made any

difference in the decision to extract the tooth.  There is, therefore, no basis upon which to hold

the United States liable for Plaintiff's dental treatment.[18]

---

[18] It also bears noting that Pennsylvania law requires Plaintiff to show some injury or
damages as a result of the alleged negligent medical care.  Plaintiff has not done so here.  See
Section B, supra.  Specifically, he has alleged solely that the tooth was extracted.  There is no
indication, however, that the extraction caused additional pain, was improperly performed, or led
to other medical complications.  In fact, a careful reading of Plaintiff's complaint indicates that
the extraction actually alleviated the pain caused by the decay in the tooth.  Furthermore, had he
been seen earlier by Dr. Collins, the outcome for Plaintiff would have been no different.  If he
had complained of pain to Dr. Collins at any time prior to November 27, 2002, then Dr. Collins
would have reached the same assessment and extracted the tooth at that time.  If he had asked to
be examined with no complaints of pain, then it would have been unadvisable to remove the

IV.     **CONCLUSION**

WHEREFORE, for the reasons stated above, Defendants' respectfully request that the

Court grant Defendants' Motion for Summary Judgment.

<div style="margin-left:40%">

Respectfully Submitted,

MARY BETH BUCHANAN
United States Attorney


/s/ Michael C. Colville
MICHAEL C. COLVILLE
Assistant U.S. Attorney
Western District of PA
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7337
PA ID No. 56668

</div>

OF COUNSEL:

Douglas S. Goldring
Assistant General Counsel
Federal Prison Industries (UNICOR)
400 First Street, NW, 8th Floor
Washington, DC 20534

---

medicated filling, which was perfectly intact, even up to the time Dr. Collins performed the
extraction.  See Report of John R. Bush, D.M.D.  As such, Plaintiff has alleged no facts
indicating that the alleged negligence resulted in any damages or other physical injury, and this
claim must be dismissed pursuant to 28 U.S.C. § 1346(b)(2).

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of February, 2007, a copy of the within **Defendants'**

**Brief in Support of Their Motion for Summary Judgment, or in the Alternative, Motion to**

**Dismiss** was served either electronically or by first-class United States mail, upon the following:


Richard A. Lanzillo, Esquire
Knox McLaughlin Gornall & Sennett, P.C.
120 West Tenth Street
Erie, PA 16501-1461



/s/ Michael C. Colville
MICHAEL C. COLVILLE
Assistant U.S. Attorney